THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

NO. 5:11-CV-295

| | | |
|---|---|---|
| BRUCE BANNISTER; JAMES F. (RICK) BURRISS JR; MAX DUTTON; PETE FLANIGAN; MARK GRIFFITH; EDWARD KONDRAD; RICK ORNDORFF; KATHY SOLES; RONALD TOMS; and MARION TOWLES; | ) ) ) ) ) ) | |
| | ) | **COMPLAINT** |
| Plaintiffs, | ) ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| WAL-MART STORES, INC.; WAL-MART STORES EAST I, INC.; and WAL-MART STORES EAST, L.P.; | ) ) ) ) | |
| Defendants. | | |

**COME NOW** Plaintiffs, by and through their attorneys, and file this Complaint against Defendants Wal-Mart Stores, Inc., Wal-Mart Stores East I, Inc., and Wal-Mart Stores East, L.P. (hereinafter collectively referred to as the "Defendants" or "Wal-Mart" unless otherwise indicated), and allege the following:

<u>**NATURE OF THE ACTION**</u>

1.      This is an action to correct unlawful employment practices for Plaintiffs and similarly situated individuals experiencing similar discriminatory treatment by Wal-Mart during the same general timeframe, for which Plaintiffs seek legal and equitable relief for violations of the Age Discrimination in Employment Act, as amended, 29 U.S.C. §§ 621 <u>et. seq.</u> ("ADEA"); the Americans with Disability Act, 42 U.S.C. § 12101 which incorporates Title VII of the Civil

1

Rights Act of 1964, as amended, 42 USC §§ 2000e <u>et. seq.</u> ("ADA"), and under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e <u>et. seq.</u> ("Title VII").

2.      This Court also has pendent, ancillary, and supplemental jurisdiction to hear and decide North Carolina state law claims for violations of the North Carolina Equal Employment Practices Act, N.C.G.S. §§ 143-422.1 <u>et. seq.</u> ("NCEEPA") and claims for intentional and/or negligent emotional distress.

3.      Plaintiffs further seek monetary relief, compensatory damages, attorneys' fees, and punitive damages pursuant to: 42 U.S.C. § 2000e-5(g); 42 U.S.C. §1981a(b); 42 U.S.C. § 12117; 29 U.S.C. § 216(b); 29 U.S.C. § 626; and the laws of the State of North Carolina.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction of this matter under the ADEA, ADA, Title VII and 28 USC §1331.  Further, this Court has supplemental jurisdiction over state claims including violations of NCEEPA pursuant to 28 U.S.C. § 1367.

5.      Venue is proper under 28 USC § 1391(b) and applicable statutes as a "substantial part of the events or omissions giving rise" to the claims herein asserted occurred in the Eastern District of North Carolina and in that Wal-Mart "may be found" the Eastern District of North Carolina.  Further, Wal-Mart operates stores and conducts business within the Eastern District of North Carolina.

6.      All conditions precedent to jurisdiction under the ADEA and 42 U.S.C. § 2000e(f)(3) have occurred, been complied with, or waived for all applicable Plaintiffs: A charge of employment discrimination was filed with the Equal Employment Opportunity Commission ("EEOC Charge") within 180 days of the commission of the discriminatory employment practice; a Notification of Right to Sue was posted from the Equal Employment Opportunity

2

Commission; and a Complaint was filed within 90 days of receipt of that Notification of Right to Sue. A copy of each Plaintiff's applicable Right to Sue letter is identified in the Exhibit Index incorporated herein as Exhibit "A." The remaining Plaintiffs, Plaintiffs Burriss, Flanigan, Kondrad, and Orndorff, have complied with the conditions precedent for jurisdictional compliance under the ADEA by joining a suit of similarly situated Plaintiffs who experienced similar discriminatory treatment by Wal-Mart during the same general time frame as allowed by Holowecki v. Federal Express Corp., 440 F.3d 558 (2d. Cir. NY 2006), Aff'd, 552 US 389, 128 S.Ct. 1147 (2008); Tolliver v. Xerox Corp., 918 F.2d 1052 (2nd Cir. 1990) (holding that the filing of a charge by named plaintiffs in an individual lawsuit satisfies the charge filing obligation of non-filing individuals provided the claims arise out of similar discriminatory treatment in the same general time frame); Bryson v. Fluor Corp., 914 F. Supp. 1292 (W.D.S.C. 1995) (holding ADEA plaintiff may piggy back on other individuals' charges even when there is no class action) (collectively referred to as the "Holowecki, Tolliver, and Bryson decisions").

## PARTIES

7.     Plaintiff Bruce Bannister ("Mr. Bannister") is a *sui juris* former employee of Wal-Mart, who resides in Lenoir County, North Carolina. At all relevant times, Mr. Bannister met the definition of an "employee" under all applicable statutes.

8.     Mr. Bannister is fifty-one (51) years of age and worked for Wal-Mart for twenty (20) years until he was illegally terminated by Wal-Mart on or about January 17, 2011. In response, Mr. Bannister filed EEOC Charge No. 433-2011-01737 and a Right to Sue letter was issued on or about March 17, 2011. A copy of Mr. Bannister's Right to Sue letter is filed herewith and incorporated herein as Exhibit "B."

9.     Plaintiff Rick Burriss, Jr. ("Mr. Burriss") is a *sui juris* former employee of Wal-Mart, who resides in Brunswick County, North Carolina.  At all relevant times, Mr. Burriss met the definition of an "employee" under all applicable statutes.

10.     Mr. Burriss is sixty (60) years of age and worked for Wal-Mart for twenty (20) years until he was illegally terminated by Wal-Mart on or about August 6, 2010.  In response, Mr. Burriss filed EEOC Charge No. 433-2011-01882 and a Right to Sue issue was issued on or about March 30, 2011.  A copy of Mr. Burriss's Right to Sue letter is filed herewith and incorporated herein as Exhibit "C."  Mr. Burriss is a Plaintiff to this suit as he has complied with the conditions precedent to jurisdiction under the ADEA by experiencing similar discriminatory treatment by Wal-Mart during the same general timeframe as allowed by the Holowecki, Tolliver, and Bryson decisions.

11.     Plaintiff Max Dutton ("Mr. Dutton") is a *sui juris* former employee of Wal-Mart, who resides in Dare County, North Carolina.  At all relevant times, Mr. Dutton met the definition of an "employee" under all applicable statutes.

12.     Mr. Dutton is fifty-seven (57) years of age and worked for Wal-Mart for seventeen (17) years until he was illegally terminated by Wal-Mart on or about February 12, 2010.  In response, Mr. Dutton filed EEOC Charge No. 846-2010-41878 and a Right to Sue letter was issued on or about March 31, 2011.  A copy of Mr. Dutton's Right to Sue letter is filed herewith and incorporated herein as Exhibit "D."

13.     Plaintiff Pete Flanigan ("Mr. Flanigan") is a *sui juris* former employee of Wal-Mart, who resides in Wayne County, North Carolina.  At all relevant times, Mr. Flanigan met the definition of an "employee" under all applicable statutes.

4

14.     Mr. Flanigan is sixty-two (62) years of age and worked for Wal-Mart for sixteen (16) years until he was illegally terminated by Wal-Mart on or about April 23, 2010.   In response, Mr. Flanigan filed EEOC Charge No. 433-2010-02687 and a Right to Sue letter was issued on or about November 22, 2010.  A copy of Mr. Flanigan's Right to Sue letter is filed herewith and incorporated herein as Exhibit "E."  Mr. Flanigan is a Plaintiff to this suit as he has complied with the conditions precedent to jurisdiction under the ADEA by experiencing similar discriminatory treatment by Wal-Mart during the same general timeframe as allowed by the Holowecki, Tolliver, and Bryson decisions.

15.     Plaintiff Mark Griffith ("Mr. Griffith") is a *sui juris* former employee of Wal-Mart, who resides in Bedford County, Virginia.   At all relevant times, Mr. Griffith met the definition of an "employee" under all applicable statutes.

16.     Mr. Griffith is fifty-nine (59) years of age and worked for Wal-Mart for eight (8) years until he was illegally terminated by Wal-Mart on or about October 22, 2010.  In response, Mr. Griffith filed EEOC Charge No. 846-2011-01645 and a Right to Sue letter was issued on or about March 31, 2011.  A copy of Mr. Griffith's Right to Sue letter is filed herewith and incorporated herein as Exhibit "F."

17.     Plaintiff Edward Kondrad ("Mr. Kondrad") is a *sui juris* former employee of Wal-Mart who resides in Guilford County, NC.  At all relevant times, Mr. Kondrad met the definition of an "employee" under all applicable statutes.

18.     Mr. Kondrad is sixty-one (61) years of age and worked for Wal-Mart for ten (10) years until he was illegally terminated by Wal-Mart on or about March 22, 2011.  In response, Mr. Kondrad filed EEOC Charge No. 435-2011-00542.  Mr. Kondrad is a Plaintiff to this suit as he has complied with the conditions precedent to jurisdiction under the ADEA by experiencing

5

similar discriminatory treatment by Wal-Mart during the same timeframe as allowed by the Holowecki, Tolliver, and Bryson decisions.

19.     Plaintiff Rick Orndorff ("Mr. Orndorff") is a *sui juris* former employee of Wal-Mart, who resides in New Hanover County, North Carolina.  At all relevant times, Mr. Orndorff met the definition of an "employee" under all applicable statutes.

20.     Mr. Orndorff is forty-five (45) years of age and worked for Wal-Mart for twenty-three (23) years until his forced resignation on or about November 12, 2010.  In response, Mr. Orndorff filed EEOC Charge No. 433-2011-01912 and a Right to Sue letter was issued on or about May 13, 2011.  A copy of Mr. Orndorff's Right to Sue letter is filed herewith and incorporated herein as Exhibit "G."  Mr. Orndorff is a Plaintiff to this suit as he has complied with the conditions precedent to jurisdiction under the ADEA by experiencing similar discriminatory treatment by Wal-Mart during the same timeframe as allowed by the Holowecki, Tolliver, and Bryson decisions.

21.     Plaintiff Kathy Soles ("Ms. Soles") is a *sui juris* female, former employee of Wal-Mart, who resides in Columbus County, North Carolina.  At all relevant times, Ms. Soles met the definition of an "employee" and a "qualified employee with a disability" under all applicable statutes.

22.     Ms. Soles is fifty-seven (57) years of age and worked for Wal-Mart for twenty-three (23) years until she was illegally terminated by Wal-Mart on or about October 6, 2010 while on a Leave of Absence.  In response, Ms. Soles filed EEOC Charge No. 433-2011-01883 and a Right to Sue letter was issued on or about May 31, 2011.  A copy of Ms. Soles's Right to Sue letter is filed herewith and incorporated herein as Exhibit "H."

23. Plaintiff Ronald Toms ("Mr. Toms") is a *sui juris* former employee of Wal-Mart, who resides in Gloucester County, Virginia. At all relevant times, Mr. Toms met the definition of an "employee" under all applicable statutes.

24. Mr. Toms is forty-four (44) years of age and worked for Wal-Mart for sixteen (16) years until he was illegally terminated through forced resignation by Wal-Mart on or about June 1, 2010. In response, Mr. Toms filed EEOC Charge No. 846-2011-47752 and a Right to Sue was issued on or about April 1, 2011. A copy of Mr. Toms's Right to Sue letter is filed herewith and incorporated herein as Exhibit "I."

25. Plaintiff Marion Towles ("Ms. Towles") is a *sui juris* African American female, former employee of Wal-Mart, who resides in Cumberland County, North Carolina. At all relevant times, Ms. Towles met the definition of an "employee" and a member of a "protected class" under all applicable statutes.

26. Ms. Towles is sixty-one (61) years of age and worked for Wal-Mart for twenty-one (21) years until she was illegally terminated by Wal-Mart on or about October 21, 2010. In response, Ms. Towles filed EEOC Charge No. 846-2010-81731 and a Right to Sue letter was issued on or about April 29, 2011. A copy of Ms. Towles's Right to Sue letter is filed herewith and incorporated herein as Exhibit "J."

27. Defendant Wal-Mart Stores, Inc. is a corporation duly organized and existing under the laws of Delaware; headquartered in Bentonville, Arkansas; authorized to do business in North Carolina; and, at all times relevant herein, engaged in an industry affecting commerce; conducted business within the State of North Carolina; and operated the Wal-Mart stores that are the subject of this Complaint. At all relevant times, Defendant Wal-Mart Stores, Inc. met the definition of an "employer" under all applicable statutes.

7

28.     Defendant Wal-Mart Stores East I, Inc. is a corporation duly organized and existing under the laws of Delaware; headquartered in Bentonville, Arkansas; authorized to do business in North Carolina; and, at all times relevant herein, engaged in an industry affecting commerce; conducted business within the State of North Carolina; and operated the Wal-Mart stores which are the subject of this Complaint. At all relevant times, Defendant Wal-Mart Stores East I, Inc. met the definition of an "employer" under all applicable statutes.

29.     Defendant Wal-Mart Stores East, L.P. is a limited partnership duly organized and existing under the laws of Delaware; headquartered in Bentonville, Arkansas; authorized to do business in North Carolina; and, at all times relevant herein, engaged in an industry affecting commerce; conducted business within the State of North Carolina; and operated the Wal-Mart stores which are the subject of this Complaint. At all relevant times, Defendant Wal-Mart Stores East, L.P. met the definition of an "employer" under all applicable statutes.

## FACTS COMMON TO ALL PLAINTIFFS

30.     Upon information and belief, Plaintiffs were targets of a culture and policy wherein they were discriminated against based on their age, race, and/or disability.

31.     Upon information and belief, as to age, Wal-Mart endorsed a discriminatory corporate culture against older, tenured employees, by actively targeting and terminating older and long-tenured employees and replacing these workers with younger associates.

32.     Upon information and belief, Wal-Mart executed its plan to remove older, long-tenured employees by understaffing the management at stores supervised by associates over the age of forty (40), in order to create problems to document or manufacture problems to document using Wal-Mart's progressive discipline policy; thus, creating a pretext for firing its older employees.

8

33.    Upon information and belief, Wal-Mart uses a progressive discipline policy known as "Coaching for Improvement" which involves a series of steps to identify and correct behavior that Wal-Mart determines is an impediment to its success.

34.    Upon information and belief, during the timeframe applicable to this Complaint, such "Coaching for Improvement" ("Coaching") involved 1) a verbal Coaching; 2) a written Coaching; 3) a decision making day (known as a "D-Day"); and then 4) termination. During the timeframe applicable to this Complaint, an associate could only receive one of each Coaching level in any 12-month period, the Coachings were to take place generally in numeric order, and an associate was to not generally receive two levels of Coachings simultaneously.

35.    Upon information and belief, each Coaching is recorded and reported to Wal-Mart management.

36.    Upon information and belief, during the timeframe applicable to this Complaint, a verbal Coaching involves a supervisor explaining to an associate that his/her job performance or conduct does not meet Wal-Mart's expectations (a "Verbal"). A Verbal is the first level in Coaching.

37.    Upon information and belief, during the timeframe applicable to this Complaint, a written Coaching involves a supervisor notifying an associate in writing that his/her job performance or conduct does not meet Wal-Mart's expectations and generally requires the associate to submit a Performance Improvement Plan ("PIP") of how the expectation will be met (a "Written"). A Written is the second level in Coaching.

38.    Upon information and belief, during the timeframe applicable to this Complaint, a D-Day involved a supervisor notifying an associate in writing that the associate failed to correct the problems outlined in the Written. If an associate received a D-Day, the supervisor was to

discuss the unacceptable performance or conduct and the associate would have until the following day to contemplate his/her future with Wal-Mart by coming up with a new written plan on how to correct the behavior or, if no acceptable plan is submitted, face termination upon the associate's return from his/her D-Day.

39. Upon information and belief, throughout the course of their employment, Plaintiffs witnessed Wal-Mart routinely subject employees over the age of forty (40) years to a disproportionate amount of D-Days.

40. Upon information and belief, Wal-Mart unduly used D-Days as a pretext for harassing and forcing older employees out of Wal-Mart's employ, in an effort to replace older employees with a less experienced, younger workforce.

41. Upon information and belief, the Coaching procedure is part of the personnel system that Wal-Mart uses to supervise and control each of its stores through its headquarters in Bentonville, Arkansas ("Headquarters").

42. Upon information and belief, a regional vice-president from Headquarters supervises each of Wal-Mart's forty-one (41) regions around the country.

43. At all times relevant to this Complaint, Wal-Mart employed David Carmen as a Regional Vice-President ("Regional Vice-President Carmen"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

44. At all times relevant to this Complaint, Wal-Mart also employed Henry Jordon as a Regional Vice-President ("Regional Vice-President Jordon"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

45.    At all times relevant to this Complaint, Wal-Mart employed Kisha Smith as Regional Human Resources Manager ("Regional Human Resources Manager Smith"), who acted as an agent of Wal-Mart and acted within the course and scope of her employment with respect to the acts complained of in the Complaint

46.    Upon information and belief, an operations manager from Headquarters is assigned to each region to supervise operation matters and policies ("Regional Operations Coordinator").

47.    At all times relevant to this Complaint, Wal-Mart employed Noah Johnson as Regional Operations Coordinator ("Regional Operations Coordinator Johnson"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

48.    Upon information and belief, an asset protection manager from Headquarters is assigned to each region to supervise asset protection matters and policies ("Regional Asset Protection Manager").

49.    At all times relevant to this Complaint, Wal-Mart employed Art Binder as a Regional Asset Protection Manager ("Regional Asset Protection Manager Binder"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

50.    Upon information and belief, a personnel manager from Headquarters is assigned to each region to supervise personnel matters and policies ("Regional Personnel Supervisor").

51.    At all times relevant to this Complaint, Wal-Mart employed Ronny Hayes as Eastern Seaboard Regional Manager ("Eastern Seaboard Regional Manager Hayes"), who acted

as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

52.     Upon information and belief, each region is divided into markets, with each market containing six to eight stores.

53.     Upon information and belief, each market vice-president is assigned to each market to supervise the market's practices and policies ("Market Vice-President").

54.     At all times relevant to this Complaint, Wal-Mart employed Henry Jordan as Market Vice-President ("Market Vice-President Jordan"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

55.     Upon information and belief, a market human resources representative is assigned to each market to supervise the market's human resources practices and policies ("Market Human Resources Representative").

56.     At all times relevant to this Complaint, Wal-Mart employed Adoncia Spann as Market Human Resources Representative ("Market Human Resources Representative Spann"), who acted as an agent of Wal-Mart and acted within the course and scope of her employment with respect to the acts complained of in the Complaint.

57.     At all times relevant to this Complaint, Wal-Mart also employed Tracy Battle as Market Human Resources Representative ("Market Human Resources Representative Battle"), who acted as an agent of Wal-Mart and acted within the course and scope of her employment with respect to the acts complained of in the Complaint.

58.     Upon information and belief, an asset protection manager is assigned to each market to supervise asset protection matters and policies ("Market Asset Protection Manager").

59.     At all times relevant to this Complaint, Wal-Mart employed Dawana Riddick as Market Asset Protection Manager ("Market Asset Protection Manager Riddick"), who acted as an agent of Wal-Mart and acted within the course and scope of her employment with respect to the acts complained of in the Complaint.

60.     Upon information and belief, each district is headed by a market manager who works with the Regional Manager regarding personnel decisions in the market's stores ("Market Manager").

61.     At all times relevant to this Complaint, Wal-Mart employed Eric Litchfield as a Market Manager ("Market Manager Litchfield"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

62.     At all times relevant to this Complaint, Wal-Mart employed Steve Wilmouth as a Market Manager ("Market Manager Wilmouth"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

63.     At all times relevant to this Complaint, Wal-Mart employed Yolanda Pou as a Market Manager ("Market Manager Pou"), who acted as an agent of Wal-Mart and acted within the course and scope of her employment with respect to the acts complained of in the Complaint.

64.     At all times relevant to this Complaint, Wal-Mart employed Chris Welborn as a Market Manager ("Market Manager Welborn"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

13

65.     At all times relevant to this Complaint, Wal-Mart employed Greg Bradley as a Market Manager ("Market Manager Bradley"), who acted as an agent of Wal-Mart and acted within the course and scope of his employment with respect to the acts complained of in the Complaint.

66.     Upon information and belief, the Regional Vice-President, Regional Personnel Supervisor and Market Manager visit each of the Wal-Mart stores on a regular basis to evaluate each store's compliance with Wal-Mart's policies and procedures as outlined by Headquarters.

67.     Upon information and belief, one of the personnel policies that Plaintiffs experienced and observed came from Headquarters and was implemented by the Plaintiffs' respective Market Managers to reduce Wal-Mart's older workforce and to replace them with a younger workforce.

68.     The policies described above are consistent with the formal strategies outlined in a 2005 Memorandum entitled "Reviewing and Revising Wal-Mart's Benefits Strategy" ("Wal-Mart Benefits Memorandum") originating from Headquarters by M. Susan Chambers.  A copy of the Wal-Mart Benefits Memorandum is filed herewith and incorporated herein as Exhibit "K."

69.     Upon information and belief, at the time the Wal-Mart Benefits Memorandum was executed, M. Susan Chambers ("Ms. Chambers") was Wal-Mart's Executive Vice President of Benefits, a member of the Executive Committee, a shareholder, and a Senior Officer.

70.     The Wal-Mart Benefits Memorandum constitutes a party admission under Fed. R. Evid. 801(d)(2)(A) as Wal-Mart publicly acknowledged the Wal-Mart Benefits Memorandum's authenticity in the New York Times on October 26, 2005.  Steven Greenhouse & Michael Barbaro, *Wal-Mart Memo Suggests Way to Cut Employee Benefit Costs*, The New York Times, Oct. 26, 2005.

71.     The Wal-Mart Benefits Memorandum blames "unsustainable" benefit costs driven by "persistent root causes (e.g., aging workforce, increasing average tenure)".

72.     The Wal-Mart Benefits Memorandum recommends that Wal-Mart dissuade aging and unhealthy employees from working at Wal-Mart by "designing benefits and other aspects of the Associate experience, such as job design, to attract a healthier, more productive workforce."

73.     The Wal-Mart Benefits Memorandum reports the need to review and revise Wal-Mart's benefits strategy which arises from the fact that, "From 2002 to 2005, [Wal-Mart's] benefits costs grew significantly faster than sales." In delivering this point, Wal-Mart maintains that the "primary driver ... (is) [Wal-Mart's] workforce is aging faster (0.50 years per calendar year) than the national average (.12 years per calendar year)."

74.     The effect of the older employee on Wal-Mart's profitability is discussed further in the Wal-Mart Benefits Memorandum:

> Given the impact of tenure on wages and benefits, the cost of an Associate with 7 years of tenure is almost 55 percent more than the cost of an Associate with 1 year of tenure, yet there is no difference in his or her productivity (Exhibit 2). Moreover, because we pay an Associate more in salary and benefits as his or her tenure increases, we are pricing that Associate out of the labor market, increasing the likelihood that he or she will stay with Wal-Mart.

75.     The Wal-Mart Benefits Memorandum reports the correlation between the longer an employee is employed with Wal-Mart and the higher likelihood they will stay at increased costs, "The cost of Wal-Mart's profit sharing and 401(k) program and paid time off grew faster than overall Associate growth, due largely to increasing Associate tenure ... Moreover, because we pay an Associate more in salary and benefits as his or her tenure increases, we are ... increasing the likelihood that he or she will stay with Wal-Mart..."

15

76.     In an attempt to lower the cost of benefits, the Wal-Mart Benefits Memorandum suggests Wal-Mart should "[r]edesign benefits and other aspects of the Associate experience, such as job design, to attract a healthier, more productive work force."

77.     Upon information and belief, Wal-Mart was aware of the impact the plan outlined in the Wal-Mart Benefits Memorandum would have on its older workers, as it acknowledges the benefit strategies outlined therein could create a "public reputation risk" and "[s]ome of the proposed revisions to the benefits strategy ... have the potential to upset Associates, especially more tenured Associates."

78.     Upon information and belief, as a result of Wal-Mart's discriminatory policies and procedures, Wal-Mart management systematically targets, fires, and otherwise discriminates against individuals over the age of forty.

79.     Upon information and belief, the illegal discriminatory acts of Wal-Mart towards Plaintiffs were performed in the spirit of addressing the concerns outlined in Wal-Mart's Benefits Memorandum and/or at the direction of Headquarters.

80.     Market Managers' use of an employee's failure to meet certain production or maintenance requirements when Wal-Mart had understaffed management at the store as a stated reason for the adverse employment actions taken against the Plaintiffs was pretextual.

81.     Plaintiffs' performances were satisfactory to meet Wal-Mart's expectations at the time of termination.

82.     Plaintiffs were replaced by younger employees, all under the age of 40.

83.     Wal-Mart's actions were done willfully and were part of an orchestrated plan to reduce costs associated with older, longer-tenured employees.

84. Upon information and belief, Headquarters directed and/or condoned Market Managers' manipulation of the Coachings to expedite the departure of older, more tenured employees.

85. Upon information and belief, Wal-Mart's actions were done willfully and were part of an orchestrated plan to reduce the number of older, more tenured employees.

## SPECIFIC FACTUAL ALLEGATIONS

### *Wal-Mart's Discrimination Against Mr. Bannister on the Basis of Age*

86. Paragraphs 1 through 85 are realleged and incorporated herein by reference.

87. At the date of this filing, Mr. Bannister is a fifty (50) year old male who worked for Wal-Mart for twenty (20) years.

88. Throughout the course of his employment, Mr. Bannister compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and bonuses based on performance.

89. In the Spring of 2009, Mr. Bannister was selected as the new manager of the Kinston, North Carolina Wal-Mart Store ("Kinston Wal-Mart").

90. During this time, Market Manager Litchfield was Mr. Bannister's supervisor.

91. Upon information and belief, in February 2010, Market Manager Litchfield began subjecting Mr. Bannister to a discriminatory hostile work environment.

92. Despite the $100 million plus size of the Kinston Wal-Mart, upon information and belief, Market Manager Litchfield refused to provide Mr. Bannister the staff and support that other similar situated younger store managers were provided.

17

93.     For example, Market Manager Litchfield decreased Mr. Bannister's staff and support when he sent Mr. Bannister's shift manager, Lisa Howard, on the road for four (4) weeks.

94.     Upon information and belief, Market Manager Litchfield used false and unsubstantiated allegations of poor judgment as a pretext for unlawful discrimination on the basis of age in discharging Mr. Bannister.

95.     Upon information and belief, the unsubstantiated allegations were made through the Coaching process.

96.     Upon information and belief, Market Manager Litchfield did not follow the standard Coaching process given to other younger similarly situated store managers for Mr. Bannister.  Instead, the occurrence of a Verbal was recorded inaccurately.

97.     Upon information and belief, Market Manager Litchfield recorded a Verbal against Mr. Bannister occurring on May 13, 2010 in Kinston, North Carolina; however, Market Human Resources Representative Spann had no record of such a Verbal warning being recorded though she was with Mr. Bannister on May 13, 2010.

98.     Upon Information and belief, despite having registered a May 13, 2010 Verbal in Kinston, North Carolina with Wal-Mart Headquarters, Market Manager Litchfield later acknowledged not being in Kinston, North Carolina on May 13, 2010 to give such a Verbal.

99.     Upon information and belief, younger similarly situated Store Managers were not subjected to this disparate treatment and harassment.  The treatment of Mr. Bannister was the result of purposeful discrimination and of unlawful employment practices and served no reasonable business purpose, yet had a disproportionately adverse impact on older employees, including Mr. Bannister.

100.    Upon information and belief, this disparate treatment and harassment was not reciprocated on younger, similarly situated store managers but was the result of purposeful discrimination and of unlawful employment practices and served no reasonable business purpose, yet had a disproportionate adverse impact on older employees, including Mr. Bannister.

101.    Mr. Bannister soon began to suffer the physical effects of the stress of the unlawful discrimination and related harassment he endured by Market Management Litchfield.

102.    As a result, on August 24, 2010, Mr. Bannister's doctor determined he was suffering from stress and depression, and recommended he take a medical Leave of Absence from work for medical treatment.

103.    Thereafter, Mr. Bannister received, executed and returned the necessary Wal-Mart Leave of Absence forms.

104.    During the time the Leave of Absence forms were being processed, Mr. Bannister continued to diligently work at the Kinston Wal-Mart.

105.    On or about Saturday, September 4, 2010, one day after Hurricane Earl moved through Kinston, Market Manager Litchfield arrived at the Kinston Wal-Mart at 8:00am to complete a model store inspection ("September 4 Inspection").

106.    Upon information and belief, during the September 4 Inspection, Market Manager Litchfield informed Mr. Bannister that he would need to paint the office, lounge, service desk, and front of the building as well as steam clean the restrooms and produce areas (the "September 4 Tasks").  Market Manager Litchfield made clear to Mr. Bannister that no additional support or funding would be provided for completing the September 4 Tasks.  Market Manager Litchfield informed Mr. Bannister the September 4 Tasks would need to be completed in three (3) days, as he would return to inspect the Kinston Wal-Mart again on September 8.

107. With his medical Leave of Absence forms still being processed, Mr. Bannister painted for approximately ten (10) hours a day for three days. Also during this time, Mr. Bannister attempted to complete the assistant evaluations for the Kinston Wal-Mart; however, the Wal-Mart system for entering such data was down a significant amount of time during this effort, but the evaluations were completed on September 7.

108. Upon information and belief, on or about September 8, 2010, Mr. Bannister's medical Leave of Absence was approved by Wal-Mart's Human Resource's Department.

109. During the medical Leave of Absence, Mr. Bannister was diagnosed with stress and anxiety that was noted to be caused by work and prescribed medication to help control his symptoms.

110. Upon information and belief, despite Mr. Bannister's physician's diagnosis that the stress and anxiety leading to the medical Leave of Absence was caused by work, Mr. Banister was directed to complete "CDL's" (a form of computer training) at Wal-Mart during his medical Leave of Absence.

111. After an evaluation on September 29, 2010, Mr. Bannister's physician determined he was not healthy enough to return to work and recommended extending his Leave of Absence for two (2) additional weeks.

112. On or about October 14, 2010, Mr. Bannister faxed an "Able to Return to Work" form as required by Wal-Mart and returned to the Kinston Wal-Mart.

113. Upon information and belief, despite meeting Wal-Mart's legitimate expectations upon resuming his work, Market Manager Litchfield subjected Mr. Bannister to heightened scrutiny compared with that received by his younger counterparts. While Market Manager

20

Litchfield would make rare visits to other stores under his supervision, he visited Mr. Bannister's store on an inordinately frequent basis, sometimes as often as three or more occasions per week.

114.     For example, upon information and belief, Market Manager Litchfield visited the Kinston Wal-Mart on December 3, December 8, December 10 and December 12, 2010.

115.     On January 17, 2011, upon information and belief, Market Manager Litchfield informed Mr. Bannister that he was being terminated in accordance with the contents of his PIP ("Bannister PIP").  The Bannister PIP, however, contained inaccurate information.  Accordingly, Mr. Bannister refused to sign the Bannister PIP.

116.     When Mr. Bannister inquired about using Wal-Mart's Open Door Policy to review the decision of his termination, Market Manager Litchfield did not follow protocol regarding Mr. Bannister's right to use the Open Door Policy recourse.  Upon information and belief, when Mr. Bannister mentioned the Open Door Policy as recourse for the termination, Market Manager Litchfield informed Mr. Bannister that Eastern Seaboard Regional Manager Hayes, the supervisor with whom Mr. Bannister would discuss reconsideration, had already signed off on Mr. Bannister's  termination.

117.     As a result of Wal-Mart's discriminatory conduct, Mr. Bannister has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

118.     Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Bannister's civil rights.

119.     As a result of the foregoing, Mr. Bannister has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Mr. Burriss on the Basis of Age*

120.   Paragraphs 1 through 119 are realleged and incorporated herein by reference.

121.   At the date of this filing, Mr. Burriss is a fifty-nine (59) year old male who worked for Wal-Mart for twenty-one (21) years.

122.   Throughout the course of his employment, Mr. Burriss compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and bonuses based on performance.

123.   In 2003, Mr. Burriss was promoted to Shift Manager at Wal-Mart Store # 1268.

124.   Mr. Burriss shared the responsibilities of Shift Manager at Wal-Mart Store #1268 with Danny Boykins ("Mr. Boykins"), a younger man than Mr. Burriss.

125.   Wal-Mart discriminated against Mr. Burriss by treating him less favorably than his younger counterpart, Mr. Boykins.

126.   Mr. Burriss was disciplined and/or counseled for incidents that he and Mr. Boykins were equally responsible, but Mr. Boykins, the younger Shift Manager, did not receive the same discipline or counseling for the incident in which they shared responsibility.

127.   Market Manager Pou targeted Mr. Burriss with discriminatory behavior and harassment while not exhibiting the same or similar conduct to the younger counter part of the Shift Manager position, Mr. Boykin.

128.   Mr. Burriss was terminated on August 6, 2010 and replaced by Ian Callahan, a man of approximately twenty-four (24) years of age.

129.   As a result of Wal-Mart's discriminatory conduct, Mr. Burriss has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

130. As a result of Wal-Mart's discriminatory conduct, Mr. Burriss has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

131. Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Burriss's civil rights.

132. As a result of the foregoing, Mr. Burriss has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Mr. Dutton on the Basis of Age*

133. Paragraphs 1 through 132 are realleged and incorporated herein by reference.

134. At the date of this filing, Mr. Dutton is a fifty-seven (57) year old male who worked for Wal-Mart for seventeen (17) years.

135. Mr. Dutton was the General Manager of Wal-Mart Store #2000 in Kitty Hawk, North Carolina ("Kitty Hawk Wal-Mart").

136. Between January and March of 2009, a Market Manager position in which Mr. Dutton's Kitty Hawk Wal-Mart's Market was located became available (the "Spring 2009 Market Manager Position").

137. Mr. Dutton had previously been interviewed at Headquarters by Wal-Mart President Lee Scott, CEO's Mike Duke and Edwardo Castro Wright, and all Divisional Vice-Presidents wherein Mr. Dutton was approved for promotion eligibility to Market Manager as Wal-Mart generally recruited Market Managers from current Store Managers in the market.

138. However, when Mr. Dutton applied for the Spring 2009 Market Manager Position, he never received an interview, only an acknowledgment thanking him for applying for the position from Wal-Mart.

139. In April 2009, Wal-Mart announced that Eric Litchfield, an individual new to Wal-Mart's employ, would occupy the Spring 2009 Market Manager Position.

140. Upon receiving Market Manager Litchfield's contact information, Mr. Dutton called Market Manager Litchfield and welcomed him to Wal-Mart.

141. During a market meeting on or about June 10, 2009 in Washington, North Carolina, Mr. Dutton expressed to Market Manager Litchfield his concerns with only having two (2) assistant managers: one (1) available during the day and one (1) assistant manager available at night. Mr. Dutton informed Market Manager Litchfield that he had repeatedly asked Human Resources Market Manager Battle for additional support as the Kitty Hawk Wal-Mart's high sales volume required a staff of one (1) shift co-manager and six (6) assistant managers according to Wal-Mart policies.

142. Market Manager Litchfield responded that Mr. Dutton should use all of the Kitty Hawk Wal-Mart resources and the best associates to operate the store to solve the staffing shortage.

143. Upon information and belief, after replacing Mr. Dutton with a younger, less experienced manager, the Kitty Hawk Wal-Mart in January 2011 had nine (9) assistant managers, seven (7) more assistant managers to offer support than Mr. Dutton had during his similar tenure.

144. Upon information and belief, two days after Mr. Dutton inquired about the additional support, or on or about 7:00am on June 12, 2009, Mr. Dutton was met at the front of

the Kitty Hawk Wal-Mart by Market Manager Litchfield, Human Resources Market Manager Battle, and Market Asset Protection Manager Riddick.

145.    Upon information and belief, Market Manager Litchfield told Mr. Dutton that Human Resources Market Manager Battle and Market Asset Manager Riddick were going to complete an investigation but refused to inform Mr. Dutton the nature or subject of their investigation.

146.    Upon information and belief, Market Manager Litchfield informed Mr. Dutton that he was to get into Market Manager Litchfield's car, wherein Mr. Dutton was removed from the Kitty Hawk Wal-Mart, driven approximately two hundred (200) miles, and returned at approximately 5:30pm. (the "June 12 Incident").

147.    This removal from the store and transportation for hours was not common practice for similarly situated Store Managers under the age of 40 years.

148.    At 6:30pm during the June 12 Incident, Mr. Dutton was called into his office at the Kitty Hawk Wal-Mart wherein Human Resources Market Manager Battle asked Mr. Dutton if he was a "Type A personality and a perfectionist?"

149.    Market Manager Litchfield, Human Resources Market Manager Battle, and Market Asset Protection Manager Riddick expressed concern during the meeting with Mr. Dutton allowing Teresa Shanefelter, an invoice clerk and mentee of Mr. Dutton's, to carry keys to the store and/or have Ms. Shanefelter sign on to the computer and check Mr. Dutton's email messages (the "Shanefelter Incident").

150.    As Ms. Shanefelter was one of Mr. Dutton's best associates, Mr. Dutton explained that Ms. Shanefelter was given these responsibilities as a product of being understaffed and Mr.

Dutton's attempt at using all of the Kitty Hawk Wal-Mart resources as directed by Market Manager Litchfield.

151. Market Manager Litchfield, Human Resources Market Manager Battle, and Market Asset Protection Manager Riddick told Mr. Dutton that they would be back and that if he spoke to anyone about "this" he would be terminated.

152. Mr. Dutton was unsure what the "this" was they were describing.

153. On or about June 16, 2009, Mr. Dutton spoke with Market Manager Litchfield regarding the June 12 Incident, to which Market Manager Litchfield replied he had nothing to do with it. Market Manager Litchfield also refused to respond when Mr. Dutton again asked for clarification as to what the "this" was he could not reference for fear of termination.

154. On or about July 14, 2009, Mr. Dutton was interviewed by Regional Asset Protection Manager Binder who expressed an interest in putting a close to the lengthy and unnecessary Shanefelter Incident investigation within a week. Unfortunately, the investigation did not end within a week.

155. On or about August 17, 2009, Mr. Dutton received a call from Market Manager Litchfield who informed him that Human Resources Market Manager Battle and Market Asset Protection Manager Riddick had "botched the investigation" and that Maria * (last name unknown), a Human Resources Manager from Myrtle Beach, would be leading a new investigation to replace the "botched investigation" by Human Resources Market Manager Battle and Market Asset Protection Manager Riddick regarding the Shanefelter Incident.

156. On or about August 17, 2009 when Maria * (last name unknown) introduced herself to Mr. Dutton, she claimed the purpose of her trip was a "Red Store Visit," which generally involves investigating union activity.

157.    Finding no concerns after she completed her investigation into the Shanefelter Incident, Maria * (last name unknown) informed Mr. Dutton that she was impressed with the Kitty Hawk Wal-Mart and hoped Mr. Dutton would transfer to Myrtle Beach to help some of her stores.

158.    In September 2009, Mr. Dutton attended a two (2) day Wal-Mart Store Market Manager meeting in New Bern, North Carolina.  To Mr. Dutton's surprise, Regional Operations Coordinator Johnson and Regional Asset Protection Manager Binder were in attendance and specifically asked to speak with Mr. Dutton.

159.    After meeting in the lobby, Regional Operations Coordinator Johnson and Regional Asset Protection Manager Binder demonstrated intimidating and harassing behavior when they asked Mr. Dutton to walk with them to the back of the hotel where they could speak further in private.

160.    Regional Operations Coordinator Johnson and Regional Asset Protection Manager Binder asked about Mr. Dutton the Shanefelter Incident and allowing her access to his computer password.  Mr. Dutton explained the staffing shortage and his attempts to use the Kitty Hawk Wal-Mart's existing resources and best associates as directed by Market Manager Litchfield, and also observed it was common practice and procedure at Wal-Mart for Store Managers to share passwords with their most qualified employees.  To further illustrate the fact, Mr. Dutton requested, through Wal-Mart, a "consistency search" regarding the issue of sharing passwords to enable efficiency.

161.    Regional Operations Coordinator Johnson told Mr. Dutton that the "writing was on the wall" and that Mr. Dutton was about to be fired.

162.     After the awkward and harassing exchange, the group walked back to the front of the hotel where Market Manager Litchfield was waiting for Regional Operations Coordinator Johnson and Regional Asset Protection Manager Binder.

163.     On or about October 12, 2009, Mr. Dutton received a telephone call from Jeff Magiver, a Human Resources Manager of Wal-Mart from Florida who informed Mr. Dutton to be in Greenville, North Carolina on October 14, 2009 for an interview by a non-biased individual with Wal-Mart.

164.     Upon information and belief, on or about November 9, 2009, Regional Vice-President Carmen, Regional OPS Coordinator Johnson, and Regional Asset Protection Manager Binder visited Mr. Dutton at the Kitty Hawk Wal-Mart, inspected the store, and interviewed the associates.

165.     Upon information and belief, following a tour of the Kitty Hawk Wal-Mart, Regional Vice-President Carmen commented that Mr. Dutton ran a great store and observed that Mr. Durron was running the Kitty Hawk Wal-Mart without any managerial support.

166.     Upon information and belief, when Regional Vice-President Carmen asked Mr. Dutton about the Shanefelter Incident, Regional Vice-President Carmen informed Mr. Dutton that, "I can fire you right now if I want."

167.     Upon information and belief, at the end of the day on or about November 9, 2009, Regional Vice-President Carmen informed Mr. Dutton that he was going to meet with Market Manager Litchfield the next day to proceed with a D-Day and administer a PIP for Mr. Dutton.

168.     In the seventeen (17) years Mr. Dutton was with Wal-Mart, he had never received a Coaching for his performance. By proceeding with a D-Day, Regional Vice-President Carmen was treating Mr. Dutton differently than similarly situated younger Store Managers wherein the

Wal-Mart policy for Coaching at the time complained herein involved receiving first a Verbal, then a Written, then a D-Day, followed by a termination.

169.    On or about November 20, 2009, Market Manager Litchfield and Human Resources Market Manager Battle came to the Kitty Hawk Wal-Mart store to give Mr. Dutton his first Coaching in seventeen (17) years.  Despite not previously receiving a Verbal or a Written, this day was designated as Mr. Dutton's D-Day.

170.    On or about November 23, 2009, after Mr. Dutton concluded that Wal-Mart was determined to prevent him from working without harassment, and instead favored younger employees, and despite more than seventeen years of exemplary service to Wal-Mart, Mr. Dutton was forced to early retirement.

171.    As a result of Wal-Mart's discriminatory conduct, Mr. Dutton has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

172.    As a result of Wal-Mart's discriminatory conduct, Mr. Dutton has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

173.    Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Dutton's civil rights.

174.    As a result of the foregoing, Mr. Dutton has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### ***Wal-Mart's Discrimination Against Mr. Flanigan on the Basis of Age***

175.    Paragraphs 1 through 174 are realleged and incorporated herein by reference.

29

176. At the date of this filing, Mr. Flanigan is a sixty-one (61) year old male who worked for Wal-Mart for sixteen (16) years.

177. Throughout the course of his employment, Mr. Flanigan compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and bonuses based on performance.

178. Despite having a successful store, Mr. Flanigan was not given the same amount of support given to other similarly situated younger managers in his market in an effort to illegally and unlawfully force him to leave Wal-Mart's employ because of his age.

179. The year 2009 was one of the best years for Mr. Flanigan's Goldsboro Store #1236 ("Goldsboro Wal-Mart"). Bonuses, which were distributed based on a store's sales, profits, and customer satisfaction, were given to every associate under Mr. Flanigan's management at the Goldsboro Wal-Mart every quarter in 2009.

180. Mr. Flanigan was able to achieve these accolades with only two (2) shift managers in 2009.

181. In or about October of 2009, every store with over eighty (80) million in sales ("High Sales Wal-Mart(s)") was scheduled to receive four (4) co-managers to help support the demands unique to the High-Sales Wal-Marts (the "October 2009 High Volume Management Support Directive").

182. The Goldsboro Wal-Mart, which was a High Sales Wal-Mart, did not receive four (4) co-managers as required by the October 2009 High Volume Management Support Directive to help support the Goldsboro Wal-Mart until after the Christmas holiday season, which is the time in which such support is most needed.

183.    During this time, Mr. Flanigan was forced to operate this High Sales Wal-Mart with only two (2) co-managers at night and only himself during the day.  Mr. Flanigan was the only store in his market that did not have four (4) co-managers soon after the October 2009 High Volume Management Support Directive.

184.    Only in approximately February of 2010, during one of the slowest times of year for the Goldsboro Wal-Mart, did Mr. Flanigan receive the support designated in the October 2009 High Volume Management Directive.

185.    Mr. Flanigan was not given the support designated in the October 2009 High Volume Management Support Directive or otherwise as a pretext to forcing Mr. Flanigan out of Wal-Mart's employ because of his age as other similarly situated younger Store Managers did receive the support designated in the October 2009 High Volume Management Support Directive or otherwise required by volume.

186.    Market Manager Litchfield only knew Mr. Flanigan for approximately six (6) weeks prior to Mr. Flanigan's termination.

187.    During Mr. Flanigan's first conference call with Market Manager Litchfield, Market Manager Litchfield commented, "half the store managers in this market will not be here much longer."

188.    Soon thereafter, three Market Managers under the supervision of Market Manager Litchfield, all over the age of forty (40), were terminated: Plaintiff Flanigan, Plaintiff Dutton, and Frank Daniels (not a party to this case).

189.    The reasons for Mr. Flanigan's termination were pretextual as Market Manager Litchfield claims one of the reasons for Flanigan's termination was his backroom not being run

effectively. However, the backroom of Mr. Flanigan's store was commensurate with stores managed by associates younger than 40 during that same time period.

190.    The Wal-Mart backroom efficiency program Mr. Flanigan followed was stopped after his termination because Wal-Mart stores across the country were having trouble running their backrooms effectively according to this program.

191.    Further, Mr. Flanigan's inventory program had recently been complimented and recognized for excellence by Ronny Hayes, Eastern Seaboard Regional Manager, and Henry Jordon, Divisional Vice President.

192.    Additionally, Mr. Flanigan did not have the necessary support to train one Shift Manager, Jennifer Mack, as she was not in the Wal-Mart system. Despite Mr. Flanigan and Ms. Mack's request for a password from Headquarters to access the Wal-Mart system as a Shift Manager, Ms. Mack had not received the required password from Headquarters to complete the necessary training plan through the day of Mr. Flanigan's illegal termination.

193.    Wal-Mart used Ms. Mack's lack of a training plan as a pretext to have Mr. Flanigan fired.

194.    Upon his termination, Mr. Flanigan requested a Red Book Investigation, which is a Wal-Mart procedure where an investigation is conducted to determine if an employee was properly terminated, but Mr. Flanigan never received a response to his request for a Red Book Investigation into his termination.

195.    As a result of Wal-Mart's discriminatory conduct, Mr. Flanigan has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

32

196.    As a result of Wal-Mart's discriminatory conduct, Mr. Flanigan has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

197.    Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Flanigan's civil rights.

198.    As a result of the foregoing, Mr. Flanigan has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Mr. Griffith on the Basis of Age and Sex*

199.    Paragraphs 1 through 198 are realleged and incorporated herein by reference.

200.    At the date of this filing, Mr. Griffith is a fifty-eight (58) year old male who worked for Wal-Mart for eight (8) years.

201.    Mr. Griffith began working for Wal-Mart in January of 2002.  Throughout the course of his employment, Mr. Griffith compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and performance based bonuses.

202.    Mr. Griffith achieved the position of Co-Manager at Store #1399 in Bedford, Virginia ("Bedford Virginia") wherein he was subjected to different terms and standards from his younger, female Co-Manager, Jennifer Campbell.

203.    In April 2007, February 2008, and February 2009, Mr. Griffith was disciplined for infractions that were inconsistent with Wal-Mart's policy and applied inconsistently.

204.    In response to the discriminatory behavior and application of policy, Mr. Griffith logged a complaint with Wal-Mart Human Resource staff members regarding the hostile work environment.  No action was taken by Wal-Mart in response to Mr. Griffith's complaints.

205.    In January 2010, Market Manager Wilmouth gave Mr. Griffith a verbal warning for alleged profanity and alleged quality assurance issues, which was not consistent with his treatment of the Lynchburg, Virginia Wal-Mart that employs a younger Store Manager.

206.    In September 2010, despite having mutually achieved a goal as Co-Managers, a "Time Off Award" was given only to Jennifer Campbell, and no similar award was given to Mr. Griffith.

207.    Ms. Campbell, as the younger female Co-Manager, was allowed to spend up to 50% of a ten (10) hour shift in the Manager's office completing paperwork as needed.

208.    The same accommodation was not allowed for Mr. Griffith, who was forced to complete paperwork in the associates' lounge.

209.    It was this forced inconvenience, completing necessary paperwork in the associates' lounge because Mr. Griffith was not receiving the same accommodations as the younger female co-manager who was allowed to complete paper work in the manager's office, which resulted in Mr. Griffith being disciplined.

210.    In seeking to force Mr. Griffith out, Wal-Mart abused its progressive discipline policy by skipping steps.

211.    For example, Coaching for Improvement #4136413 was reduced to a Verbal after Mr. Griffith utilized Wal-Mart's Open Door Policy, making the next step in the progressive discipline policy a Written, not a D-Day.

212.    As a result of Wal-Mart's discriminatory Conduct, Mr. Griffith has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

213. Mr. Griffith filed an EEOC complaint summarizing his complaints as described herein and was retaliated against by Wal-Mart for his action.

214. As a result of Wal-Mart's discriminatory conduct, Mr. Griffith has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

215. Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Griffith's civil rights.

216. As a result of the foregoing, Mr. Griffith has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Mr. Kondrad on the Basis of Age*

217. Paragraphs 1 through 216 are realleged and incorporated herein by reference.

218. At the date of this filing, Mr. Kondrad is a sixty-one (61) year old male who worked for Wal-Mart for ten (10) years.

219. Throughout the course of his employment, Mr. Kondrad compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and performance based bonuses.

220. Mr. Kondrad was the Manager of the Wendover Avenue Wal-Mart in Greensboro, North Carolina ("Greensboro Wal-Mart") and was the victim of a campaign of harassment and discrimination by Wal-Mart to understaff and then use its disciplinary process to unlawfully terminate employees over the age of 40.

221. For approximately 1 ½ years preceding Mr. Kondrad's illegal termination, the Greensboro Wal-Mart suffered from severe understaffing in management. The Greensboro Wal-

Mart was given less or the same amount of payroll hours as other stores in the market that were not open 24 hours a day, as the Greensboro Wal-Mart is.

222.    Wal-Mart's failure to provide Mr. Kondrad with the appropriate support needed to succeed and meet goals was an effort to harass and discriminate against him.  This fact is further illustrated in that two (2) weeks after Mr. Kondrad's termination, management staffing had been increased to the point where there was a surplus of one assistant.

223.    In April 2010, Mr. Kondrad received a visit from Regional Vice President Jordan and Eastern Seaboard Regional Manager Hayes wherein a number of problems were noted prior to a major remodel including an excessive number of outs.  An "out" is an item that is out of stock and not available for purchase (the "April 10 Issues").

224.    On or about April 12, 2010, Mr. Kondrad contacted Market Manager Bradley and confirmed with him the fact that the excessive number of outs, a significant concern of the April 10 Issues, was due to a distribution center accidently turning off shipments to the Greensboro Wal-Mart two (2) weeks earlier than planned due to the forthcoming scheduled remodel.  Market Manager Bradley thanked Mr. Kondrad for the information and research.

225.    Three days later, on or about April 15, 2010, Market Manager Bradley came to the Greensboro Wal-Mart and administered a Verbal and placed Mr. Kondrad on a PIP for the April 10 Issues despite Mr. Kondrad's clarifications.

226.    At the first follow-up on the PIP plan, Mr. Kondrad received a rating of "Meets Expectations" and Market Manager Bradley explained that he was suspending the next follow up PIP appointment until after the remodel of the Greensboro Wal-Mart.  Market Manager Bradley claimed such a postponement was fair due to the many problems to be expected during a remodel.

36

227. On the day of the Grand Opening, Market Manager Bradley administered a Coaching - designating it to be a "D-Day" Coaching - for store standards during the remodel. Market Manager Bradley administered the D-Day Coaching despite placing Mr. Kondrad's PIP on hold until after the Greensboro Wal-Mart's remodel.

228. Recognizing the hypocrisy of the circumstances, Mr. Kondrad used Wal-Mart's "Open Door" policy to speak with the Regional Human Resources Manager Smith.

229. Regional Human Resources Manager Smith agreed that the Coaching should not have been administered and informed Mr. Kondrad that the Coaching would be deleted from his file.

230. Regional Human Resources Manager Smith later retracted that the Coaching would be deleted from the file and stated that instead the Coaching should only be extended for another thirty (30) days.

231. During the PIP process, Mr. Kondrad was harassed in an effort to get him to voluntarily leave his job.

232. For example, Market Manager Bradley suggested, and Mr. Kondrad complied, that the checkout stands and freezer cases be cleaned with a tooth brush on ones' hands and knees.

233. With all of the problems encountered during the remodel of the Greensboro Wal-Mart store, Mr. Kondrad, as Store Manager, felt compelled to work eighty-seven (87) days in a row, an average of fourteen (14) hours a day, to help keep the Wal-Mart store at an acceptable standard.

234.     Not surprisingly, this work ethic took a toll on Mr. Kondrad's back and a neurosurgeon suggested Mr. Kondrad take a medical Leave of Absence to allow for neuromuscular therapy in order to reduce continued damage to Mr. Kondrad's back.

235.     While Market Manager Bradley made it a point to call younger similarly situated Store Managers while they are on a Leave of Absence to check on their health, Market Manager Bradley never called Mr. Kondrad in an attempt to isolate Mr. Kondrad and discriminate against Mr. Kondrad because of his age.

236.     Upon Mr. Kondrad's return to work from his medical Leave of Absence, Mr. Kondrad was able to excel with regard to the expectations on the PIP: score cards for the stockrooms were all well above Wal-Mart average, the Greensboro Wal-Mart exceeded Wal-Mart's goals in connection with stocks, and the sales floor standards had improved.

237.     While these achievements were documented weekly and sent to Market Manager Bradley, these were the same items that Market Manager Bradley listed as "below standard", and thus the reason for Mr. Kondrad's involuntary termination, on Mr. Kondrad's final PIP.

238.     As a result of Wal-Mart's discriminatory conduct, Mr. Kondrad has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

239.     Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Kondrad's civil rights.

240.     As a result of the foregoing, Mr. Kondrad has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Mr. Orndorff on the Basis of Age and Retaliation*

241.   Paragraphs 1 through 240 are realleged and incorporated herein by reference.

242.   At the date of this filing, Mr. Orndorff is a 45 year old male who worked for Wal-Mart for 23 years.

243.   Throughout the course of his employment, Mr. Orndorff compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and performance based bonuses.

244.   Since 1999, Mr. Orndorff was the Store Manager of the Wal-Mart in Wilmington, North Carolina ("Wilmington Wal-Mart") and was consistently one of the top three store managers in his region with regard to sales and profits while at the Wilmington Wal-Mart.

245.   Mr. Orndorff was perceived as a top manager with a number of performance based promotions until March 1, 2010 when Yaeunda Pou was placed as Mr. Orndorff's Market Manager.

246.   Upon information and belief, Market Manager Pou has been with Wal-Mart for approximately six (6) years wherein she was first an Assistant Manager, then placed in a Human Resources position, and then promoted to a Market Manager. She did not follow the usual Wal-Mart leadership structure in that she was never a Co-Manager or Store Manager.

247.   On or about May 7, 2010, Mr. Orndorff hosted a "Re-Grand Opening" of the Wilmington Wal-Mart after a three (3) month remodeling project.

248.   On or about May 14, 2010, Mr. Orndorff was given a Written for job performance along with two others.

249.   On or about May 22, 2010, Mr. Orndorff used the Wal-Mart "Open Door" policy to speak with Eastern Seaboard Regional Manager Hayes about the Coaching, as he believed the Written was unwarranted.

250. On or about June 7, 2010, the Written was changed to a Verbal against Mr. Orndorff.

251. On or about July 16, 2010, Market Manager Pou gave Mr. Orndorff a Written and PIP for unauthorized overtime and insubordination (the "July 16 Written and PIP").

252. As a practice, Market Manager Pou generally did not reprimand overtime for similarly situated managers under the age of forty (40) as she did those over the age forty (40), as she did with Mr. Orndorff.

253. On or about July 19, 2010, Mr. Orndorff spoke with Eastern Seaboard Regional Manager Hayes about the July 16 Written and PIP, discussing the inconsistency regarding overtime.

254. On or about August 4, 2010, Market Manager Pou re-issued a new PIP.

255. On or about September 10, 2010, Market Manager Pou was scheduled to have her first PIP follow up with Mr. Orndorff. On that same day, Market Manager Pou issued Mr. Orndorff a D-Day.

256. On or about September 15, 2010, Mr. Orndorff went on a medical Leave of Absence.

257. Wal-Mart deliberately made working conditions so intolerable that Mr. Orndorff was forced to resign.

258. Mr. Orndorff was replaced by Robert Hicks, a male of thirty-two years (32).

259. As a result of Wal-Mart's discriminatory Conduct, Mr. Orndorff has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

260.    As a result of Wal-Mart's discriminatory conduct, Mr. Orndorff has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

261.    Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Orndorff's civil rights.

262.    Mr. Orndorff complained about and/or otherwise opposed such discriminatory practices to Wal-Mart management.  In an act of retaliation because of such complaints and/or opposition, Mr. Orndorff was denied equal employment opportunities.

263.    As a result of the foregoing, Mr. Orndorff has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### *Wal-Mart's Discrimination Against Ms. Soles on the Basis of Age and Disability*

264.    Paragraphs 1 through 263 are realleged and incorporated herein by reference.

265.    At the date of this filing, Ms. Soles is a fifty-seven (57) year old female who worked for Wal-Mart for twenty-nine (29) years.

266.    Throughout the course of her employment, Ms. Soles compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and performance bonuses.

267.    Ms. Soles last position at Wal-Mart was as the Store Manager at the Wal-Mart in Whiteville, North Carolina ("Whiteville Wal-Mart").

268.    Currently and during her employment with Wal-Mart, Ms. Soles suffers from acute back pain, the symptoms suffered by Ms. Soles include without limitation: sharp, localized

pain in the neck, upper and lower back, especially after lifting heavy objects and sitting or standing for extended periods of time.

269.     As a consequence of this disability, Ms. Soles suffers occasional limitations on certain activities.

270.     Wal-Mart acknowledged Ms. Soles's disability in the past and would allow Ms. Soles to work with restrictions such as no lifting, bending, climbing, or standing/walking for prolong periods of time.

271.     The Whiteville Wal-Mart consistently did not receive the management support it needed or was provided to other similarly situated stores with Store Managers less than forty (40) years of age.

272.     In March of 2010, Yaeunda Pou became Ms. Soles's Market Manager.

273.     During one meeting in or about March 2010, Market Manager Pou told Ms. Soles, as the Store Manager of the Whiteville Wal-Mart, that she needed to evaluate the Whiteville Wal-Mart's long term associates as they were costing the Whiteville Wal-Mart too much money. Market Manager Pou claimed that the Whiteville Wal-Mart could hire two (2) to (3) Wal-Mart associates for every one (1) of the long term Wal-Mart associates.

274.     While it is standard Wal-Mart practice to counsel a Store Manager's actions in private and not in front of associates, Market Manager Pou purposefully and with a desire to harass Ms. Soles, belittled her performance as a Store Manager while on the sales floor in front of associates and customers.

275.     Market Manager Pou would also call Ms. Soles on a daily basis and during Ms. Soles's time off in a harassing manner to the extent that Ms. Soles's health was affected.

276. Market Manager Pou issued a Verbal and Written as well as placed Ms. Soles on a PIP.

277. Ms. Soles used the Open Door Policy to speak with Eastern Seaboard Regional Manager Hayes regarding the behavior she endured as well as the unfounded nature of both the Coachings and the PIP.

278. After Eastern Seaboard Regional Manager Hayes spoke with Market Manager Pou, she canceled out both the Written and Verbal as well as the PIP.

279. That same day, Market Manager Pou issued a new Verbal.

280. A Written was issued only a few weeks later.

281. Ms. Soles soon began to suffer the physical effects of the stress of the harassment and the discrimination she endured by Wal-Mart management which exacerbated her disability

282. On October 4, 2010, at the direction of her doctor and for the benefit of her health and the protection of her disability, Ms. Soles took a medical Leave of Absence as she could hardly walk.

283. While Ms. Soles's disability had been reasonably accommodated at the Whiteville Wal-Mart in the past through restrictions such as no lifting, bending or climbing, Market Human Resources Representative Spann informed Ms. Soles that Ms. Soles could not return to work with any restrictions.

284. Market Human Resources Representative Spann also stated that Wal-Mart was going to post Ms. Soles's position at the end of 90-days, which began while Ms. Soles went out on short-term disability leave on or about October 4, 2010.

285. Ms. Soles was replaced by a man named Jed (last name unknown) who is of approximately twenty-five (25) years of age.

43

286. As a result of Wal-Mart's discriminatory conduct, Ms. Soles has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

287. As a result of Wal-Mart's discriminatory conduct, Ms. Soles has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

288. Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Ms. Soles's civil rights.

289. As a result of the foregoing, Ms. Soles has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to her reputation and career.

### *Wal-Mart's Discrimination Against Mr. Toms on the Basis of Age*

290. Paragraphs 1 through 289 are realleged and incorporated herein by reference.

291. At the date of this filing, Mr. Toms is a forty-four (44) year old male who worked for Wal-Mart for sixteen (16) years.

292. Throughout the course of his employment, Mr. Toms compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and performance bonuses. Mr. Toms was recognized as Store Manager of the Year for Wal-Mart, Store of the Quarter for 13 Quarters for the Region, and received numerous awards as Store Manager.

293. Mr. Toms last position with Wal-Mart was as the Store Manager for the Yorktown, Virginia Wal-Mart ("Yorktown Wal-Mart").

294. The Yorktown Wal-Mart consistently had a shortage of management support, and Mr. Toms was told by Wal-Mart management there were no Assistant Shift Managers available, while other similarly situated stores supervised by younger Store Managers were overstaffed.

295. According to Wal-Mart's own management staffing plan, Mr. Toms had the weakest Shift Managers/Assistant Managers team in the area but yet he was the highest volume store.

296. Mr. Toms was told by Wal-Mart management the day before undergoing surgery that it would be in Mr. Toms's best interest to reschedule the surgery so that he could continue to support the skeletal staff of the Yorktown Wal-Mart. Mr. Toms agreed, cancelled the surgery, and continued to support the Yorktown Wal-Mart. The surgery was never rescheduled.

297. Mr. Toms was placed on a PIP on or about March 22, 2010, but the PIP was not to be implemented until April 2, 2010.

298. The timing of the implementation of the PIP, and the monthly follow-ups on the second of each month, falls on one of the largest volume days of the Yorktown Store, and coincidently, one of the hardest days from which to recover a store.

299. For this reason, Mr. Toms' Market Manager, Chris Mehler ("Market Manager Mehler") did not visit other large volume stores with younger managers during the first part of the month, but always visited Mr. Toms to evaluate the performance, cleanliness and orderliness of the Yorktown Wal-Mart.

300. When Market Manager Mehler asked Mr. Toms what he needed to be successful, Mr. Toms informed him that he needed to be at least fully staffed to Wal-Mart's guidelines.

301.     Market Manager Mehler informed Mr. Toms there was no extra management staff to provide the Yorktown Wal-Mart, despite the fact that other Wal-Mart stores in the market were overstaffed during this same or similar time.

302.     Finally, another Store Manager informed Mr. Toms that an Assistant Manager would finally report to the Yorktown Store from one of the overstaffed Wal-Mart stores.

303.     During the time Mr. Toms was on his PIP, he was constantly reminded by Market Manager Mehler how many more days were left until his next PIP follow up, and was humiliated on conference calls in front of other Store Managers when Market Manager Mehler would curse and harass Mr. Toms regarding minor issues in which he would not mention the same issue to a similarly situated younger Wal-Mart Store Manager.

304.     The inconsistent and prejudicial treatment of Mr. Toms and, likewise, the Yorktown Wal-Mart was also evident when it came to zone merchandise supervisors.

305.     Zone merchandise supervisors at Wal-Mart were supposed to carry walky-talkies and keys to their particular area.  Market Manager Mehler took the walky-talkies and keys away from the zone merchandise supervisors at the Yorktown Wal-Mart.

306.     In speaking with Wal-Mart stores in the Yorktown market as well as the neighboring market ("Neighboring Wal-Marts"), each Neighboring Wal-Mart's zone merchandise supervisors carried walky-talkies and keys and were allowed to receive telephone calls relevant to their department.

307.     Two (2) months prior to Mr. Toms's forced departure, Mr. Toms received a call informing him that Market Manager Mehler was telling Shift Managers in his Market that an opportunity for a Store Manager position was opening up in two (2) months, and it was apparent that the store with the opening was going to be the Yorktown  Wal-Mart.

308.    The day Mr. Toms was forced out of his Store Management position with the Yorktown Wal-Mart, Market Manager Mehler met at the Yorktown Wal-Mart with staff under the impression that a decision had already been made that Christy Williams was selected as the new Store Manager.

309.    Wal-Mart deliberately made working conditions so intolerable for Mr. Toms he was forced to resign.

310.    Less than a week later, Christy Williams reported to the Yorktown Wal-Mart as Store Manager despite the Wal-Mart career preference stating that a position needs to be posted for three days prior to the commencement of the interview process, and then the selection process.

311.    Christy Williams is approximately 38 years of age.

312.    As a result of Wal-Mart's discriminatory conduct, Mr. Toms has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

313.    Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Mr. Toms's civil rights.

314.    As a result of the foregoing, Mr. Toms has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to his reputation and career.

### _Wal-Mart's Discrimination Against Ms. Towles on the Basis of Age and Race_

315.    Paragraphs 1 through 314 are realleged and incorporated herein by reference.

316.    At the date of this filing, Ms. Towles is a sixty (60) year old African American woman who worked for Wal-Mart for twenty-one (21) years.

317.     Throughout the course of her employment, Ms. Towles compiled an exemplary performance record and was rewarded by Wal-Mart with numerous promotions and pay raises.

318.     The last position Ms. Towles held with Wal-Mart was Store Manager of the Wal-Mart Store #5118 at 10050 Glenwood Avenue in Raleigh, North Carolina ("Raleigh Wal-Mart")

319.     Ms. Towles was the oldest Store Manager under Market Manager's Chris Welborn's ("Market Manager Welborn") supervision.

320.     Market Manager Welborn commented to Ms. Towles's shift manager that he needed to get her out of the Raleigh Store as Store Manager.

321.     In furtherance of Wal-Mart's efforts to remove Ms. Towles from her position of Store Manager, Market Manager Welborn distributed previously "prepared" PIPs that could be tailored quickly with a name change to a particular Store Manager.

322.     The prepared PIPs, however, were often contradicted by the score cards that were automated by Wal-Mart.

323.     In the case of Ms. Towles, her "prepared" PIP claims that she was "affecting profits and sales in a negative capacity." Yet Wal-Mart's objective data on score cards reflects the Raleigh store, under Ms. Towles's management, was at 99% of sales budget and 127% of profit during that same time period.

324.     On or about September 1, 2010, Ms. Towles was placed on a PIP and a D-Day together on the same day.

325.     On or about October 21, 2010, Ms. Towles was discharged as the Raleigh Wal-Mart Store Manager.

326.    Market Manager Welborn informed Ms. Towles that she was placed on a PIP and discharged because the Raleigh Wal-Mart received a red score due to frozen food and dairy cooler not being on IMS, the floors not being highly waxed, and poor store conditions.

327.    However, a similarly situated store manager under the age of forty, also received a red score but was not discharged, did not receive a PIP, nor was she coached.

328.    Within the two (2) year period since Market Manager Welborn took over the Raleigh market area, approximately twenty-five (25) management employees were discharged, demoted, or forced to resign, who were over the age of forty (40) years of age and mostly African American and/or Latino.

329.    Stacey Treadwell who was a Caucasian female in her thirties, who was in the same and similar situation as Ms. Towles, a Store Manager, was treated better than Ms. Towles.

330.    The conditions in the Raleigh Wal-Mart were as good as other stores in the area.

331.    The disparate distribution of these positions to younger employees is the result of purposeful discrimination and of unlawful employment practices that serve no reasonable business purpose, yet have a disproportionate adverse impact on older employees.

332.    As a result of Wal-Mart's discriminatory Conduct, Ms. Towles has suffered monetary and/or economic damages, including but not limited to the loss of past and future income, compensation and other benefits.

333.    As a result of Wal-Mart's discriminatory conduct, Ms. Towles has suffered severe mental anguish and emotional distress, including but not limited to depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

334. Wal-Mart's discriminatory actions were intentional, done with malice, and/or showed willful, wanton, and reckless indifference to Ms. Towles's civil rights.

335. As a result of the foregoing, Ms. Towles has suffered, and continues to suffer, economic loss, emotional distress, humiliation, and damage to her reputation and career.

**FIRST CLAIM FOR RELIEF**
**Violation of the Age Discrimination In Employment Act**
**(All Plaintiffs)**

336. Plaintiff realleges and incorporates by reference paragraphs 1 through 335 of this Complaint as set forth herein by reference.

337. The actions of Wal-Mart, as set forth herein, constitute harassment and discrimination based on Plaintiffs' ages.

338. In the alternative, each Plaintiff's respective Market Manager's conduct created a hostile working environment for Plaintiff based on his or her age.

339. The Market Managers' age based harassment of Plaintiffs, as set forth herein, was severe and pervasive.

340. The Market Managers' harassment had the effect of unreasonably interfering with Plaintiffs' work performance.

341. Wal-Mart was on notice of the Market Managers' age-based discrimination and harassment because of their management positions.

342. Other management employees of Wal-Mart knew or should have known of the Market Managers' propensity to engage in acts of age-based harassment and specifically of his or her age-based harassment of Plaintiffs.

343.    Wal-Mart failed to stop the Market Managers' age-based harassment or to discipline the Market Managers for their unlawful behavior.

344.    Wal-Mart has an ineffective harassment policy.

345.    Because of this ineffective harassment policy, the Market Managers reasonably believed that they would not be punished for their unwelcome age-based harassment of Plaintiffs.

346.    Plaintiffs informed Wal-Mart through the Open Door Policy or otherwise  of Market Managers' age-based harassment as alleged herein.

347.    Despite Plaintiffs reports of the age based harassment, Wal-Mart failed to thoroughly investigate Plaintiffs' complaints or otherwise take any action to remedy the Market Managers' conduct.

348.    Plaintiffs have suffered lost wages and benefits in an amount each exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

349.    The actions of Wal-Mart as set forth herein constitute age discrimination and harassment in violation of Plaintiffs' rights under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et. seq. (ADEA).

350.    The actions of Wal-Mart as set forth herein constitute willful violations of the ADEA.

351.    Plaintiffs have suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

352.    Plaintiffs are entitled to recover liquidated damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

## SECOND CLAIM FOR RELIEF

## Wrongful Discharge Based on Age as a Violation of North Carolina's Public Policies as Set Forth in N.C.G.S. § 143-422.1 et. seq.
### (Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles)

353.    Plaintiff realleges and incorporates by reference paragraphs 1 through 335 of this Complaint as set forth herein by reference.

354.    The public policies of the State of North Carolina, as set forth in N.C.G.S. 143-422.1 et. seq., North Carolina's Equal Employment Practices Act, includes the prohibition against age discrimination in employment.

355.    Wal-Mart gave Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles inadequate management support and poor performance evaluations, as described herein, in whole or in part, because of their age.

356.    Wal-Mart's treatment of Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles, as described herein, are acts that violate the public policies set forth in North Carolina's Equal Employment Practices Act.

357.    As a proximate result of Wal-Mart's wrongful conduct, Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles have suffered lost wages and benefits, severe emotional distress, humiliation, and other damages in an amount exceeding $10,000.00, and are entitled to recover compensatory damages in an amount exceeding $10,000.00.

358.    Wal-Mart's actions were done maliciously, willfully, and wantonly or in a manner, which demonstrates a reckless disregard for Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles's rights.  As a result of Wal-Mart's conduct, Plaintiffs Bannister, Flanigan, Griffith, Kondrad, Soles and Towles are entitled to recover punitive damages in an amount exceeding $10,000.00.

# THIRD CLAIM FOR RELIEF
## Race Discrimination
### (Plaintiff Towles)

359.    Plaintiffs Towles realleges and incorporates by reference paragraphs 1 through 85 and paragraphs 315 through 335 of this Complaint as set forth herein by reference.

360.    The actions of Wal-Mart, as set forth above, constitute harassment and discrimination against Plaintiff Towles based on her race, African American.

361.    In the alternative, Wal-Mart created a hostile working environment for Plaintiff Towles based on her race, African American.

362.    Wal-Mart's race-based harassment of Plaintiff Towles was severe and pervasive.

363.    Wal-Mart's race-based harassment had the effect of unreasonably interfering with Plaintiff Towles's work performance.

364.    Wal-Mart was on notice of Market Manager Welborn's race-based harassment because of his management position.

365.    Other management personnel of Wal-Mart either knew or should have known of Market Manager Welborn's propensity to engage in acts of race-based harassment and specifically of his race-based harassment of Plaintiff Towles.

366.    Wal-Mart failed to stop Market Manager Welborn's race based harassment or to discipline Market Manager Welborn for his unlawful behavior.

367.    Wal-Mart has an ineffective harassment policy.

368.    Because of this ineffective policy, Market Manager Welborn reasonably believed that he would not be punished for his unwelcome race-based harassment of Plaintiff Towles.

369.    The actions of Wal-Mart as set forth herein constitute race discrimination and harassment in violation of Plaintiff's civil rights, 42 U.S.C. § 2000e, et. seq., (Title VII).

53

370.    The actions of Wal-Mart constitute unlawful, intentional discrimination within the meaning of the Civil Rights Act of 1991, 42 U.S.C. § 1981a(a)(i).

371.    Wal-Mart engaged in discriminatory practices against Plaintiff Towles with either malice or reckless indifference to the federally protected rights of Plaintiff Towles to be free from race harassment and discrimination in the workplace, as set forth in 42 U.S.C. § 1981(b)(1).

372.    Plaintiff Towles has suffered lost wages and benefits in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

373.    Plaintiff Towles has suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

374.    Plaintiff Towles is entitled to recover punitive damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of the conduct of Defendants as alleged herein.

<u>**FORTH CLAIM FOR RELIEF**</u>
**Wrongful Discharge Based On Race As A Violation Of North Carolina's Public Policies As Set Forth In N.C.G.S. § 143-422.1 <u>et.</u> <u>seq.</u>**
**(Plaintiff Towles)**

375.    Plaintiff Towles realleges and incorporates by reference paragraphs1 through 85 and paragraphs 315 through 335 of this Complaint as set forth herein by reference.

376.    The public policies of the state of North Carolina, as set forth in N.C.G.S. 143-422.1 <u>et.</u> <u>seq.</u>, North Carolina's Equal Employment Practices Act, includes the prohibition against race discrimination in employment.

377.    Wal-Mart gave Plaintiff Towles inadequate management support and poor performance evaluations, as described herein, in whole or in part, because of her race.

378.    Wal-Mart's treatment of Plaintiff Towles as described herein, are acts that violate the public policies set forth in North Carolina's Equal Employment Practices Act.

379.    As a proximate result of Wal-Mart's wrongful conduct, Plaintiff Towles has suffered lost wages and benefits, severe emotional distress, humiliation, and other damages in an amount exceeding $10,000.00, and is entitled to recover compensatory damages in an amount exceeding $10,000.00.

380.    Wal-Mart's actions were done maliciously, willfully, and wantonly or in a manner, which demonstrates a reckless disregard for Plaintiff Towles's rights.  As a result of Wal-Mart's conduct, Plaintiff Towles is entitled to recover punitive damages in an amount exceeding $10,000.00.

## FIFTH CLAIM FOR RELIEF
### Disability Discrimination Based on the Americans with Disability Act
### (Plaintiff Soles)

381.    Plaintiff realleges and incorporates by reference paragraphs 1 through 85 and paragraphs 264 through 289 of this Complaint as set forth herein by reference.

382.    The actions of Wal-Mart, as set forth herein, constitute harassment and discrimination against Plaintiff  Soles because Wal-Mart regarded her as disabled.

383.    Market Manager Pou's disability-based harassment of Plaintiff Soles was severe and pervasive.

384.    Market Manager Pou's disability-based harassment had the effect of unreasonably interfering with Plaintiff Soles's work performance.

385.    Wal-Mart was on notice of Market Manager Pou's disability-based harassment because of Market Manager Pou's management position.

386.    Other management employees of Wal-Mart either knew or should have known of Market Manager Pou's propensity to engage in acts of disability-based harassment and specifically of her disability-based harassment of Plaintiff Soles.

387.     Wal-Mart failed to stop Market Manager Pou's disability-based harassment or to discipline Market Manager Pou for her unlawful behavior.

388.     Wal-Mart had an ineffective harassment policy.

389.     Because of this ineffective policy, Market Manager Pou reasonably believed that she would not be punished for her unwelcome disability-based harassment of Plaintiff Soles.

390.     When Wal-Mart informed Plaintiff Soles of her termination from employment, Plaintiff informed Wal-Mart's Human Resources Department that reasonable accommodations had been made in the past and of Market Manager Pou's disability-based harassment.

391.     Despite Plaintiff Soles's report, Wal-Mart failed to investigate Plaintiff Soles's complaint or otherwise take any action to remedy Market Manager Pou's conduct.

392.     The actions of Wal-Mart as set forth herein constitute disability-based discrimination and harassment in violation of Plaintiff Soles's rights under the Americans with Disabilities Act, 42 U.S.C. § 1201, et. seq. (ADA).

393.     Wal-Mart engaged in discriminatory practices against Plaintiff Soles with either malice or reckless indifference to the federally-protected rights of Plaintiff Soles to be free from disability-based harassment and discrimination in the workplace, as set forth in 42 U.S.C. § 1201 et. seq.

394.     Plaintiff Soles has suffered lost wages and benefits in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

395.     Plaintiff Soles has suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

396.     Plaintiff Soles is entitled to recover punitive damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of Wal-Mart's conduct alleged herein.

## SIXTH CLAIM FOR RELIEF
### Wrongful Discharge Based On Disability As A Violation Of North Carolina's Public Policies As Set Forth In N.C.G.S. 143-422.1 et. seq.
### (Plaintiff Soles)

397.    Plaintiff Soles realleges and incorporates by reference paragraphs 1 through 85 and paragraphs 264 through 289 of this Complaint as set forth herein by reference.

398.    The public policies of the state of North Carolina, as set forth in N.C.G.S. 143-422.1 et. seq., North Carolina's Equal Employment Practices Act, includes the prohibition against disability discrimination in employment.

399.    Wal-Mart gave Plaintiff Soles inadequate management support and poor performance evaluations, as described herein, in whole or in part, because of her disability.

400.    Wal-Mart's treatment of Plaintiff Soles as described herein, are acts that violate the public policies set forth in North Carolina's Equal Employment Practices Act.

401.    As a proximate result of Wal-Mart's wrongful conduct, Plaintiff Soles has suffered lost wages and benefits, severe emotional distress, humiliation, and other damages in an amount exceeding $10,000.00, and is entitled to recover compensatory damages in an amount exceeding $10,000.00.

402.    Wal-Mart's actions were done maliciously, willfully, and wantonly or in a manner, which demonstrates a reckless disregard for Plaintiff Soles.  As a result of Wal-Mart's conduct, Plaintiff Soles is entitled to recover punitive damages in an amount exceeding $10,000.00.

## SEVETH CLAIM FOR RELIEF
### Negligent Retention and Supervision
### (All Plaintiffs)

403.     Plaintiff realleges and incorporates by reference paragraphs 1 through 402 of this Complaint.

404.     Wal-Mart was on notice of the Market Managers' tortious conduct, as set forth herein

405.     Wal-Mart either knew or should have known of the Market Managers' propensity to engage in the tortious conduct described herein.

406.     Despite its knowledge of the Market Managers' tortious conduct, Wal-Mart took no action to prevent the Market Managers' conduct.

407.     Wal-Mart had knowledge or reason to know that the Market Managers were likely to commit the tortious acts as described herein.

408.     Wal-Mart was negligent in retaining and in supervising the Market Managers and failed to use ordinary care to protect the Plaintiffs from injury.

409.     Wal-Mart's negligence was the proximate cause of the resulting injuries and damages suffered by Plaintiffs.

410.     Plaintiff has suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of Wal-Mart's negligent conduct as alleged herein.

411.     Plaintiffs are entitled to recover punitive damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of Wal-Mart's negligent conduct as alleged herein.

## EIGHTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (All Plaintiffs)

412.     Plaintiff realleges and incorporates by reference paragraphs 1 through 411 of this Complaint.

413.     The conduct of Wal-Mart, as set forth herein, was extreme and outrageous and exceeded all bounds usually tolerated by a decent society.

414.     The conduct of Wal-Mart, as set forth herein, was intended to cause severe emotional distress to Plaintiffs.

415.     Alternatively, Wal-Mart was recklessly indifferent to the likelihood that its conduct, as set forth herein, would cause severe emotional distress to Plaintiffs.

416.     The conduct of Wal-Mart, whether intentional or reckless, did in fact cause Plaintiffs to suffer severe emotional distress.

417.     Plaintiffs have suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

418.     Plaintiffs are entitled to recover punitive damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of the conduct of Wal-Mart as alleged herein.

## NINTH CLAIM FOR RELIEF
### Negligent Infliction Of Emotional Distress
### (All Plaintiffs)

419.     Plaintiff realleges and incorporates by reference paragraphs 1 through 418 of this Complaint.

420.     Wal-Mart negligently engaged in conduct, as set forth herein, that was reasonably foreseeable to cause Plaintiffs severe emotional distress.

59

421.  The conduct of Wal-Mart, as set forth herein, did in fact cause Plaintiffs to suffer severe emotional distress.

422.  Plaintiffs have suffered compensatory damages in an amount exceeding $10,000.00 as a proximate result of Wal-Mart's negligent conduct as alleged herein.

423.  Plaintiffs are entitled to recover punitive damages from Wal-Mart in an amount exceeding $10,000.00 as a proximate result of Wal-Mart's negligent conduct as alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Bannister, Burriss, Dutton, Flanigan, Griffith, Kondrad, Orndorff, Soles, Toms and Towles respectfully request this Court:

1.  That all issues of fact raised by this pleading be tried by a jury;

2.  That the Court declare that the acts and practices complained herein are in violation of Title VII of the Civil Rights Act of 1964 and 1991, the Americans with Disabilities Act, the Age Discrimination in Employment Act, and North Carolina law;

3.  That Plaintiffs recover from Wal-Mart for age discrimination in violation of the ADEA compensatory damages in an amount exceeding $10,000.00 and liquidated damages in an amount exceeding $10,000.00;

4.  That Plaintiffs Bannister, Burriss, Flanigan, Griffith, Kondrad, Soles, and Towles recover from Wal-Mart for age discrimination in violation of North Carolina's Equal Employment Practices Act, N.C.G.S. § 143-422.1 et. seq. compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

60

5. That Plaintiff Towles recover from Wal-Mart for race discrimination in violation of Title VII compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

6. That Plaintiff Towles recover from Wal-Mart for race discrimination in violation of North Carolina's Equal Employment Practices Act, N.C.G.S.§ 143-422.1 et. seq. compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

7. That Plaintiff Soles recover from Wal-Mart for disability discrimination in violation of the ADA compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

8. That Plaintiff Soles recover from Wal-Mart for disability discrimination in violation of North Carolina's Equal Employment Practices Act, N.C.G.S.§ 143-422.1 et. seq. compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

9. That Plaintiffs recover from Wal-Mart for negligent retention and supervision compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00

10. That Plaintiffs recover from Wal-Mart for intentional and negligent infliction of emotional distress compensatory damages in an amount exceeding $10,000.00 and punitive damages in an amount exceeding $10,000.00;

11. That the Court award Plaintiffs reasonable attorneys' fees as provided by § 706(k) of Title VII, 42 U.S.C. § 2000e-5(k).

12. That the Court direct Wal-Mart to pay Plaintiffs such interest as may be allowed by law.

13. That the costs of this suit be taxed to Wal-Mart.

14. That the Court orders such other and further relief as may be just, proper and necessary to afford complete relief to Plaintiffs.

This 13th day of June, 2011.

/s/ Culley C. Carson IV
Culley C. Carson IV
N.C. State Bar No. 36412
Email: culley@carsonlaw-nc.com
Sarah E. Carson
N.C. State Bar No. 38618
Email: sarah@carsonlaw-nc.com
The Carson Law Firm, PLLC
311 New Bern Ave.
P.O. Box 28748
Raleigh, NC 27611
Telephone: (919) 926-9670
Facsimile: (919) 928-5095


/s/ Robert A. Meynardie
Robert A. Meynardie
N.C. State Bar No. 20566
Email: bob@mnlaw-nc.com
Joseph Nanney
N.C. State Bar No. 18355
Email: joe@mnlaw-nc.com
Capital Plaza Bank
333 Fayetteville St., Suite 500
Raleigh, NC 27601
Telephone: (919) 786-2504
Facsimile: (919) 324-3693

Attorneys for Plaintiffs Bruce Bannister et. al.