# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
### EASTERN DIVISION

Civil Action No. 4:11-CV-00094-BO

BRUCE BANNISTER; MAX DUTTON;
and MARION TOWLES;

        Towles,

   vs.

WAL-MART STORES EAST, L.P.,

        Defendant.

**APPENDIX TO DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT REGARDING MAX
DUTTON'S CLAIMS**

A
**Max Dutton Deposition Transcript Excerpts**

1            IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF NORTH CAROLINA
2                    EASTERN DIVISION

3
   BRUCE BANNISTER, et al.,      :    Civil Action No.
4
                  Plaintiff,     :    4:11-CV-00094-BO
5
        vs.                      :
6
   WAL-MART STORES, INC., et al., :
7
                  Defendant.     :
8

9

10

11

12          VIDEOTAPE DEPOSITION OF MAX DUTTON
13             (Taken by Defendant)
14             Raleigh, North Carolina
15             Thursday, May 16, 2013
16

17

18

19

20

21

22

23              Reported in Stenotype by
24              Marian E. Cummings, LSR
     Transcript produced by computer aided transcription
25

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 2 of 160

**BRUCE BANNISTER, et al. vs. WAL-MART STORES, INC., et al.**
**Max Dutton on 05/16/2013**

Page 8

1      Q.     Are you experiencing any problems that
2  might affect your ability to think or recall
3  information?

4      A.     No.

5      Q.     Are you on any medication?

6      A.     Yes, I am.

7      Q.     What medication are you on?

8      A.     Gosh, I'm on two types of blood pressure
9  medicine, Lipitor, Cyzal.

10     Q.     How do you spell Cyzal?

11     A.     C-Y-Z-A-L.  Proair, Advair, Cozart, and
12  I'm supposed to be on some other medications that I'm
13  not taking at this time.

14     Q.     What medications are those?

15     A.     My doctor wanted me to see a
16  psychologist and my funds did not permit that.

17     Q.     Is that -- you stated that you're
18  supposed to be on other medication but you're not
19  taking it, what other medication have you been
20  prescribed that you're not taking?

21     A.     I did not get prescribed but he wanted
22  me to go that direction.

23     Q.     And you stated that your doctor wanted
24  you to see a psychiatrist but you don't have the
25  funds to do that; is that correct?

**Huseby, Inc.**
**1230 West Morehead Street, #408, Charlotte, NC 28208**                **www.huseby.com**
**(704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 3 of 160

1  it's like a powder that comes out of a cylinder.

2      Q.     And was that prescribed by Dr. Powell?

3      A.     There again a combination of the three

4  doctors.

5      Q.     And you don't recall when you began

6  taking Advair?

7      A.     I want to say that could be in -- when I

8  first started having those symptoms '08, '09 maybe.

9  I can provide that record.

10     Q.     To your knowledge does Advair affect

11 your memory?

12     A.     No, it does not.

13     Q.     To your knowledge does Advair affect

14 your ability to listen to questions and provide

15 truthful and complete answers?

16     A.     No.

17     Q.     Circling back to the issue of alleged

18 mold found at Wal-Mart, after Mr. Litchfield

19 allegedly told you to be quiet and toughen up did you

20 contact anybody else in Wal-Mart about the potential

21 mold problem?

22     A.     I did not.  I contacted a gentleman that

23 did -- that was a vendor for Wal-Mart to just look

24 into the duct work because a lot of associates in the

25 pharmacy area were complaining also.

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 4 of 160

1    Q.    But that vendor is not a Wal-Mart

2    associate?

3    A.    Not an associate, it.  Was Providence

4    Electric but they didn't do just electric, they did

5    heat and air, electric, everything, and we did have

6    him come in and just check the vents in the pharmacy,

7    things like that.  I told him make sure they're clean

8    but apparently that wasn't where the real problem

9    was.  He did what I asked him to do.

10    Q.    And what's that gentleman's name?

11    A.    Pardon me?

12    Q.    What was the vendor's name?

13    A.    Providence Electric.  The man's name is

14    Martin May, M-A-Y.

15    Q.    And Martin May, when he came out and

16    looked at the store he didn't see any evidence of

17    mold?

18    A.    Not really.  He did some cleaning.  He

19    did some cleaning and up in the vents of the pharmacy

20    because they were they were cleaning up there but no,

21    he did not do the whole store.

22    Q.    Is Providence Electric an authorized

23    Wal-Mart vendor?

24    A.    Yes, they are.

25    Q.    Did you call the compliance hotline

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 5 of 160

1  about Mr. Litchfield's alleged action?

2      A.    No, I did not.

3      Q.    Did you contact the ethics hotline

4  regarding Mr. Litchfield's alleged actions in telling

5  you to be quiet about mold and toughen up?

6      A.    No, I did not.

7      Q.    Did you contact the regional compliance

8  manager regarding Mr. Litchfield's alleged actions in

9  telling you to be quiet about the mold and toughen

10 up?

11     A.    No, I did not.

12     Q.    Did you notify Wal-Mart's health and

13 wellness manager regarding what you believed to be a

14 mold problem?

15     A.    No, I did not.

16     Q.    Why did you not call any of those

17 individuals?

18     A.    I'm trying to think who I did call but

19 it was mainly just to see if we could have the

20 building checked and I'm trying to think who I called

21 and that's when they told me to have Martin May who

22 is an approved vendor locally, he was Wal-Mart

23 approved, to come out and see what he could find

24 because right at that time the worst complaint that

25 was happening was up in the pharmacy area.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 6 of 160

```
 1        A.      It could have been the 13th, it could
 2   have been the 14th, but I do have that document.
 3        Q.      Did you contact the ethics hotline
 4   regarding Mr. Litchfield's allegedly kidnapping you
 5   on June 12th, 2009?
 6        A.      No, I did not.
 7        Q.      Did you contact your regional compliance
 8   manager or anybody else in the regional management
 9   team regarding Mr. Litchfield's alleged kidnapping on
10   June 12th, 2009?
11        A.      No, because in my mind I was trying to
12   figure out what in the world was going on.
13        Q.      On June 12, 2009 Mr. Litchfield told you
14   that you were under investigation and asked you to
15   ride with him while the store -- while an
16   investigation was conducted in your store, isn't that
17   right?
18        A.      That was on the 12th, you said?
19        Q.      Yes.
20        A.      Yes, that's correct.
21        Q.      And you and Mr. Litchfield went to lunch
22   in Elizabeth City; is that right?
23        A.      Very awkward and yes, I did go to lunch
24   because I figured if I didn't do exactly what I was
25   told I'd be terminated and really was not sure why
```

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 7 of 160

1  and I probably asked a hundred times what is going

2  on, what -- because I walked into the store that

3  morning and very arrogantly Eric Litchfield, Tracey

4  Battle and Dawana were at the front of the store with

5  their arms crossed.

6      That day we were having a special fundraiser for

7  Children's Hospital that had been planned because

8  we're in the -- we were always in the top 10 percent

9  per capita to raise money for Children's Hospital.

10 We were having what was called a beach day and I was

11 cooking for all the associates and that.

12     Instead, the associates see me being taken out

13 of the store and they said we're going do to an

14 investigation.  I said fine, what can I help with.  I

15 run a very good store.  I said what may I help with.

16 They said nothing.  Eric said no, you're going with

17 me, get in my car.  And the next thing I know 200

18 miles plus later I'm back on the Outer Banks.

19     Q.     Mr. Litchfield actually asked you to get

20 in the car with him, isn't that right?

21     A.     I was told to get in the car.

22     Q.     Did you tell Mr. Litchfield you didn't

23 want to get in the car?

24     A.     No, because the strangest behavior I've

25 ever experienced in my adult life I thought well, I

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 8 of 160

1  guess if I don't I'll be terminated because something

2  is wrong anyways and I could feel it from the -- I

3  felt it from the beginning of June.

4      Q.     Did Mr. Litchfield ever tell you that

5  you would be terminated if you didn't get in the car?

6      A.     No, he didn't.

7      Q.     Did anybody ever tell you you'd be

8  terminated if you didn't get in the car?

9      A.     Not at that point, no.

10     Q.     And not ever nobody told you if you

11 didn't get in the car you would be terminated?

12     A.     Not associated with the car.

13     Q.     So you go to lunch with Mr. Litchfield

14 in Elizabeth City.  Did you complain or inform

15 anybody at the restaurant that Mr. Litchfield had

16 allegedly kidnapped you?

17     A.     No, I did not.

18     Q.     After lunch you went to visit a store in

19 Elizabeth City because Mr. Litchfield wanted to get

20 your thoughts as a long time Wal-Mart manager and

21 county commissioner, isn't that right?

22     A.     That is not correct.

23     Q.     You toured a store in Elizabeth City

24 with Mr. Litchfield?

25     A.     I don't know that we even talked and he

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 9 of 160

1  went off in the store and I'm in that store knowing a

2  lot of associates and we were having a beach day

3  fundraiser.  I'm in shorts and a Hawaiian shirt and

4  felt like a total idiot because I'm supposed to be

5  back at my store raising money for Children's

6  Hospital.

7      Q.    But you didn't tour the store with

8  Mr. Litchfield, that's your testimony?

9      A.    I want to say I walked through the back

10 room with him just because I wasn't sure what else I

11 was really supposed to be doing and had no reason

12 whatsoever why I would be in Elizabeth City.

13     Q.    Did you tell anyone at the Wal-Mart in

14 Elizabeth City that Mr. Litchfield had kidnapped you

15 or was otherwise holding you against your will?

16     A.    No, I did not, I was too embarrassed.

17     Q.    So isn't it safe to say that the word

18 kidnapping doesn't accurately reflect what happened

19 with Mr. Litchfield on June 12th, you weren't held

20 against your will?

21     A.    It was very awkward, very awkward and

22 when your supervisor tells you to do something you

23 usually follow that but once again, my adult life

24 I've never, ever experienced anything like that,

25 intimidating, bullied feeling.  It was beyond

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 10 of 160

1  anything that's ever happened to me in my adult life.

2      Q.      Mr. Litchfield didn't physically

3  threaten you in any way, correct?

4      A.      No, no.

5      Q.      Mr. Litchfield didn't say get in the car

6  or else?

7      A.      He said get in the car.

8      Q.      But he didn't say what would happen if

9  you didn't get in the car?

10     A.      He did not.

11     Q.      So again to say that you were kidnapped

12 and held against your will is not an accurate

13 reflection of what happened on June 12th, 2009?

14     A.      When he drove to the first place which

15 was a Ben Franklin store in Nag's Head I was

16 contemplating because I only lived about a mile from

17 there just walking away and then in my thoughts and

18 you think about your family, you think about your

19 wife and kids, would I have been terminated, I'm sure

20 I would have been.

21     Q.      But you could have walked away at that

22 time?

23     A.      I could have, yes.

24     Q.      And so again the use of the word -- what

25 do you believe kidnapping to mean?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 11 of 160

1      A.      I would say no.

2      Q.      You said your schedule was hectic, why

3  is your schedule so hectic right now?

4      A.      Because I'm responsible for training 60

5  international students in Corolla, North Carolina and

6  it takes a lot of time every day to ensure we get

7  them on board and trained properly.

8      Q.      Is that -- is the training of

9  international students, is that through your current

10 job?

11     A.      Yes, it is, Harris Teeter.

12     Q.      What is your position with Harris

13 Teeter?

14     A.      I'm an assistant manager.

15     Q.      When did you begin that position?

16     A.      May 7th of 2011.

17     Q.      Is that a full-time schedule?

18     A.      Yes, it is.

19     Q.      What's the location Harris Teeter is

20 that?

21     A.      Right now it's Corolla, Store 266,

22 Corolla, North Carolina.

23     Q.      And how much do you earn at your

24 employment with Harris Teeter?

25     A.      It's approximately 63,000.

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 12 of 160

1      Q.      Do you receive any bonuses?

2      A.      Yes.

3      Q.      Did you receive a bonus last year?

4      A.      Yes.

5      Q.      How much was that bonus?

6      A.      In my tax return I could give you the

7  exact amount.  I want to say around $9,000.

8      Q.      Any other bonuses that you receive at

9  Harris Teeter?

10     A.      No.

11     Q.      How many hours per week do you work?

12     A.      Right now probably 65.

13     Q.      Sounds pretty demanding.

14     A.      It's very demanding.

15     Q.      Do you believe you're a good performer

16 at Harris Teeter?

17     A.      Yes, I do.

18     Q.      Have good attendance?

19     A.      Perfect.

20     Q.      Do you feel like Harris Teeter treats

21 you well?

22     A.      Yes.

23     Q.      Have you been an assistant manager since

24 you were hired?

25     A.      Yes.

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 13 of 160

1      Q.      Great.  You say that your schedule is

2  hectic due to the training through Harris Teeter, any

3  other scheduling obstacles or anything else that

4  makes your schedule hectic right now?

5      A.      Well, right now I started a new bicycle

6  and pedestrian safety coalition and I've been

7  developing training tapes for Dare County and for the

8  State of North Carolina.

9      Q.      How many hours a week does that

10 coalition take up of your time?

11     A.      At least 30 minutes a day just with

12 phone calls, and then we just had an event which was

13 a about 5 p.m. to 8 p.m. event.

14     Q.      And you'd say you're really involved in

15 that coalition?

16     A.      Yes.

17     Q.      What about the training tapes, how much

18 time a week do you spend on that?

19     A.      When I made the training tapes my

20 segment was only, probably didn't last five minutes.

21     Q.      We can switch.

22             THE VIDEOGRAPHER:  The time is 10:11 and

23             we're going off the record.

24             (A brief recess was taken.)

25             THE VIDEOGRAPHER:  We're back on the record

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 14 of 160

1  University or something like that?

2      A.      Uh-huh.

3      Q.      Other than that addition, the classes at

4  Harris Teeter, do you have anything else to add or

5  change to this resume?

6      A.      As far as just work experience or

7  anything that's happened in my life?

8      Q.      Anything.

9      A.      I was elected as the Dare County

10  commissioner.

11      Q.      When was that?

12      A.      That was six years ago.

13      Q.      Do you remember, would that have been

14  November 2006?

15      A.      Yes.

16      Q.      And you were publicly elected?

17      A.      Yes.

18      Q.      How long is that term?

19      A.      Four years.

20      Q.      So you -- were you re-elected then in

21  2010?

22      A.      Yes.

23      Q.      What kind of a time commitment is the

24  county commissioner position?

25      A.      The first and third Monday of every

1 month are board meetings.

2     Q.     How long do those last?

3     A.     They can last anywhere from 2 hours to

4 12 hours.

5     Q.     Aside from the first and third Monday of

6 every month, any other time commitments that the

7 county commissioner position requires?

8     A.     Yes, I attend a board of education

9 meeting the second Tuesday of every month and it's

10 evening meetings.

11     Q.     How long are those meetings?

12     A.     Hour or two hours maximum.

13     Q.     Do you do any other work for your county

14 commissioner position?

15     A.     Yes, I'm on the East Carolina Behavioral

16 Health board. That meets the fourth Tuesday of every

17 other month and this last month was a meeting.

18     Q.     How long are those meetings?

19     A.     Three to four hours and they're an

20 evening meeting also.

21     Q.     Any other commitments that the county

22 commissioner position accepts?

23     A.     Yes, every other -- I'm sorry, the

24 fourth Thursday of every other month there's a

25 community development corporation board that I'm on.

**Huseby, Inc.**      www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208**      **(704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 16 of 160

1  And it meets from approximately 8:30 to 10:30 in the

2  morning.

3       Q.     Any other commitments that you have for

4  the county commissioner position?

5       A.     Just the new coalition that I started,

6  the bicycle pedestrian safety, because we had five

7  people killed last year and 50 injured.

8       Q.     What's your -- do you have a position

9  with that coalition, like director or --

10      A.     I'm the chairman.

11      Q.     How many -- could you refresh my memory,

12  how many hours a week do you spend on that coalition?

13      A.     We've had six meetings which last -- my

14  meetings last 59 minutes and that's only because the

15  schedule and I'm mindful of everyone's schedule

16  because I have a lot of very involved people and

17  they're police officers and firemen.

18      And then we had one event that was a 3-hour

19  event so nine hours just physically in meetings and

20  then I take phone calls of any kind of opportunities

21  there are and working with D.O.T. and perfecting

22  crosswalks and things.

23      Q.     How many hours a month do you estimate

24  you spend on phone calls or in otherwise working on

25  county commissioner work that's not part of these

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208**    **(704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 17 of 160

1  meetings?

2      A.    The only time I return calls and things

3  is of course when I'm not engaged with my work

4  schedule.  Everybody knows that either early, early

5  in the morning they can catch me or late, late at

6  night and it varies.  I mean, it could be -- phone

7  calls could be one hour a week or five hours a week

8  but that's not during business hours.  They're either

9  before or after business hours.

10     Q.    Are you compensated for the county

11 commissioner position?

12     A.    Yes, we get what's called -- it's more I

13 guess like a travel allowance just so your gas and

14 expenses are taken care of and it's approximately I

15 want to say like $600 a month.

16     Q.    Do you have records reflecting that

17 income?

18     A.    Yes.

19     Q.    Could you provide those to your attorney

20 to produce to us?

21     A.    Certainly.

22     Q.    When did you start your bicycle and

23 pedestrian safety coalition?

24     A.    June 9th of this year.

25     Q.    Of 2012?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
www.huseby.com
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 18 of 160

 1      A.      '13.

 2      Q.      When did you start the coalition?

 3      A.      January 9th.

 4      Q.      January, okay, I thought you said -- I

 5  heard June.  I apologize.

 6              MR. NANNEY:  He said June, he made a

 7          mistake.

 8              MS. SHAH:  Thank you.

 9  BY MS. SHAH:

10      Q.      So the county commissioner position

11  keeps you pretty busy?

12      A.      (Nodding.)

13      Q.      Do you enjoy your work on that?

14      A.      Yes, for the good things we can get done

15  on that, yes.

16      Q.      Have you had more time to devote to the

17  county commissioner position since you -- since your

18  employment with Wal-Mart ended?

19      A.      Do I have more time to spend, I'm

20  sorry?

21      Q.      Correct.  Have you had more time to

22  devote to being county commissioner since your

23  employment with Wal-Mart ended?

24      A.      No.

25      Q.      Any other political or government

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 19 of 160

1  20th at 5:30 getting an email from Eric Litchfield

2  about your grocery experience; is that right?

3      A.    It was 5:39, yes, ma'am.

4      Q.    And that email occurred after you had

5  already submitted your notice of resignation, isn't

6  that right?

7      A.    I would have to check those dates.  I

8  want to say that was before.

9      Q.    You had submitted your notice of

10 voluntary resignation on November 23rd, isn't that

11 right?

12     A.    I have to check those dates.

13     Q.    And according to your testimony you

14 submitted your notice of retirement so that you would

15 not be terminated; is that right?

16     A.    I was going to be terminated, that's

17 correct.

18     Q.    But so you chose to retire simply to

19 avoid being terminated; is that right?

20     A.    Being forced out and I knew and even

21 being told the writing was on the wall, I knew it was

22 going to happen.  I was pretty much told what was

23 going to happen.  So yes, I could not stand that

24 embarrassment to let such a thing happen.

25     Q.    Mark as Exhibit 3.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 20 of 160

1   the awful year that I put up with I would actually be

2   able to receive my bonus if I made it to February 1st

3   and I wasn't about to not get that after the year

4   that I had put up with.

5        Q.     You state in the letter that you are

6   quote, happy and content to end your career at the

7   store that supported you; is that correct?

8        A.     I was very happy and loved every

9   associate in there, that's correct.

10       Q.     You also stated that you'd be happy to

11  assist in any capacity following your retirement,

12  isn't that correct?

13       A.     I made sure I made this very positive so

14  I wouldn't be fired before February 1st, that's

15  correct, and that was going to happen.

16       Q.     But you have no proof that that was

17  going to happen, correct?

18       A.     It was going to happen.

19       Q.     But you have no proof that that was

20  going to happen, correct?

21       A.     It all depends if harassment and

22  bullying and all is considered fact to what you're

23  asking me.

24       Q.     You've -- when you use the term

25  harassment you are simply referring to what you

Husby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
                                                            (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 21 of 160

1           Video 2 in the deposition of Mr. Dutton.  We're

2           on the record at 11:29.

3  BY MS. SHAH:

4      Q.    Mr. Dutton, when did you have your lawn

5  care business?

6      A.    That was the summer of 2010.

7      Q.    Did you have it after the summer of

8  2010?

9      A.    No, I mean I still have the equipment

10 and everything but not in use.

11     Q.    You testified that you were depressed

12 after you left Wal-Mart.  You've never received a

13 medical diagnosis of depression; is that right?

14     A.    I don't think Dr. Mann ever put that in

15 my records.  I know he wanted me to see someone but I

16 don't -- it could be in my records but --

17     Q.    When you say your records, which

18 records --

19     A.    My medical records.

20     Q.    Your medical records from Dr. Mann?

21     A.    That's correct, because he noticed I was

22 very depressed and I mean just, I don't know, wasn't

23 looking good.

24     Q.    When did you see Dr. Mann regarding the

25 alleged depression?

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 22 of 160

1        Q.      And you actually weren't terminated

2   after that below expectation PIP, isn't that right?

3        A.      Because of my letter of retirement

4   before that occurred.

5        Q.      How do you know that?

6        A.      Just because of everything that

7   transpired.  I knew they were trying to get me out of

8   the store in any way they could.  They had a hard

9   time figuring out as you can see because it took 7

10  months of torture, bullying, threatening and I'm

11  going to be honest, my medical condition, I could not

12  take it anymore so I guess they won.

13       Q.      But again nobody told you that they were

14  going to terminate you?

15       A.      Different phrases.

16       Q.      What different phrases were used?

17       A.      The writing is on the wall.

18       Q.      That phrase was used by --

19       A.      I've got a bead on your head which is

20  very threatening.

21       Q.      The writing is on the wall, that was

22  made by Noah Johnson, isn't that right?

23       A.      That is correct.

24       Q.      And that was after the -- an

25  investigation had uncovered that you had engaged in

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 23 of 160

1  policy violations, isn't that correct?

2      A.      Repeat that, please.

3      Q.      Mr. Johnson uttered that statement after

4  you had admitted to violating multiple company

5  policies, isn't that correct?

6      A.      No, a policy.

7      Q.      Which policy is that?

8      A.      That is utilizing my key person which he

9  had used keys for 17 years, two managers prior to me

10  and was approved by Chris Mailer to have keys and

11  then when Eric, Mr. Litchfield, came to the market I

12  don't know that we ever got that approved but she had

13  always carried keys because of receiving.  But yes,

14  did I say yes to her having keys and my sign-on for

15  me to operate a building that was not staffed, that

16  is totally correct.

17      Q.      And those are actually two policies,

18  isn't that correct, the key and door -- the key and

19  door controls policy and the access control policy,

20  isn't that right?

21      A.      That would be correct.

22      Q.      And both of those policies allow for

23  discipline up to and including termination for

24  violations of those policies, isn't that correct?

25      A.      That's a good question.  I'm not sure.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 24 of 160

1  I know any time that we've ever covered anything it's

2  been the coaching, Wal-Mart's corporate policy to

3  follow the coaching structure.

4      Q.    And you -- when Mr. Johnson made that

5  comment to you in September of 2009; is that right?

6      A.    That's correct.

7      Q.    And you weren't actually terminated at

8  that time, isn't that right?

9      A.    I was at a meeting in New Bern.

10     Q.    You weren't terminated even a month

11 later, isn't that right?

12     A.    That's correct.

13     Q.    And in fact, instead of termination they

14 issued you a decision making day and a performance

15 improvement plan, isn't that correct?

16     A.    That's correct.

17     Q.    I'd like to mark as Exhibit 4. --

18     (Exhibit 4 was marked for identification.)

19 BY MS. SHAH:

20     Q.    Mr. Dutton, have you seen this document?

21     A.    Yes.

22     Q.    Is this a copy of Wal-Mart's access

23 control policy?

24     A.    Yes, it is.

25     Q.    Is this -- to the best of your knowledge

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 25 of 160

1  is this a true and accurate copy of Wal-Mart's access

2  control policy?

3       A.     As far as I know, yes.

4       Q.     And this was in effect at least as of

5  April of 2009, isn't that correct?

6       A.     Correct.

7       Q.     And this policy on the second page under

8  user IDs and passwords states that each user is

9  responsible for safeguarding all of his or her user

10  IDs pursuant to the policy; is that right?

11      A.     Yes.

12      Q.     And that shared ID would be permitted

13  only if specifically approved in writing by

14  Wal-Mart's information systems division security

15  team, isn't that true?

16      A.     I believe that's what it says.

17      Q.     It also states that passwords for

18  individual user IDs must not be shared, displayed or

19  written down or stored in any location that will

20  allow -- it also states that passwords for individual

21  user IDs must not be shared, displayed or written

22  down and stored at any location that will allow

23  uncontrolled access to that password, isn't that

24  correct?

25      A.     Yes, ma'am.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 26 of 160

1        Q.       It also states that passwords have to be

2   kept confidential, isn't that correct?

3        A.       Yes, ma'am.

4        Q.       It also states that usage of user IDs is

5   limited to activities specifically required to

6   perform your specific and authorized job function and

7   only to the extent your personal user ID does not

8   permit this level of access, isn't that correct?

9        A.       Yes.

10       Q.       Did you ever seek a waiver or permission

11  from the information systems division security team

12  for your invoice clerk to use your user name and

13  password?

14       A.       No, I did not.

15       Q.       It also states that any violation of the

16  policy may result in disciplinary action up to and

17  including termination, isn't that accurate?

18       A.       Correct.

19       Q.       And as a store manager you were charged

20  with familiarizing and knowing all of the company's

21  policies, isn't that right?

22       A.       Uh-huh, yes.

23       Q.       And serving as a leader for your

24  associates for best practices on policies, isn't that

25  correct?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 27 of 160

1       A.      Yes.

2       Q.      Mark as Exhibit 5.

3       (Exhibit 5 was marked for identification.)

4  BY MS. SHAH:

5       Q.      And actually looking back to Exhibit 4,

6  Mr. Dutton, I apologize, this is one of the policies

7  that you stated earlier that you had admittedly

8  violated in allowing Miss Shanefelter to use your

9  user name and password; is that correct?

10      A.      Yes, using a person to help me run my

11 building, yes.

12      Q.      Looking at Exhibit -- what's been marked

13 as Exhibit 5, do you recognize this document?

14      A.      Yes.

15      Q.      To the best of your knowledge is this a

16 copy of Wal-Mart's keys and door controls policy?

17      A.      Yes.

18      Q.      And is this one of the policies that you

19 admitted that you admitted you violated when you

20 allowed Miss Shanefelter to use keys to the store?

21      A.      Miss Shanefelter had keys I want to say

22 for the entire time two managers before me and there

23 was an approval process only because she was the

24 invoice clerk which dealt very closely with receiving

25 so yes, she had keys to the back door.

Huseby, Inc.                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 28 of 160

1      Q.      Did -- and Miss Shanefelter didn't ever
2  return the keys that she had in her possession, isn't
3  that true?

4      A.      I don't believe she did for the entire
5  17 years, no.

6      Q.      She never filled out any kind of log
7  about the keys that she had?

8      A.      She had the keys, like I said, for the
9  entire time that store was there prior to me even
10 being store manager and helped run the building, not
11 necessarily the front or had alarm codes but
12 definitely the back door and yes, she did have keys.

13     Q.      If you look on page 2 through 4 of the
14 policy do you see anywhere where the invoice clerk is
15 one of the authorized people listed to have keys?

16     A.      No, I do not and of course, she acted as
17 a member of my management with not having being
18 staffed.

19     Q.      But she was not member of your
20 management; is that correct?

21     A.      For me she was, she did not have the
22 title.

23     Q.      So it's your testimony that she
24 performed the duties of a salaried member of
25 management but was not compensated accordingly?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
www.huseby.com
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 29 of 160

1      Q.      But you testified earlier that she

2  really acted more as a manager for you, isn't that

3  right?

4      A.      A manager or just a key person in the

5  building that assisted me knowing that I needed

6  assistance not having the six members of management

7  as they did after I was no longer at that store in

8  the same month.

9      Q.      On page five of the key and door policy

10  it states that violating the policy may result in

11  disciplinary action up to and including termination,

12  isn't that correct?

13      A.      That's correct.

14      Q.      And you testified that you don't know

15  whether she had any written authorization to have

16  keys for the store; is that correct?

17      A.      I don't know that it was written, just

18  an approval.

19      Q.      But you don't know that she even had

20  approval, isn't that right?

21      A.      No, she did have approval from Chris

22  Mailer who is a district manager.

23      Q.      How do you know that she had approval

24  from Chris Mailer?

25      A.      Because there would be times where being

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 30 of 160

1      Q.     And you understand that you have an

2 obligation -- you had an obligation to find

3 comparable employment after you left Wal-Mart, isn't

4 that right?

5      A.     I wanted to, but was not able to.

6      Q.     Why weren't you able to?

7      A.     Because probably the state I was in.

8      Q.     When you talk about the state you were

9 in you're talking about your belief that you were

10 depressed?

11     A.     Not my belief, I was very severely

12 depressed and I just wasn't -- I wasn't coping well

13 with anything.  I was just angry inside and this

14 whole segment of my life has been a total nightmare.

15     Q.     How long did this alleged depression

16 last?

17              MR. NANNEY:  Object to the form, go ahead.

18     A.     The depression is still today.

19     Q.     And again you've never been medically

20 diagnosed with depression?

21     A.     Just Dr. Robert Mann and the states he

22 has examined me really wanted me to get some

23 additional help but as I stated earlier, finances --

24 what all occurred did not permit that.

25     Q.     So you've not been medically diagnosed

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 31 of 160

1 with depression?

2      A.     No, other than he -- I mean medically I

3 would -- he knows that or I guess he wouldn't have

4 written me and contacted a person for me to see.

5      Q.     Do you have a copy of that

6 correspondence from Dr. Mann?

7                    MR. NANNEY:  Object to the form, go ahead.

8      A.     I'm sure I do.

9      Q.     Could you provide that to your attorney

10 so they could produce it to us, please?

11      A.     Most definitely or I'll get it from

12 Dr. Mann himself.

13      Q.     Have you done everything you can do to

14 limit or minimize your damages in this case?

15      A.     I'm not sure I understand the question.

16      Q.     What have you done to limit any monetary

17 damages that you claim you're owed, for example,

18 finding subsequent employment?

19      A.     What have I done?

20      Q.     Have you -- did you look for a job,

21 apply for positions other than Harris Teeter?

22      A.     Oh, yes.

23      Q.     Who did you apply with?

24      A.     Target, K-Mart, of course Harris

25 Teeter.  Gosh, who else.  There was quite a few.

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 32 of 160

1  working and he would probably call me because he knew

2  I wasn't in a very good state of mind.

3      Q.    How did he know you weren't in a good

4  state of mind?

5      A.    Because he kind of -- he knew throughout

6  that 7 months what I was putting up with.

7      Q.    He only knew from what you had told him,

8  isn't that correct?

9      A.    That is correct.

10     Q.    In November of 2010 you were re-elected

11 to the county commissioner position, isn't that

12 right?

13     A.    Yes.

14     Q.    Is there any campaigning that you did

15 for that position?

16     A.    I did very little, thank goodness, and I

17 was running unopposed so I did not do a whole lot of

18 campaigning.

19     Q.    Did you ever take any leave of absence

20 from your county commissioner post?

21     A.    No.

22     Q.    When you're not working at Harris Teeter

23 and when you weren't -- when you aren't fulfilling

24 county commissioner duties how do you spend your

25 personal time?

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 33 of 160

1      A.     As much as I possibly can with my

2   family.

3      Q.     What kinds of things do you do with your

4   family?

5      A.     Everything from -- well, of course the

6   weather permits, swim, go to the beach, definitely a

7   lot of bicycle riding.  My wife works out a lot so

8   she makes me work out too.  My oldest daughter, her

9   and her fiance are in the process of purchasing a

10  home so and they did so, so helping them fix up their

11  fixer upper.  And my youngest daughter who just

12  graduated, ended her first year of college, just

13  communicate with her a lot when she's not in school,

14  mostly all family stuff.

15     Q.     Did you apply for any type of government

16  assistance since leaving Wal-Mart?

17     A.     No, I was too embarrassed, no.

18     Q.     You didn't seek any unemployment

19  benefits after leaving?

20     A.     Too embarrassed, no.

21     Q.     Was your embarrassment the only reason

22  you didn't apply for government assistance?

23     A.     Yes, that's why I didn't allow myself to

24  be terminated.

25     Q.     Mark as Exhibit 6.

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 34 of 160

1  it your allegation that that was because of your age?

2      A.    Yes, to remove me out of that store,

3  yes.

4      Q.    So when you say threatened you're

5  referring to the alleged threats of termination?

6      A.    Yes.

7      Q.    Were you ever threatened with bodily

8  harm?

9      A.    Just Mr. Litchfield made the comment

10 that a bead is on your head.

11     Q.    When did Mr. Litchfield make that

12 comment?

13     A.    That was on a conference call which was

14 heard by all the other store managers because I

15 received phone calls after that call.

16     Q.    When was that call?

17     A.    It was anywhere from April 2009 to June

18 or July 2009.

19     Q.    What exactly did Mr. Litchfield say?

20     A.    He just said as far as our -- well, it

21 was said several times but as far as our fundraising

22 practices and everybody better raise the amount of

23 money and there's a bead on your head and --

24     Q.    How did you interpret there's a bead on

25 your head to mean?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 35 of 160

1      A.      Very threatening, we'll shoot you in the

2 head.  That's a military term and I am familiar with

3 it.

4      Q.      Did you believe that Mr. Litchfield

5 would actually shoot you in the head if you didn't

6 make your fundraising goals?

7      A.      I don't know, I didn't know him that

8 well.

9      Q.      But sitting here today one way or the

10 other you didn't have a belief that Mr. Litchfield

11 would shoot you in the head?

12                  MR. NANNEY:  Objection, go ahead.

13      A.      I can't answer that.  I just know how I

14 was threatened.

15      Q.      Wasn't Mr. Litchfield just at most if he

16 said it using it as an expression of here are our

17 goals, everybody better make them?

18      A.      It was threatening.

19      Q.      Aside from Mr. Litchfield allegedly

20 telling you there was a bead on your head did

21 Mr. Litchfield or anyone else at Wal-Mart ever

22 threaten you with bodily harm?

23      A.      Threaten me, yes.

24      Q.      With bodily harm?

25      A.      No, not with bodily harm.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 36 of 160

1  to be terminated, right?

2       A.      That's what it meant.

3       Q.      And you weren't terminated at any time

4  during your employment, isn't that right?

5       A.      That is correct.

6       Q.      And instead you were told that instead

7  of termination you'd be issued a decision making day

8  and given a PIP, isn't that right?

9       A.      That is correct.

10      Q.      Did Mr. Johnson say anything having to

11 do with your age during that conversation?

12      A.      No, he did not.

13      Q.      And you stated that your store was

14 performing exceptionally at that time, that's your

15 own opinion, isn't that correct?

16      A.      No, it was performing exceptionally

17 well.

18      Q.      In your opinion it was performing

19 exceptionally well?

20      A.      I had people tell me how great it as.

21      Q.      Who told you how great it was?

22      A.      Customers.

23      Q.      Customers aren't familiar with

24 Wal-Mart's standards and expectations?

25      A.      The associates, I had an 82 engagement

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 37 of 160

1  numerous occasions areas of opportunity for your

2  store, isn't that right?

3      A.    Probably so.

4      Q.    Who else -- what other store managers

5  allowed their -- any of their associates to have keys

6  to the store?

7      A.    I wouldn't have knowledge of that.

8      Q.    What other store managers do you know

9  who allow an invoice clerk or other hourly associate

10 to have their user name and password?

11     A.    Greenville, North Carolina did it.

12     Q.    Who was that store manager?

13     A.    That was Turner Thompson.

14     Q.    And Mr. Thompson is over 40; is that

15 correct?

16     A.    I don't know his age.

17     Q.    And he's now the store manager of Store

18 2000; is that correct?

19     A.    That's correct.  And also Ahoskie, North

20 Carolina Lynn Connor has had her manager sign on for

21 every store manager that's been there and I cannot

22 tell you how many years she had been there, it's been

23 a long, long time.

24     Q.    When you were employed do you know who

25 the store manager of the Ahoskie store was?

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 38 of 160

1      A.      Gosh, what's his name.  I can find out

2  but I can't think of his name at this time.

3      Q.      You testified that Art Binder had his

4  head down while you were speaking with Noah Johnson

5  because you believed that he seemed uncomfortable or

6  knew it was wrong, is that your testimony?

7      A.      That's what I saw, yes.

8      Q.      But that was just your perception, not

9  anything that Mr. Binder ever shared with you?

10      A.      He never shared anything with me.

11      Q.      So aside from the alleged threat by Noah

12  Johnson that the writing was on the wall what other

13  threats were you subjected to that formed the basis

14  for this lawsuit?

15      A.      Just the way I was treated from June

16  10th until February.

17      Q.      And you testified earlier that on June

18  10th is when you had asked Mr. Litchfield for

19  additional support; is that right?

20      A.      I needed to be staffed properly so I

21  could run the building properly.

22      Q.      How did Mr. -- strike that.  You

23  referenced the way that you were treated from June

24  10th, 2009 to February, treated by whom?

25      A.      By Mr. Litchfield.

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 39 of 160

1      A.      When I was requesting to be staffed I
2  want to say it was January of 2009.
3      Q.      And even though you were understaffed
4  you were still able to in your opinion successfully
5  perform your job duties with only two assistant
6  managers; is that right?
7      A.      It was very rough but I did.  Daily I
8  would empower my strongest people to help me run the
9  building and I could probably name those people and
10  they would help me run the building because I could
11  not be everywhere in that building.
12      Q.      And you testified that in your opinion
13  you were an exceptional performer, right, your store
14  performed exceptionally well I think was the
15  testimony?
16      A.      Yes, we were right at a 10 percent which
17  is kind of unheard of and I want to say the best
18  Division I store in the corporation.
19      Q.      And financial numbers are only one piece
20  of a store manager's performance, correct?
21      A.      They have a lot of duties, yes.
22      Q.      And it wasn't until November of 2009
23  that you were held accountable for any performance
24  problems as identified in your decision day and PIP;
25  is that right?

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 40 of 160

1      Q.     And she filed a complaint after her

2  resignation indicating that she believed that you had

3  harassed her or acted inappropriately towards her,

4  isn't that right?

5      A.     No, I do not know that.  If there's

6  something that was brought out it was never shared

7  with me.

8      Q.     You were interviewed regarding a poster

9  that you made about Miss Moore, isn't that right?

10     A.     Yes, that is correct.

11     Q.     And on this poster that you had made you

12  stated I don't like protein, I want to be sick; is

13  that right?

14     A.     That is correct.

15     Q.     And you showed that poster to members of

16  management; is that right?

17     A.     I showed it to Tonja.

18     Q.     You didn't show it to anyone else?

19     A.     I did not.  She may have, I did not.

20     Q.     If other people stated that you had

21  shown them the poster would they be lying?

22                MR. NANNEY:  Object to the form, go ahead.

23     A.     I don't know of anyone I showed it to

24  other than Tonja.

25     Q.     Why did you make a poster of Tonja?

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 41 of 160

1       A.       Because being the fatherly image I was

2   to probably most associates, maybe that's against my

3   age there also because that's kind of how it was.  I

4   got Tonja promoted.  I mentored her from the time she

5   was a cashier to a customer service manager to I got

6   her into the management training program.  She did

7   great.

8       I helped her with all her studies at work to get

9   her through that, getting her promoted, you know.  I

10  was concerned about everyone.  Every meal that she

11  would eat, I know this probably sounds silly, would

12  be Fritos and Mountain Dew.  And we, we and I'm

13  saying probably the whole management team would talk

14  to her about eating healthy because she always said

15  she didn't feel good.

16      So I know a gentleman that I had overnight on my

17  maintenance crew was -- got this really special diet,

18  went to this class and things like that.  He gave me

19  a copy.  I asked Tonja if she wanted a copy and at

20  first she didn't, but then I think she did.

21      But I don't want to say as a joke, just a wake

22  up was me making that picture in jest as they would

23  do with me, and I have a picture that I can show you,

24  a picture in jest to get her attention for her to eat

25  healthy and that's all I was trying to achieve and I

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 42 of 160

1  did only show it to her.

2      Q.     Mark as Exhibit 7.

3      (Exhibit 7 was marked for identification.)

4  BY MS. SHAH:

5      Q.     Mr. Dutton, you've been shown what's

6  been marked as Exhibit 7.  Is this a copy of the

7  poster you made for Tonja?

8      A.     Yes.

9      Q.     How did she respond when you gave her

10 that?

11     A.     She laughed as we all would when we did

12 this to each other.  She laughed and first thing I

13 can remember she said, she says I've got to send my

14 mother a picture of this, and that was probably the

15 extent of it.

16     Q.     Mark Exhibit 8.

17     (Exhibit 8 was marked for identification.)

18 BY MS. SHAH:

19     Q.     Mr. Dutton, you've been shown what's

20 been marked as Exhibit 8.  Is this a copy of the diet

21 plan that you referenced giving to Miss Moore?

22     A.     Yes, this was one that was given to me

23 by the gentleman overnight that was bragging to all

24 of us about how great he feels now because he's been

25 following this so I started following it and at the

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 43 of 160

1  same time I also gave Tonja, I asked her if she would

2  just look at it and look at some of the things she

3  does enjoy eating because I told her Fritos and

4  Mountain Dews every day for your breakfast, lunch and

5  dinner is probably not on here.

6      Q.      And you testified that she at first did

7  not want a copy of this; is that right?

8      A.      I asked her if she wanted a copy.  I

9  think it was pretty much a laughter thing and then I

10  said but it's a good diet, it's a healthy diet, and

11  then I think she took a copy and it was offered.  I

12  didn't make her take the copy.

13      Q.      Respect for the individual is very

14  important at Wal-Mart, isn't it?

15      A.      Yes, it is.

16      Q.      One of the three founding beliefs of the

17  company?

18      A.      Yes, it is.

19      Q.      Can you understand how Miss Moore would

20  have interpreted this as a lack of respect?

21              MR. NANNEY:  Object to the form, go ahead.

22      A.      No, because we were always doing this

23  type thing to each other.  As a matter of fact, I

24  have a picture of me that they did and I actually

25  have it with me, if you'd like to see it.

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 44 of 160

1  an assistant manager at Store 2000; is that right?

2      A.      Yes, he was there for a short time also.

3      Q.      Was he there in 2009?

4      A.      Yes.

5      Q.      So to go over your testimony you've

6  identified the following individuals who served as

7  assistant managers at least at some point in 2009

8  Clayton Saan, Prita Kalinidi, Elmo Reed, Tonja Moore,

9  Sammy Marriner, Chris Wetherington, Debra Beavers,

10  Tracy Hilton and Tony Taylor; is that right?

11      A.      I would have to check the date but I

12  believe so.

13      Q.      And that's nine individuals who served

14  as assistant managers at some point in 2009, isn't

15  that right?

16      A.      That sounds correct.

17      Q.      And in fact, at least three of them were

18  hired after you complained to Mr. Litchfield in June

19  of 2009, Chris Wetherington, Elmer Reed and Prita

20  Kalinindi, isn't that right?

21      A.      They sent me some new people I think

22  right out of the program, yes.

23      Q.      So how do you calculate that you only

24  had two assistant managers?

25      A.      That was in January until this time

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 45 of 160

1  frame which I would have to look at the dates, maybe

2  July.  I'd have to look at the dates.

3      Q.    So you are saying from January 2009

4  until July 2009?

5      A.    Or June.

6      Q.    Or June is when you had only two people,

7  correct?  Is that your testimony?

8      A.    That sounds correct.

9      Q.    Even though Tony Taylor was there from

10  at least April 2008 until you testified some point in

11  2009, Tracy Helton was hired in April of 2009

12  according to your testimony, Debra Beavers was there

13  in part of 2009 though only a short time, you had

14  Sammy Marriner.  Tonja Moore was there until the

15  spring of 2009 starting in April 2008, and then

16  Clayton Saan who started in approximately 2008 and

17  was there in 2009, so again, I mean, that is five

18  individuals that I'm counting; is that incorrect?

19      A.    That's probably correct.  I would have

20  to check the dates once again and I know when I put

21  it out there that with restructuring my sales I was

22  able to have one comanager which they changed the

23  name to shift manager and six assistants.

24      Q.    You actually didn't qualify for a

25  comanager though because you didn't have the

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 46 of 160

1  necessary 65 million in sales for a comanager, isn't

2  that right?

3      A.    I had 60.

4      Q.    Right, and the requirement for a

5  comanager, it starts at $65 million stores, isn't

6  that right?

7      A.    That I can't answer.  I know I was told

8  and I can't remember who it was that I qualify for a

9  comanager.

10     Q.    Were Sammy Marriner and Tracy Helton,

11 did they -- how many days a week did they work?

12     A.    How many what?

13     Q.    Days a week did they work?

14     A.    At that time I want to say Sam went to

15 four day a week but I don't know if they could

16 because of the short staffing.  They were supposed to

17 be on a schedule of four days on but I don't know

18 that I was able to do that.

19     Q.    Were all your assistant managers full

20 time?

21     A.    Yes.

22     Q.    So when you said that you had only two

23 assistant managers during this time period that might

24 be incorrect, isn't that right?

25     A.    No.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208        www.huseby.com
                                                    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 47 of 160

1  Center now?

2      A.     Not yet, it's in the process.

3      Q.     It's being staffed as a Super Center

4  right now to prepare for when it becomes a Super

5  Center, isn't that right?

6      A.     Yes, but the February after I left and

7  even in that year there was nine assistants.

8      Q.     And after you complained to

9  Mr. Litchfield in June of 2009 the store hired three

10  assistant managers that year, isn't that correct?

11      A.     I believe so.

12      Q.     So what evidence do you have that any

13  alleged under staffing occurred because of your age?

14      A.     I think everything occurred because of

15  my age.

16      Q.     What evidence do you have to support

17  that the alleged under staffing which I am not

18  contending exists but the alleged under staffing

19  occurred because of your age because you asked for

20  more staffing, you got more staffing, isn't that

21  right?

22      A.     As time went on, yes some came, some

23  left.

24      Q.     But you were given -- three assistant

25  managers were hired after you talked to Eric

1 Litchfield about it.  So what evidence do you have

2 that any management, any staffing was withheld

3 because of your age?

4      A.     I'm not sure.

5      Q.     As you sit here today you're not aware

6 of any evidence that any staffing issues occurred

7 because of your age?

8                 MR. NANNEY:  Objection, go ahead.

9      A.     It was being there was -- there was a

10 mission to get me out of that store and as far as

11 staffing, I don't know if I can answer that right now

12 but I'll be able to.

13     Q.     What would assist you with being able to

14 answer that question?

15     A.     Just some time to think and look at the

16 dates that I'll have to look up.

17     Q.     What dates would help you determine

18 whether any decisions were made because of your age?

19     A.     The entire 7-month investigation and I

20 hope I'm answering this and maybe I'm not.  I know it

21 had to do with my age because older managers were

22 being eliminated just like the ones that I know of.

23 I haven't talked to some of them, a couple of them I

24 have.  I said Bruce Bannister and Marion, the older

25 ones are gone and they allowed themselves to be

Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 49 of 160

1          record at 12:57.

2               (A luncheon recess was taken.)

3               THE VIDEOGRAPHER:  Start of Video 3 and

4          we're on the record at 1:49.

5  BY MS. SHAH:

6     Q.    Mr. Dutton, I want to show you what I

7  will mark as exhibit 9.

8     (Exhibit 9 was marked for identification.)

9  BY MS. SHAH:

10    Q.    Mr. Dutton, do you recognize this

11 document?

12    A.    Yes.

13    Q.    What is this?

14    A.    This is an application to Wal-Mart.

15    Q.    And this is your application to

16 Wal-Mart; is that correct?

17    A.    Yes.

18    Q.    Is this an accurate copy of your

19 application with Wal-Mart?

20    A.    Yes.

21    Q.    Is everything stated on the application

22 true and correct?

23    A.    Yes.

24    Q.    You were hired in at Wal-Mart in 1993;

25 is that correct?

Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 50 of 160

1      A.     Actually in 1992 with a -- in November

2   but a start date because of other obligations until

3   February I want to say 17th.

4      Q.     Of 1993?

5      A.     Yes.

6      Q.     And you were hired as an assistant

7   manager; is that right?

8      A.     Yes, that's correct.

9      Q.     And you were promoted to a store manager

10  position in 1996; is that correct?

11     A.     Yes.

12     Q.     And that was to the Kitty Hawk store?

13     A.     Yes.

14     Q.     Show you what I will mark as Exhibit 10.

15     (Exhibit 10 was marked for identification.)

16  BY MS. SHAH:

17     Q.     Mr. Dutton, I've shown you what's been

18  marked as Exhibit 10.  Do you recognize this

19  document?

20     A.     Yes.

21     Q.     What is this?

22     A.     It is a job description and it looks

23  like a pay scale.

24     Q.     So that would have been the score, this

25  would have applied to your position as the store

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 51 of 160

1 manager over Store 2000; is that correct?

2      A.    Yes, yes.

3      Q.    Does this document accurately reflect

4 your job duties and responsibilities?

5      A.    Yes.

6      Q.    And these duties are Wal-Mart's

7 expectations of their store managers; is that right?

8      A.    That's correct.

9      Q.    So if a store manager isn't fulfilling

10 the duties listed on here they're not meeting

11 Wal-Mart's expectations; is that correct?

12                MR. NANNEY:  Object to the form, go ahead.

13      A.    That's correct.

14      Q.    In 2009 Wal-Mart relaunched its IMS

15 program; is that correct?

16      A.    Yes.

17      Q.    And so placed more of an emphasis on

18 back room structures, inventory to make sure that

19 inventory processes run more smoothly, is that

20 accurate?

21      A.    That's correct.

22      Q.    I want to direct your attention to your

23 or the complaint in this lawsuit which has already

24 been marked as Exhibit 6 and specifically I want to

25 direct your attention to pages 9 and 10 of the

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 52 of 160

1  complaint, paragraphs 33 through 41.  This complaint

2  references Wal-Mart's coaching for improvement in

3  paragraphs 33 to 41; is that correct?

4       A.     Yes.

5       Q.     What does the term coaching mean?

6       A.     Coaching is when you're trying to make

7  someone successful and you start -- of course, the

8  coaching process of Wal-Mart is first a verbal so you

9  explain to someone what exactly they have an

10  opportunity on and how you can help them improve and

11  then of course if it does not improve then you take

12  them to a written and try to get them convinced of

13  the proper way and then next to decision, a decision

14  making day and you try, if you're trying to make

15  someone successful you try to help them to figure out

16  how to get better at what they're going.

17       Q.     And as a store manager you would have

18  instructed your salaried members of management to use

19  the coaching process if someone wasn't performing

20  their jobs or wasn't meeting their expectations; is

21  that right?

22       A.     That's correct.

23       Q.     And the Wal-Mart coaching for

24  improvement policy contemplates that under certain

25  circumstances levels in the coaching process can be

**Huseby, Inc.**                     **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 53 of 160

1  skipped; is that correct?

2       A.     I've never seen that happen.  I have

3  with me, but I haven't seen that a happen with anyone

4  else.

5       Q.     I'd like to mark Exhibit 11.

6       (Exhibit 11 was marked for identification.)

7  BY MS. SHAH:

8       Q.     Mr. Dutton, do you recognize what's been

9  marked as Exhibit 11?

10      A.     Coaching for Improvement.

11      Q.     And this is Wal-Mart's policy on the

12  coaching for improvement; is that right?

13      A.     That's correct.

14      Q.     And is this a true and accurate copy of

15  the coaching for improvement policy as you understood

16  it during your employment?

17      A.     Yes.

18      Q.     The policy contemplates that, and you

19  may not have seen it, but the policy contemplates

20  that levels of coaching can be skipped for the

21  behavior and misconduct at issue, isn't that right?

22  For example page 2 under guidelines for administering

23  the coaching for improvement process, Number 4?

24      A.     That's what it says on this sheet, yes.

25      Q.     And it even -- the policy even

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 54 of 160

1  contemplates that there could be some situations

2  where you don't have to use the coaching process at

3  all and immediate termination can occur; is that

4  right?

5      A.     If something is -- yes, uh-huh.

6      Q.     For example, and the policy classifies

7  that immediately terminable offenses as gross

8  misconduct, is that accurate?

9      A.     Yes.

10      Q.     And examples of gross misconduct under

11  the policy include inappropriate conduct or rude and

12  abusive conduct towards an associate; is that

13  correct?

14      A.     Yes.

15      Q.     And also includes situations where a

16  salaried member of management either directed, knew

17  or should have known that an hourly associate worked

18  without being properly compensated; is that correct?

19      A.     Yes.

20      Q.     And so in those situations Wal-Mart

21  policy allows that a manager doesn't even need to go

22  through coaching, can just immediately terminate the

23  violator; is that correct?

24      A.     Yes.

25      Q.     The coaching for improvement policy also

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 55 of 160

1  contemplates that investigations will occur as part

2  of the coaching process that maybe would lead to a

3  coaching; is that correct?

4      A.    Yes.

5      Q.    And under Wal-Mart policy the company

6  really wants to ensure a complete review of the facts

7  and time for proper consideration of appropriate

8  disciplinary action; is that correct?

9      A.    Yes.

10      Q.    And the policy also contemplates that an

11  associate who is under investigation might be

12  suspended without pay if the circumstances so

13  warrant; is that right?

14      A.    Yes.

15      Q.    In the complaint you state that you had

16  never been -- you had never before received a

17  coaching; is that right?

18      A.    That is correct.

19      Q.    Mark as Exhibit 12.

20      (Exhibit 12 was marked for identification.)

21  BY MS. SHAH:

22      Q.    Do you recognize this document that's

23  been marked as Exhibit 12?

24      A.    I've never seen this before.

25      Q.    Did you -- under action plan do you see

**Huseby, Inc.**                                **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 56 of 160

1      A.     Not payroll integrity but they were

2  doing -- we just got on a program that they were

3  using the different levels of pay for people to get

4  credits for certain qualifications and my personnel

5  manager and I went through all those, gave everyone

6  the proper credits, but Greg May contested that they

7  were not correct and yet we went through those and

8  the finding was they were correct.

9      Q.     You've coached associates before in your

10  capacity as a store manager, isn't that right?

11      A.     Yes.

12      Q.     Have you ever known a situation where a

13  coaching could be acknowledged where the person did

14  not enter their user name and password?

15      A.     Not that I'm aware of, no.

16      Q.     And a decision making day is a paid day

17  off where an associate is asked to reflect on their

18  performance and whether they'll commit to improving

19  their performance or conduct, isn't that right?

20      A.     That's correct.  May I say something?

21  And this was even at Store 1379 which is in

22  Greenville, North Carolina.

23      Q.     So a decision making day coaching does

24  not affect one's pay; is that right?

25      A.     No, it does not.

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 57 of 160

1      Q.     No level of coaching affects pay; is

2  that right?

3      A.     No.

4      Q.     And a coaching isn't a demotion?

5      A.     No, it's just to help you be successful.

6      Q.     And so it doesn't -- a coaching doesn't

7  change job responsibilities or a title?

8      A.     No.

9      Q.     There are no permanent effects on

10 employment when given a coaching?

11     A.     Permanent effects, no, not unless it's a

12 termination for theft or something that would be

13 gross misconduct.

14     Q.     And you received performance evaluations

15 during your employment; is that correct?

16     A.     That is correct.

17     Q.     I'm going to just show you a series of

18 evaluations, Exhibit 13.

19     (Exhibit 13 was marked for identification.)

20 BY MS. SHAH:

21     Q.     Do you recognize this document?

22     A.     Yes, it's a performance evaluation.

23     Q.     And the review period is January 2006

24 to -- February 2006 to January 2007?

25     A.     Yes.

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 58 of 160

1     Q.     And this is a review from Mr. May; is

2  that correct?

3     A.     Yes.

4     Q.     And on the last page, is that your

5  signature next to the date of April 12, 2007?

6     A.     Yes.

7     Q.     And you received a copy of this

8  evaluation?

9     A.     Yes, I'm sure I did.

10    Q.     Show you what's marked as Exhibit 14.

11    (Exhibit 14 was marked for identification.)

12  BY MS. SHAH:

13    Q.     Mr. Dutton, do you recognize what's been

14  marked as Exhibit 14?

15    A.     Yes.

16    Q.     Is this a copy of a performance

17  evaluation you would have received in April of 2008

18  from Tim Jackson?

19    A.     Yes.

20    Q.     And is that your signature on the last

21  page?

22    A.     Yes, it is.

23    Q.     And you were rated exceeds expectations

24  on this evaluation; is that right?

25    A.     Yes, that's correct.

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 59 of 160

```
 1      Q.      Who is Tim Jackson's supervisor at this
 2 time?
 3      A.      I believe it was David Carmon or it
 4 could have been Lance de la Rosa.
 5      Q.      I'll show you what we'll mark as Exhibit
 6 15.
 7      (Exhibit 15 was marked for identification.)
 8 BY MS. SHAH:
 9      Q.      Mr. Dutton, do you recognize what's been
10 marked as Exhibit 15?
11      A.      Yes, it's a 2009 performance evaluation.
12      Q.      Who gave you this evaluation?
13      A.      This is my 2009.  I believe it was done
14 on June 10th in Little Washington at a meeting.
15 Absolutely nothing was filled out whatsoever.  It was
16 a blank form.  I was asked to sign this form and
17 Noah -- Mr. Johnson and Mr. Litchfield talked to me
18 about the company.
19      Q.      So who gave you this evaluation?
20      A.      Mr. Noah Johnson and Mr. Eric Litchfield
21 and it was a blank form when I signed the form with
22 nothing on it.
23      Q.      The comments on the last page that have
24 been typed under strengths and opportunities, is it
25 your testimony that those comments, strengths and
```

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 60 of 160

1  individual I know as I told you was in the room

2  hearing this, and then also when Penny who currently

3  works at Petsmart mentioned to me that essentially

4  the old guard has got to go and Wal-Mart needs to

5  have the new face and that terminology started

6  getting used by different individuals that they call

7  it the old guard and the new face of Wal-Mart and

8  they were looking for new and younger people.

9      Q.      Motion to strike for non responsive.

10 What evidence do you have that Eric Litchfield read

11 or knew about the memorandum identified in

12 Interrogatory Number 15 in your complaint?

13     A.      And please repeat that, I'm sorry.

14     Q.      Do you have any evidence that Eric

15 Litchfield ever read or relied on the memorandum

16 identified in Interrogatory Number 15?

17     A.      I'm not actually sure what

18 Mr. Litchfield knows or what he's --

19     Q.      Had you ever read this memorandum while

20 you were employed with Wal-Mart?

21     A.      I have not.

22     Q.      When you were an associate at Wal-Mart

23 anyone ever mention this memorandum to you?

24     A.      Yes, I want to say Ronnie Toms.

25     Q.      What did Ronnie Toms tell you about the

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 61 of 160

1  memorandum?

2      A.     Just pretty much how their reduction of

3  management was talked about and I don't know if he

4  got that from upper management friends or what but

5  he, Ronnie Toms, had also made a comment that

6  something about I think something about the old guard

7  but there's going to be a new face of Wal-Mart, in

8  other words, going after younger associates for -- to

9  be managers.

10     Q.     Is it your testimony that Ronnie Toms

11  was stating that this memorandum set forth that

12  strategy?

13     A.     I'm just saying that's what was told.

14  He didn't initiate it or anything, he was repeating.

15     Q.     But was Ronnie Toms referencing this

16  memorandum when he was talking to you about that?

17     A.     He knew all about -- he mentioned Susan

18  Chambers and I don't know if he mentioned he read it

19  and he was just telling me of it.

20     Q.     You were never given a directive during

21  your employment to discharge your older workers; is

22  that right?

23     A.     No, I was not, as a matter of fact, I

24  hired older workers.

25     Q.     What evidence do you have that Art

Huseby, Inc.
www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 62 of 160

1  Binder read the Chambers memo?

2      A.      I'm sorry?

3      Q.      What evidence do you have that Art

4  Binder read the memorandum that's referenced in

5  Interrogatory Number 15?

6      A.      I don't know what Art Binder has read.

7      Q.      And so you don't know if Noah Johnson

8  ever read the Chambers memorandum?

9      A.      I don't know that factually, no.

10     Q.      And you don't know if David Carmon read

11  the Chambers memorandum?

12     A.      I do not.

13     Q.      And you don't know if Tracey Battle read

14  the Chambers memorandum?

15     A.      I do not.

16     Q.      Ever told to take any actions against

17  older workers?

18     A.      No.

19     Q.      Do you have any evidence that the

20  Wal-Mart board of directors adopted anything from the

21  Chambers memo?

22     A.      I do not.

23     Q.      And the memorandum that's referenced in

24  your complaint in Interrogatory Number 15 is from

25  2005; is that correct?

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 63 of 160

1      A.      Yes.

2      Q.      And you were -- you retired or left the

3  employment of Wal-Mart approximately five years

4  later; is that correct?

5      A.      February of 2010.

6      Q.      And you had received exceeds

7  expectations performance evaluations and solid

8  performance evaluations ratings after 2005; is that

9  correct?

10      A.      Yes, ma'am.

11      Q.      Any evidence that Eric Litchfield relied

12  on the Chambers memorandum in any way in issuing you

13  a decision making day or a PIP?

14              MR. NANNEY:  Objection, go ahead.

15      A.      I'm really not sure what Mr. Litchfield

16  was thinking or reacting to.

17      Q.      Do you know who made the decision to

18  issue you a decision making day and a PIP?

19      A.      Are you asking me or who was all

20  involved or --

21      Q.      Sitting here today do you know who was

22  involved in the decision to extend -- to offer you --

23  strike that -- to issue you a decision day coaching

24  and a PIP?

25      A.      David Carmon.

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 64 of 160

1      Q.     How do you know that David Carmon was
2  involved in issuing you the decision day and the PIP?
3      A.     Because he came to the Kitty Hawk
4  Wal-Mart in November of 2009 along with Noah Johnson
5  and Art Binder and was somewhat rude to me in my
6  office.  And prior to that he said gosh, store looks
7  great, everything is wonderful, this is great, we're
8  going to put a close to this hundred year
9  investigation.  He said he couldn't believe it went
10 on this long.
11     And then he -- I don't know, we went to the back
12 office and at that point he said I was going to get a
13 decision making day.
14     Q.     And he told you that he could have
15 terminated you but was issuing you a decision day
16 instead; is that correct?
17     A.     Got very vocal, very verbal and said you
18 know I could, very loud and I won't be like that, I
19 can terminate you right now if I want.
20     Q.     But he told you that he wasn't going to
21 be terminating you, that you would be receiving a
22 decision day and a PIP; is that correct?
23     A.     That is correct.
24     Q.     Who else do you contend played any role
25 in your receiving a decision day and a PIP?

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 65 of 160

```
 1        A.     Noah Johnson, Art Binder and
 2   Mr. Litchfield.
 3        Q.     Do you have any evidence to support that
 4   Noah Johnson relied on the Chambers memorandum in
 5   deciding to issue you the decision day and the
 6   coaching?
 7        A.     No.
 8        Q.     Same for Art Binder?
 9        A.     No.
10        Q.     And as we discussed, same for Eric
11   Litchfield?
12        A.     No.
13        Q.     What evidence do you have that Art
14   Binder played a role in the decision to issue you a
15   decision day and a PIP?
16        A.     I've known Art for a long time.  As a
17   matter of fact -- Mr. Binder was at the store that
18   day and he also in my back office with a closed door,
19   got in a way I've never seen him before, very vocal,
20   very mad and intimidating looking and this is after
21   he's been to the store several times to administer
22   cookouts for all the associates with Lance de la Rosa
23   and George Joyner who is a district manager because
24   our regional store of the year and the associates
25   getting nothing but awards and accolades for their
```

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 66 of 160

 1       A.      Pardon me?

 2       Q.      Miss Marion Towles, you only know her as

 3  a result of this litigation; is that correct?

 4       A.      I've known her for years.  She's a very,

 5  very good store manager.

 6       Q.      So sitting here today your only evidence

 7  that it was age discrimination is that you don't know

 8  what else it would be.

 9       A.      That is correct.

10       Q.      And the same goes for Noah Johnson, Eric

11  Litchfield and Art Binder; is that correct?

12       A.      Yes, ma'am.

13       Q.      None of them made comments to you about

14  wanting to get rid of older workers?

15       A.      No, just a comment made prior to

16  Christmas in 2009.

17       Q.      What comment was that?

18       A.      It was by Mr. Litchfield in our

19  Christmas candy aisle and there were several

20  associates walking, there may have been one assistant

21  manager there and they made a comment or someone

22  asked for like the ribbon candy which used to be a

23  real popular thing and apparently we didn't have it

24  and a comment was made the only person that would

25  remember it, that's old enough to remember it is

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 67 of 160

1  Max.  So that was very demeaning, it got a chuckle, I

2  mean, out of everybody but it was very demeaning.

3      Q.      But you testified earlier that you

4  worked in a joking environment where you would joke

5  with people about what they ate and not being healthy

6  and how they looked, isn't that correct?

7      A.      That part's correct, yes.

8      Q.      So isn't it possible that Eric

9  Litchfield was also if he ever said that just joking

10 along with people?

11     A.      It wasn't in a joking -- let's put it

12 this way, for my life it wasn't in a joke -- a time

13 to be joking so yes, it was very demeaning.

14     Q.      So Mr. Litchfield allegedly made one

15 comment regarding you being old enough to remember

16 Christmas candy --

17     A.      Ribbon Christmas candy.

18     Q.      Ribbon Christmas candy.  Did

19 Mr. Litchfield ever make any other comments about

20 your age?

21     A.      The only thing when he initially got

22 there he said you've been here a long time.

23     Q.      Well, you had been there a long time,

24 right?  You'd been there 16, 17 years?

25     A.      That's correct.

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 68 of 160

1    Q.    That had nothing to do with your age; is
2  that correct?

3    A.    Not my age, maybe.

4    Q.    Did Art Binder, Noah Johnson or David
5  Carmon ever make any comments about your age?

6    A.    No.

7    Q.    So sitting here today it's only your
8  speculation that you were treated differently because
9  of your age?

10              MR. NANNEY:  Objection, go ahead.

11   A.    That's all I can figure it was with my
12 record and what I've done for Wal-Mart that's all it
13 can -- I can't figure what else it would be.

14   Q.    I'd like to show you what we'll mark as
15 Exhibit 18 -- 19, I apologize.

16   (Exhibit 19 was marked for identification.)

17 BY MS. SHAH:

18   Q.    Mr. Dutton, do you recognize this
19 document?

20   A.    Yes.

21   Q.    What is it?

22   A.    Once again, I guess I always called it
23 the discovery which a lot of times with the legal
24 jargon I had a hard time understanding.

25   Q.    It is indeed.  This is a -- your

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 69 of 160

1  documents but they were kept for myself, I was trying

2  to do better, and I don't know if there's anything in

3  there I need to submit or not.

4       Q.      What I would ask is that following this

5  deposition you, and I know I can't order you to

6  discuss anything with your attorney, but if you could

7  review those with just yourself or Mr. Nanney and

8  make sure that you've given us everything that you

9  would state that you've given us.

10      I know we have discussed a number of documents

11  that you have.  For example, there are documents that

12  are requested regarding your performance,

13  evaluations, any other employment related matters

14  that I believe would cover what we've discussed

15  today.

16      Then also direct your attention, this also

17  includes but is not limited to Defendant's request

18  for production number 20 regarding documents you

19  might use to compute damages which could include your

20  pay stubs from Harris Teeter and any other employer

21  that you've had, your tax returns as requested in

22  request number 22, your -- any other documents

23  regarding income as requested in request number 25,

24  to the extent you have any documents regarding which

25  positions you applied or interviewed for with

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 70 of 160

1  like that, just a call to see how you doing.

2      Q.     Did -- what have you and Mr. Bannister

3  discussed about the theory of your case without legal

4  counsel present?

5      A.     Probably the only thing that we shared

6  is we just -- you just have to stop and look what

7  you've done for years and years and then that's gone

8  and it's -- it really plays on you.  And other than

9  that, facts or anything like that, we probably never

10 even got into -- just a very wrongful doing is

11 probably the extent of the conversation and just kind

12 of disbelief that it even occurred.

13     Q.     And Miss Towles and Mr. Bannister were

14 both discharged by Wal-Mart; is that correct?

15     A.     That's what I understand.

16     Q.     And is it your understanding that they

17 were discharged for performance reasons?

18     A.     I didn't really get into -- to that with

19 them.

20     Q.     You were trained on Wal-Mart's policies

21 and procedures, isn't that correct?

22     A.     There was constant training all the time

23 on everything, yes.

24     Q.     I show you what I'll mark as Exhibit

25 20.

**Huseby, Inc.**                                    www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 71 of 160

1        (Exhibit 20 was marked for identification.)

2   BY MS. SHAH:

3        Q.     Do you recognize this document,

4   Mr. Dutton?

5        A.     Yes.

6        Q.     What is this?

7        A.     It's the training, you know, that you

8   take throughout your essentially career and it's

9   constant training on a lot of things.

10       Q.     And this is a five page record of all

11  the trainings that you took; is that right?

12       A.     That's correct.  I never printed one but

13  I know it was a lot of training.

14       Q.     You were trained that as a manager you

15  were supposed to be a servant leader; is that

16  correct?

17       A.     That is correct.

18       Q.     And specifically that you were supposed

19  to lead by example?

20       A.     Yes, ma'am.

21       Q.     And part of your job as a store manager

22  was to know and familiarize yourself with all

23  Wal-Mart policies; is that right?

24       A.     Yes.

25       Q.     And you were trained about Wal-Mart's

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 72 of 160

1  open door policy, both how to use it and how to

2  manage it; is that correct?

3      A.    Yes.

4      Q.    And you were trained about Wal-Mart's

5  discrimination and harassment prevention policy, both

6  how to use it and how to manage it; is that correct?

7      A.    Yes.

8      Q.    Same goes for Wal-Mart's statement of

9  ethics, you were trained about how to use it and how

10 to manage it; is that correct?

11     A.    Correct.

12     Q.    As the store management you were the

13 highest level of management within that store; is

14 that right?

15     A.    That's right.

16     Q.    And in that position you were

17 responsible for ensuring compliance with Wal-Mart's

18 policies and procedures; is that correct?

19     A.    Uh-huh.

20     Q.    And you were trained about the resources

21 within the company that were available to you to

22 ensure compliance with those policies; is that right?

23     A.    Yes.

24     Q.    Under the open door policy you were

25 supposed to listen to any open door complaints that

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 73 of 160

1  you received from an associate; is that right?

2       A.    That's correct.

3       Q.    And you knew that if you had an issue

4  you could use the open door policy if you have any

5  problems with your employment?

6       A.    As I did, yes.

7       Q.    And you could call the ethics hotline

8  anonymously if you needed?

9       A.    (Nodding.)

10      Q.    Is that a yes?

11      A.    Yes.  I'm sorry.

12      Q.    No, you're doing great with that.  And

13 you're aware that Wal-Mart had a non retaliation

14 policy with people who used the open door; is that

15 right?

16      A.    Yes.

17      Q.    And it was part of your job to ensure

18 that any open door complaint that you received was

19 either resolved by you or referred to somebody else

20 to resolve; is that right?

21      A.    That's correct.

22      Q.    Are you aware that there were associates

23 who complained that you had not listened to their

24 open door requests?

25      A.    No.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208      www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 74 of 160

1     Q.     Did you ever tell a cashier named Maxine

2 that she would be fired if she ever complained again

3 about someone named Terry Collins?

4     A.     Absolutely not.

5     Q.     You were informed with regard to

6 Wal-Mart's discrimination and harassment prevention

7 policy that if you became aware of complaint of

8 discrimination or harassment, you had to assure that

9 it was addressed or relayed to be addressed promptly;

10 is that correct?

11     A.     Yes.

12     Q.     And a failure to report a claim of

13 discrimination or harassment would subject you to

14 disciplinary action; is that right?

15     A.     Yes.  If you didn't take care of

16 business, yes.

17     Q.     And the same is true regarding the open

18 door policy that if you got an open door and you

19 didn't resolve it or ensure that somebody else did

20 that you could be subjected to disciplinary action?

21     A.     Uh-huh.

22     Q.     And Wal-Mart's policy states that it

23 doesn't tolerate any type of discrimination or

24 harassment based on age; is that correct?

25     A.     That's correct.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208         (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 75 of 160

1        Q.        And the company, Wal-Mart, expects that

2    investigation related information be revealed only on

3    a-need-to-know basis; is that correct?

4        A.        If you'll repeat that, please.

5        Q.        Wal-Mart's expectations for

6    investigations is that any information gathered

7    during that process be revealed only on a-need-to-

8    know basis; is that right?

9        A.        Yes.

10        Q.        So investigations are supposed to be

11    kept confidential?

12        A.        Oh, most definitely, yes.

13        Q.        And the reason for that is to facilitate

14    the investigation and ensure that had there are no

15    opportunities for retaliation or gossip, those sorts

16    of things about it; is that correct?

17        A.        Yes.

18        Q.        And it's to ensure that the company can

19    do what it needs to gather the facts to determine

20    whether it can substantiate or not substantiate the

21    allegations; is that right?

22        A.        Yes.

23        Q.        And the Wal-Mart policy states that a

24    breach of con -- strike that.  Wal-Mart policy states

25    that a breach of confidentiality may be used as gross

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 76 of 160

1   misconduct resulting in disciplinary action up to and

2   including termination; is that right?

3        A.     Yes.

4        Q.     And as we discussed earlier you were

5   informed about Wal-Mart's three basic beliefs; is

6   that right?

7        A.     That's correct.

8        Q.     And those are the respect for the

9   individual, service to customers and strive for

10  excellence; is that right?

11       A.     Most definitely.

12       Q.     What does respect for the individual

13  mean?

14       A.     It means that everyone is to be

15  respected as you would want to be respected and our

16  store was over and beyond as far as respecting each

17  other.

18       Q.     And you understood that Wal-Mart

19  operated its business with those three basic beliefs

20  always at the foremost; is that right?

21       A.     Most definitely, most definitely.

22       Q.     And as a salaried member of management

23  you were required to demonstrate respect for the

24  individuals maybe above and beyond what an hourly

25  associate would be required?

Huseby, Inc.                      www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 77 of 160

1       A.      Definitely.

2       Q.      And you understood that failing to

3  demonstrate respect for the individual would subject

4  you to disciplinary action; is that right?

5       A.      Most definitely.

6       Q.      And you were required as a store manager

7  to immediately raise concerns you might have about

8  requests or acts that would violate Wal-Mart's

9  statement of ethics or any other Wal-Mart policy; is

10 that right?

11      A.      Yes.

12      Q.      And it was your understanding -- strike

13 that.  Under the statement of ethics when there's a

14 conflict between ethics and business objectives is it

15 your understanding ethics always have to come first?

16      A.      Most definitely, ethics and respect,

17 yes.

18      Q.      And the statement of ethics make clear

19 that disciplinary action up to and including

20 termination can result for violations of the

21 statement of ethics; is that right?

22      A.      Yes.

23      Q.      Show you what I will mark as Exhibit 21.

24      (Exhibit 21 was marked for identification.)

25 BY MS. SHAH:

**Huseby, Inc.**                              www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 78 of 160

1    Q.    Do you recognize this document?

2    A.    Yes.

3    Q.    What is this document?

4    A.    It is open door communication policy.

5    Q.    And is this a copy of the open door

6 communication policy as you understood it during your

7 employment?

8    A.    Yes, I don't know that I ever printed it

9 off but we've had it in several classes.

10    Q.    And it's always -- and Wal-Mart's

11 policies are available on the Wire too; is that

12 correct?

13    A.    That's correct.

14    Q.    And the Wire is Wal-Mart intranet?

15    A.    Uh-huh.

16    Q.    I'd like to mark Exhibit -- I will do 22

17 first.

18    (Exhibit 22 was marked for identification.)

19 BY MS. SHAH:

20    Q.    What is -- do you recognize Exhibit 22?

21    A.    It says it's the discrimination and

22 harassment prevention policy.

23    Q.    And according to the face of this

24 document this is the one in effect on July 22nd,

25 2008; is that right?

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 79 of 160

1      A.      That's correct, yes.

2      Q.      And on the second page of the policy

3 lists examples of harassing conduct that Wal-Mart

4 prohibits; is that correct?

5      A.      Yes.

6      Q.      And this includes making offensive

7 comments about an individual's appearance; is that

8 correct?

9      A.      Yes.

10      Q.      And it also includes circulating or

11 displaying offensive pictures, cartoons, posters,

12 letters or notes, emails, imitations or other

13 materials; is that correct?

14      A.      That's what it says right here, yes.

15      Q.      Show you what I'll mark as Exhibit 23.

16      (Exhibit 23 was marked for identification.)

17 BY MS. SHAH:

18      Q.      Mr. Dutton, what is this document?

19      A.      It says it is discrimination and

20 harassment prevention policy.

21      Q.      And this is the policy that was updated

22 November 21st, 2009; is that correct?

23      A.      Yes.

24      Q.      Is this to best of your knowledge a true

25 and correct copy of Wal-Mart's discrimination and

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 80 of 160

1 prevention policy in effect November 21, 2009?

2       A.      That's what it says, yes.

3       Q.      Show you what I'll mark as Exhibit 24.

4       (Exhibit 24 was marked for identification.)

5 BY MS. SHAH:

6       Q.      And do you recognize this document?

7       A.      The statement of of ethics.

8       Q.      Is this to the best of your knowledge a

9 true and correct copy of the statement of ethics?

10      A.      To the best of my knowledge.

11      Q.      And you were required as a store manager

12 to comply with this at all times; is that right?

13      A.      Yes, that's correct.

14      Q.      Did you ever refer to this during your

15 employment, review it, read it, familiarize yourself

16 with it?

17      A.      I know I was in classes about it but

18 like to print it off or read it or sit and read it,

19 no.  If there was an opportunity you would go to it

20 and maybe use it as a reference.

21      Q.      We can take a break now.

22              THE VIDEOGRAPHER:  Going off the record at

23          2:53.

24          (Discussion off the record.)

25              THE VIDEOGRAPHER:  On the record at 3:04.

**Huseby, Inc.**                         **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 81 of 160

1 BY MS. SHAH:

2      Q.      Mr. Dutton, Wal-Mart encourages

3 charitable giving and contributions; is that right?

4      A.      Yes, ma'am.

5      Q.      And the company gives its stores goals

6 to meet for donations to charities; is that right?

7      A.      That's correct.

8      Q.      But there are no actions taken against a

9 store or its associates if the store fails to meet

10 that giving goal; is that right?

11      A.      That's correct.

12      Q.      And there are policies that govern and

13 dictate charitable contributions and giving; is that

14 correct?

15      A.      Yes.

16      Q.      In 2008 and/or 2009 you directed

17 subordinates to solicit vendors for donations; is

18 that right?

19      A.      We put and I say we, we were all trying

20 to see how we could raise the most money for

21 Children's Hospital and we've done this in the past

22 and actually directed to do this but not this

23 particular time.  And all's we did is ask for

24 donations.  We had cookouts, we had different raffles

25 going on essentially like we did in the past.

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 82 of 160

1      Q.      And when you say ask for donations, that

2  includes soliciting vendors to ask them to donate

3  money to Children's Hospital or Children's Miracle

4  Network; is that right?

5      A.      My understanding there was a sign put up

6  in receiving about that and that was taken down.

7      Q.      When was it put up?

8      A.      I can't tell you the exact date.  I

9  didn't make the sign.  I didn't put it up, but the

10  associates, a very aggressive group always wanted to

11  kind of fight to be number one.  They had a lot of,

12  you know, very competitive nature.

13      Q.      When did the sign get taken down?

14      A.      As far as I know immediately after it

15  went up.

16      Q.      Did you ever see the sign?

17      A.      I did not.

18      Q.      You directed Teresa Shanefelter to draft

19  the sign, isn't that right?

20      A.      I don't recall that.  Not to my

21  recollection.

22      Q.      Mark Exhibit 25.

23      (Exhibit 25 was marked for identification.)

24  BY MS. SHAH:

25      Q.      Is the document that's been marked as

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 83 of 160

1  very same thing, the associates wanted to do

2  everything they could to meet a goal.

3       Q.    Isn't it your responsibility as the

4  store manager to make sure that associates are

5  adhering to company policy?

6       A.    Yes.

7       Q.    And you never told any associates that

8  they couldn't solicit vendors for donations for

9  charity?

10       A.    I want to say the sign came down

11  immediately.

12       Q.    But you didn't take the sign down?

13       A.    I did not take the sign down, no.

14       Q.    And the sign violates Wal-Mart policy,

15  isn't that right?

16       A.    Yes, and in my past I was instructed to

17  do it by a district manager Wayne Lewis.

18       Q.    What was his name again?

19       A.    Wayne Lewis.

20       Q.    When was Wayne Lewis a district manager?

21       A.    Not sure the years.  I would have to do

22  some research.

23       Q.    Before 2004?

24       A.    Could have been in that time frame.

25       Q.    Eric Litchfield never told you that you

**Huseby, Inc.**                              **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 84 of 160

1  could solicit vendors for donations for charity, did

2  he?

3       A.      No, just we were told to do whatever we

4  had to do to meet a goal.

5       Q.      Did you ever ask for clarification about

6  that?

7       A.      No, I did not.

8       Q.      Eric Litchfield never gave you any

9  instruction that it would be okay to violate any

10  Wal-Mart policy for any reason; is that right?

11      A.      That wasn't said like that, correct.

12      Q.      Mark as Exhibit 26.

13      (Exhibit 26 was marked for identification.)

14  BY MS. SHAH:

15      Q.      Do you recognize what's been marked as

16  Exhibit 26?

17      A.      A volunteerism and charitable

18  contribution.

19      Q.      And is this -- have you ever seen this

20  document before?

21      A.      Not like this I haven't.

22      Q.      But you were familiar with the policy

23  from your role as a store manager; is that right?

24      A.      Yes.

25      Q.      And on the second page under supplier

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 85 of 160

1  participation and or contributions suppliers are

2  prohibited from being solicited for donations and

3  from giving any money directly or on behalf of

4  Wal-Mart to a charity; is that right?  Let me phrase

5  that, I apologize.

6       A.      Okay.

7       Q.      This policy prohibits associates from

8  soliciting suppliers for charitable donations for

9  Wal-Mart's behalf; is that right?

10      A.      I'm sure that's what it says, yes.

11      Q.      And this policy also prohibits a

12 supplier giving money directly to Wal-Mart for a

13 charity; is that right?

14      A.      They always did it for 17 years.

15      Q.      But the policy still prohibits it, isn't

16 that right?

17      A.      Yes, I know even one check that we got

18 was for a gentleman that is -- his son had brain

19 surgery with CHKD at birth and thank goodness, his

20 son is I want to say 10 or 12 years old now and he

21 would always contribute.

22      Q.      You told Diane Harris on June 9th of

23 2009 that she had to call vendors and ask for money;

24 is that right?

25      A.      No, that is not correct.  Do we know,

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 86 of 160

1    Q.    Do you know what this document is?

2    A.    Is this from George Marshall?  It's one

3  of my -- Maria in my accounting office came and told

4  me she received a $500 check.

5    Q.    Have you ever seen this document before?

6    A.    Marie brought it to me and said you know

7  we received a $500 check from George Marshall and I

8  was rather shocked and the next time I saw him he

9  said he was up front and told the story once again of

10  his son and felt compelled to do so.  I didn't in no

11  means make him do this.

12    Q.    How would vendors know about Wal-Mart's

13  charity drive if associates didn't tell them?

14    A.    Pretty much year 'round for 17 years, I

15  mean for 17 years we would, prior to me even being

16  store manager we fund raised for Children's Hospital

17  all year long from dress down day to beach day to oh,

18  gosh, just a hundred different ways of constantly

19  raising money for the hospital and that's how we

20  ended up being in the top ten per capita fundraising

21  stores for Children's Hospital.

22    Q.    Art Glidden is a non Wal-Mart employee

23  who you allowed to come inside the store, work

24  several hours and raise money for Children's Miracle

25  Network on behalf of Wal-Mart, isn't that correct?

**Huseby, Inc.**                              **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 87 of 160

1    A.    Yes, but I may add he --

2    Q.    There's no question pending.

3          MR. NANNEY:  He's entitled to explain his

4          answer.

5    A.    Yes, he did.  Prior to the Kitty Hawk

6 Wal-Mart store being built, him and the store manager

7 at that time John Birch got a relationship and I mean

8 his relationship as far as a fundraising we're going

9 to make Wal-Mart number one in the community fund

10 raise and they started this even before the store was

11 open with the associates fundraising.  And then it

12 turned right into a 17-year -- while I was there the

13 same thing occurred for 17 years.

14   Q.    And you never stopped Mr. Glidden from

15 coming into the store; is that correct?

16   A.    That's correct.  I mean we had certain

17 times he would come and then certain times he

18 wouldn't, but the majority of the year we were doing

19 some type of fundraising.

20   Q.    So how often would Mr. Glidden come into

21 the store to help Wal-Mart raise money for Children's

22 Miracle Network?

23   A.    Over the 17 years?

24   Q.    Yes.

25   A.    All the time, I mean.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 88 of 160

1     Q.     Once a month, once a week?

2     A.     He received a golden -- Governor's Gold
3  Leaf Award for volunteerism.  It wasn't just
4  Children's Hospital at our location.  Outside of our
5  location he raised money for Joy Fund.  I mean,
6  that's what he did in the community is raise money
7  for charitable events.

8     Q.     Motion to strike as nonresponsive.

9     How often did Mr. Glidden come to Store 2000 to
10  help the company raise money for Children's Miracle
11  Network?

12     A.     I mean do you want days?  I'm not sure
13  what you're asking.  He did it for 17 years.

14     Q.     Right, but once a week, once a month
15  would he come in, once every few months?

16     A.     He may not come in for two weeks and
17  then he might come in the next week every day.

18     Q.     And Mr. Glidden would sit inside the
19  store; is that right?

20     A.     That's correct.

21     Q.     Typically in front of women's apparel I
22  think it was?

23     A.     That's correct.

24     Q.     And on multiple occasions he would be
25  wearing Wal-Mart attire; is that right?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO     Document 96-2     Filed 08/28/13     Page 89 of 160

1      A.      Mr. Art dressed about every way you

2   could imagine.

3      Q.      But you admitted to the EEOC that

4   Mr. Glidden would come in dressed in Wal-Mart attire;

5   is that correct?

6      A.      I will tell you this, he never did until

7   one day and the came in and he looked rather rough

8   and I think it was brought to my attention and I

9   didn't say something to him, but I guess a very good

10  friend of his said you need to clean up your act

11  being in the front of Wal-Mart a little bit and I

12  think he did that.

13     Q.      So he did wear Wal-Mart attire, correct?

14     A.      He may have.

15     Q.      In fact, again you admitted to the EEOC

16  that he came dressed in Wal-Mart attire?

17     A.      Like I say, in khaki and blue.

18     Q.      But that's Wal-Mart's dress code, isn't

19  that correct?

20     A.      That is Wal-Mart's dress code.

21     Q.      And in fact, Mr. Glidden also wore a

22  Wal-Mart name tag, isn't that correct?

23     A.      One that he had had for 17 years, yes.

24     Q.      But you never took away that Wal-Mart

25  name tag; is that correct?

Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 90 of 160

1      A.      Every district manager I ever had and it

2   probably was about nine, they loved Art to death and

3   realized what he was doing for Children's Hospital.

4   It was for strictly Children's Hospital.

5      Q.      But you never took Mr. Glidden's name

6   tag away even though he wasn't a Wal-Mart associate?

7      A.      No, I did not.  Not -- it was given to

8   him prior to me being the store manager and it was

9   acceptable by everybody and everybody knew him and

10   then in 2009 I guess all that changed.

11      Q.      Did you send associates to pick up Art

12   Glidden when he would come to the store?

13      A.      We did that on occasion, yes, we did.

14   When he wanted to come he would call and say can

15   anyone come and get me.

16      Q.      And those associates weren't reimbursed

17   for the mileage that they spent going to pick up

18   Mr. Glidden, isn't that right?

19      A.      I'm not sure.

20      Q.      And as a store manager you were required

21   to comply with all applicable federal, state and

22   local wage and hour laws; is that right?

23      A.      Yes.

24      Q.      And failure to comply with wage and hour

25   laws is a pretty serious offense for Wal-Mart, is it

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 91 of 160

1  not?

2      A.      It would be, yes.

3      Q.      And so that's something that would be

4  grounds termination; is that right?

5      A.      I would think so.

6      Q.      And you're aware -- are you aware that

7  Wal-Mart ended up having to pay Mr. Glidden for time

8  worked due to his time spent in the store?

9      A.      I am not, no.

10     Q.      Did -- Mr. Glidden had his own charity,

11  the Joy Fund, isn't that what you said?

12     A.      That's correct.

13     Q.      Was that a 501(c)3?

14     A.      As far as I know, yes.  I never checked

15  on what he did outside of Wal-Mart.

16     Q.      Did he ever come into the store to

17  solicit for his Joy Fund?

18     A.      No, he -- him and his firemen did that

19  but it was usually we followed the corporate policy

20  of them being 20 or 25 feet away from the front door

21  and they would usually have a fire boot and a fireman

22  there in his uniform.

23     Q.      Ever tell Art Glidden that he could have

24  half of the money that he raised for Children's

25  Miracle Network?

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208       (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 92 of 160

1     Q.     That's just your speculation though; is
2  that correct?
3     A.     Yes, that would be my speculation.
4     Q.     Did Mr. Glidden -- Mr. Glidden came to
5  the store to sell raffle tickets for Wal-Mart and
6  collect money for Children's Miracle Network, isn't
7  that right?
8     A.     Yes.
9     Q.     And the raffle was for a $500 shopping
10 spree; is that right?
11    A.     I think we did several of those
12 throughout the years.
13    Q.     Mark at Exhibit 29.
14    (Exhibit 29 was marked for identification.)
15 BY MS. SHAH:
16    Q.     Do you recognize this document?
17    A.     Yes.
18    Q.     And this is -- what is this?
19    A.     It's a document to do a $500 Wal-Mart
20 shopping spree with all proceeds going to Children's
21 Hospital.
22    Q.     You were told that it was against
23 company policy to do raffles, isn't that correct?
24    A.     No, I did exactly what I was -- had been
25 doing for the last 17 years.

Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 93 of 160

1      Q.      And raffles actually violate PD 72,
2  prizes and awards, isn't that right?
3      A.      If that's what it states.
4      Q.      Art Glidden's caretaker actually won
5  this raffle, isn't that right?
6      A.      I was told that after the fact, yes.
7      Q.      And you don't know who did the drawing
8  for that raffle?
9      A.      I do not.
10     Q.      And you admitted when questioned about
11  the raffle that it wouldn't happen again; is that
12  right?
13     A.      If for the years that we did raffles and
14  even prior to managers to me that if they didn't want
15  us to do them, yes, it would not happen again.
16     Q.      That's because it violates company
17  policy, isn't that right?
18     A.      And there again I was following what I
19  did for 17 years but if that's what the policy
20  states.
21     Q.      If Mr. Glidden was working -- was
22  dressed as a Wal-Mart associate, had a Wal-Mart badge
23  and was working to collect the money on behalf of
24  Wal-Mart for Children's Miracle Network wouldn't that
25  be a wage and hour problem?

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 94 of 160

1      A.      17 years ago when they -- prior to me

2  being the store manager and they made a pact because

3  all's he wanted to do for the rest of his life which

4  he has passed now is volunteer his time.

5      Q.      Move to strike as nonresponsive.  Could

6  you repeat the question?

7      (Whereupon, the court reporter read back the

8  previous question.)

9      A.      Yes.

10      Q.      Mark as Exhibit 30.

11      (Exhibit 30 was marked for identification.)

12  BY MS. SHAH:

13      Q.      Do you recognize this document?

14      A.      Yes.

15      Q.      What is this?

16      A.      It would be a document that would be

17  working off the clock.

18      Q.      And on page 4 of this policy the policy

19  contemplates that any associate found to have

20  violated the policy is subject to disciplinary action

21  up to and including termination; is that right?

22      A.      Yes.

23      Q.      I'd like to show you what's marked as

24  Exhibit 31.

25      (Exhibit 31 was marked for identification.)

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 95 of 160

1   BY MS. SHAH:

2        Q.      Do you recognize this document?

3        A.      Yes, I do.

4        Q.      Is this a statement that you wrote on

5   July 14, 2009?

6        A.      Yes, it is.

7        Q.      And in this statement you claim that Art

8   Glidden had been involved in CMN fundraisers for the

9   past 11 years; is that right?

10       A.      Yes.

11       Q.      And you testified a moment ago that it

12  was actually much longer than 11 years, at least 17

13  years; is that right?

14       A.      That is correct, it was 17 years.

15       Q.      So this letter is incorrect in that

16  aspect; is that correct?

17       A.      In the years, yes.

18       Q.      You admit halfway down in the paragraph

19  beginning one day on an email that one morning at

20  morning meeting it was brought up if we could put a

21  sign up for truck drivers or anyone coming in the

22  back if they would like to donate to CMN, do you

23  remember that?

24       A.      I remember everybody one was throwing

25  out ideas.

Huseby, Inc.                         www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 96 of 160

1      Q.      Did you tell whoever brought that up
2  that that was against company policy?
3      A.      I did not.
4      Q.      And it's your job as a leader to advise
5  people of what appropriate company policy would be;
6  is that right?
7      A.      That's correct, but I was also --
8  whenever with Wal-Mart you were told do whatever it
9  takes and I've been told that in the past, we always
10  did whatever it took to achieve a goal.
11      Q.      But the statement of ethics says that
12  when ethics and business conflict that ethics wins,
13  isn't that right?
14      A.      Correct.
15      Q.      So in this situation it would be
16  understood that the ethics of how to handle this
17  should win over raising the money for CMN, isn't that
18  correct?
19      A.      Yes.
20      Q.      And so as a leader you were responsible
21  for telling the associates they can't do that, that
22  ethically that's prohibited by the statement of
23  ethics, isn't that right?
24      A.      Yes.
25      Q.      I'd like to mark 31 -- 32.

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 97 of 160

1      A.      If I were referencing the conditions our

2  store needed to be or what the expectation would be

3  that I would deliver but in a threatening way, no,

4  that's not my style.

5      Q.      But you did convey to the associates

6  that Eric Litchfield was a pretty tough market

7  manager, isn't that right?

8      A.      High expectations which I thought was

9  very good.

10      Q.      Ever state to associates that you needed

11  new blood in the store?

12      A.      New blood, no.

13      Q.      Ever state that Eric Litchfield was

14  going could come in with his gun and the red dot

15  target was going to be on their head?

16      A.      I think I said that or Sammy said that

17  about the bead on the head because that was a

18  terminology that I was hearing a lot.

19      Q.      So you conveyed that to associates?

20      A.      I may have, yes.

21      Q.      Do you remember when?

22      A.      I do not.  I always wanted them to be at

23  their best.

24      Q.      Are you aware that complaints were made

25  by multiple associates that you held female assistant

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 98 of 160

1  is one that occurred in June of -- June 12th of 2009;

2  is that correct?

3       A.    Yes, ma'am.

4       Q.    And that was prompted by associate

5  complaints, was it not?

6       A.    As I'm guess I'm learning now that would

7  be a complaint from Tonja.

8       Q.    Was that your understanding before

9  today?

10      A.    No.  I mean I knew, I could never figure

11  it out but I figured that no one ever shared any of

12  that with me.

13      Q.    And if -- and they wouldn't have shared

14  that with you under the requirements for

15  confidentiality; is that correct?

16      A.    That's correct.

17      Q.    And it's part and parcel of Wal-Mart's

18  policies and foundation of beliefs that if an

19  associate were to complain even about a store manager

20  that the company should look into it and investigate

21  it, isn't that right?

22      A.    Most definitely.

23      Q.    Wouldn't it be reasonable for the

24  subject of the investigation to not be present when

25  the investigation is occurring?

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 99 of 160

1  individual defendant in this, have you?

2              MR. NANNEY:  We'll stipulate that he is

3         not.

4              MS. SHAH:  An individual defendant?

5              MR. NANNEY: (Nodding.)

6  BY MS. SHAH:

7    Q.    During your car ride with Mr. Litchfield

8  you guys talked about Andy Griffith, didn't you?

9    A.    I've talked to a lot of people about

10 Andy Griffith, we may have that day.  It's been a

11 while ago.

12   Q.    You had some pleasant conversations with

13 Mr. Litchfield that day?

14   A.    To try to get past what was occurring,

15 probably.

16   Q.    And you had your cell phone with you

17 that day, did you not?

18   A.    I'm not sure.

19   Q.    In fact, you used your cell phone on

20 that day, is that right, during your drive with

21 Mr. Litchfield?

22   A.    I'm going to be honest, that day is a

23 haze.  I'm not sure if I did or did not.

24   Q.    Which policy did Mr. Litchfield violate

25 by taking you on the car right to lunch and then to

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 100 of 160

1  tour the Elizabeth City store?

2              MR. NANNEY:  Objection.

3      A.     What did he violate?

4      Q.     Which policy.

5      A.     Probably not a Wal-Mart policy.  I don't

6  know that that's ever been a practice of a Wal-Mart

7  district manager to take someone out of their store

8  against their will.

9      Q.     And during that drive Mr. Litchfield

10 never physically threatened you, correct?

11     A.     No.

12     Q.     Never physically touched you?

13     A.     No.

14     Q.     And you testified that you told Bill

15 Simon about the car ride, who else did you tell about

16 the car ride?

17     A.     At this time I can't remember.  I know I

18 put it in my statement that you have.

19     Q.     Which statement?

20     A.     Well, what I submitted in these papers.

21 I know I -- it was mentioned that I was taken out of

22 the store.

23     Q.     What did Mr. Litch -- strike that.  Why

24 did you believe that Mr. Litchfield was taking you on

25 a drive because of your age?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 101 of 160

1      A.      I'm going to be -- that day I could not

2  figure out for the life of me what was going on.

3      Q.      But Mr. Litchfield never said anything

4  to you that indicated that he was taking you anywhere

5  because of your age?

6      A.      No.

7      Q.      Never gave you any other indication that

8  that drive that day had anything to do with age?

9      A.      No.

10     Q.      And you also claim that during the

11 investigation Tracey Battle called you a Type A

12 personality and perfectionist to your face, do you

13 recall that?

14     A.      That was after we came back from a 7 in

15 the morning ride to 6, 5:30 in the evening back to

16 the outer banks and that was approximately 6 or 6:30

17 in my office.

18     Q.      And that statement doesn't have anything

19 to do with your age, correct?

20     A.      No.

21     Q.      And in fact, it's not really a negative

22 statement, is it?

23     A.      No, but it was treated as one.

24     Q.      Treated -- you took it as a negative

25 statement?

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 102 of 160

1        A.      The way it was delivered, yes.

2        Q.      And you admitted to Mr. Litchfield, Miss

3   battle and the market asset protection manager

4   Dawana -- that you gave Teresa Shanefelter some keys

5   to the store; is that right?

6                    MR. NANNEY:   Objection, go ahead.

7        A.      Yes, and she had them for a long time

8   before me.

9        Q.      And you admitted to Mr. Litchfield and

10  Miss Battle and Mr. Riddick that you never took away

11  Miss Shanefelter's keys?

12       A.      No, she is a viable member of my team.

13       Q.      But actually Mr. Litchfield took away

14  her keys that day on June 12th, isn't that right?

15       A.      That's my understanding, yes.

16       Q.      And Mr. Litchfield told you that Miss

17  Shanefelter couldn't have access to the keys again;

18  is that right?

19       A.      That's correct.

20       Q.      Did you open door that concern with

21  anyone?

22       A.      During that time everything that was

23  going on I didn't know what to think.  I absolutely

24  did not know what to think, so no, that -- the whole

25  situation I open doored and attempted to open door

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 103 of 160

1 Mr. Litchfield and Dawana and Tracey is getting ready
2 to leave and I was told if I discuss any of "this"
3 because I remember saying may I ask what "this" is
4 because I did not know and they said if you ask you
5 talk about "this" and I still said what's "this" and
6 they said you'll be terminated.

7     Q.     And the investigation policy that we
8 discussed earlier calls for discipline up to and
9 including termination if the confidentiality of the
10 investigation is compromised in any way, isn't that
11 right?

12     A.     Yes.

13     Q.     And you have no evidence that they made
14 the comment about being terminated if you disclosed
15 this because of your age, isn't that right?

16               MR. NANNEY:  Objection, go ahead.

17     A.     Please repeat that.

18     Q.     You have no evidence that Miss Battle,
19 Mr. Riddick or Mr. Litchfield made the comment to you
20 that you could be terminated for violating
21 confidentiality because of your age, isn't that
22 right?

23     A.     That wasn't said but I was treated very
24 differently.

25     Q.     But you have no evidence that you were

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 104 of 160

1  treated differently that day because of your age?

2                  MR. NANNEY:  Objection.

3       A.    I don't know what else it was.

4       Q.    But you don't have any evidence to

5  support that it was your age?

6       A.    I'm not sure.

7       Q.    Okay.

8                  THE VIDEOGRAPHER:  That concludes Video 3

9             and we're off the record at 4 o'clock.

10                  (A brief recess was taken.)

11                  THE VIDEOGRAPHER:  Start of Video 4 in the

12            deposition of Mr. Dutton.  On the record at

13            4:10.

14  BY MS. SHAH:

15      Q.    Mr. Dutton, in -- on July 14 of 2009 Art

16  Binder came and spoke with you regarding the

17  allegations concerning Art Glidden and the Children's

18  Miracle Network, isn't that right?

19      A.    Yes.

20      Q.    And Mr. Binder's position at the time

21  was regional asset protection manager?

22      A.    Yes.

23      Q.    And in that position he was charged with

24  protecting the assets of the company; is that right?

25      A.    Yes.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 105 of 160

1    Q.    Did Mr. Binder tell you the purpose of

2  his visit?

3    A.    He did at first.  He said I know this

4  investigation has taken way too long and he said I'm

5  going to try to make sure it's done within the week

6  which of course did not happen.

7    He asked me to write that first statement and it

8  was like so rushed and he appeared to be in quite a

9  hurry that I just quick typed something up for him

10 and then that's why after I sat and thought for a

11 minute after he had left I think it became a little

12 more lengthy.

13   Q.    And when you say the first statement,

14 which statement was the first one that you were

15 referring to, which exhibit?

16   A.    The first one is Exhibit Number 31 and

17 then like I said it was kind of rushed and I was just

18 trying to put everything down quickly.  And then when

19 I left I -- or when he left, then I kind of like sat

20 and thought about things longer and sent him an

21 additional copy which is Exhibit 32.

22   Q.    You had no -- you have no evidence that

23 Mr. Binder came and spoke with you because of your

24 age; is that right?

25   A.    That's correct.

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 106 of 160

1  of her investigation?

2       A.     No, just to do more communication with

3  the associates and there was one point throughout

4  everything that said I was communicating with my

5  associates too much so it was kind of --

6       Q.     She never said any part in the

7  investigation had to do with your age?

8       A.     No, she did not.  She just did make the

9  statement that something is definitely wrong, someone

10 is out to get you and if I were you -- why don't you

11 come to Myrtle Beach because you run a great store.

12      Q.     But she never said anything that

13 somebody was out to get you because of your age?

14      A.     No, she did not make that statement.

15      Q.     Would you be surprised to know that she

16 found numerous areas of concern and policy violations

17 as result as a result her investigation?

18      A.     Yes, I would.

19      Q.     For example, would it surprise you to

20 learn that she found the policy had been violated

21 when you had corrected Teresa Shanefelter's time and

22 not done that for other people?

23      A.     Correct her time?

24      Q.     Yes.

25      A.     In reference to what?  I'm not what

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13   Page 107 of 160

1      Q.      Did he ever tell you who was out to get

2  you?

3      A.      No, she just said some -- something --

4  she said something in your market team is not right.

5  She said someone is out to get you.  If I were you I

6  would transfer to Myrtle Beach.

7      Q.      On September 8, 2009 is when you had the

8  store market manager meeting where you spoke with

9  Noah Johnson and Art Binder; is that right?

10     A.      They spoke to me, yes.

11     Q.      And when they pulled you to the back of

12 the hotel was that not out of a concern to keep their

13 discussion with you confidential?

14     A.      I don't know.  It was a very harassing

15 moment because Noah was raising his voice, said you

16 know I don't want to be here so I was like -- and at

17 that time I still didn't know what was going on.  I'm

18 like what in the world.

19     Q.      And when you say harassing you're

20 talking about him raising his voice and threatening

21 you with termination?

22     A.      Kind of as if any two people was walking

23 down the sidewalk and one is raising their voice and

24 yes.

25     Q.      But again no comments about your age

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 108 of 160

1  were made?

2      A.      No.

3      Q.      Nothing led you to believe that he was

4  raising his voice at you or threatening you with

5  termination because of your age?

6      A.      No.

7      Q.      And Mr. Johnson didn't physically

8  threaten you?

9      A.      No.

10     Q.      Did you provide Mr. Johnson or

11 Mr. Binder with names of managers who had violated

12 similar policies that you had?

13     A.      I believe I had.  I knew several people

14 that did the same thing to run their business.

15     Q.      Who were these individuals?  Before I

16 believe you only identified two individuals, one is

17 Turner Thompson and that was just regarding the user

18 name and password, if I'm not mistaken.  And then the

19 other was the store manager in the Ahoskie store and

20 that was also just regarding the user name and the

21 password.  What other -- what other individuals are

22 you aware of who violated the access control or key

23 and door controls policy?

24     A.      Mr. Litchfield.

25     Q.      How so?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 109 of 160

1      A.      And Tracey Battle and Dawana Riddick

2   because I had an opportunity with my computer one

3   day.  Vickie Race, the district assistant was trying

4   to help me and she couldn't help me with her sign

5   on.  She said here, let me sign in as Eric, it didn't

6   work.  She tried Tracey and then she tried Dawana so

7   she had all three of their sign ons.

8      Q.      A market assistant is a completely

9   different position than an invoice clerk, isn't that

10  right?

11     A.      No.

12     Q.      You're basing that on your own

13  perception and not on the company's expectations and

14  understanding?

15     A.      A sign on violation would be a sign on

16  violation.

17     Q.      But do you know if market assistants are

18  authorized to access the account of their market team

19  members?

20     A.      I do not know that.

21     Q.      So sitting here today you don't know if

22  Vickie Race actually violated the key and door

23  control policy or the access controls policy?

24     A.      Access controls I don't think she did

25  but I think Mr. Litchfield, Tracey Battle and Dawana

Huseby, Inc.                           www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 110 of 160

1  Riddick.

2      Q.     But again you testified that you don't

3  know if market assistants are authorized to obtain

4  the user names and passwords of their market team

5  members, right?

6      A.     I don't think I've ever seen that

7  written anywhere.

8      Q.     But you don't know one way or the other?

9      A.     No, I do not.

10      Q.     So you don't know one way or the other

11  if Eric Litchfield, Miss Battle or Mr. Riddick

12  violated the access controls policy?

13      A.     I'm not sure.

14      Q.     Aside from those individuals who you've

15  identified, anybody else who you believe violated the

16  access control policy or the key and door control

17  policy?

18      A.     Not at this time.

19      Q.     So who did you tell Noah Johnson and Art

20  Binder had violated those policies?

21      A.     I don't think I told them anyone.  I

22  just said that -- I asked for consistency search to

23  be done because I know I was not the only one doing

24  that to operate your store to best of your ability.

25      Q.     Aside from Noah Johnson and Art Binder

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 111 of 160

1  did anyone else witness your conversation with them?

2      A.     No, no, like I said, it was a Mafia

3  setting.  It was very strange.

4      Q.     Did you report the event to anyone?

5      A.     At that point I didn't know who to

6  report anything to.

7      Q.     Is that a yes or no?

8      A.     No.

9      Q.     Why not call ethics hotline?

10     A.     I was still in my mind just baffled and

11 trying to figure out what in the world is going on

12 and I didn't know what -- initially using that open

13 door policy and getting nowhere and essentially

14 getting lied to that he didn't know Mr. Litchfield

15 even though they eat breakfast on Saturdays I thought

16 where else can I go that someone is going to tell me

17 the truth and that's how I felt at that point.

18     Q.     Why not try the ethics hotline and

19 see -- that's another avenue, is it not, for lodging

20 complaints?

21     A.     The way I was being treated I didn't

22 feel that anybody at that point was going to be of

23 help to me because I've tried.

24     Q.     But that was just your belief, right?

25     A.     No, that's what was happening.

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 112 of 160

1    Q.    But you don't know what steps Mr. Simon,

2  for example, took to have your concerns investigated,

3  do you?

4    A.    After he didn't tell me the truth no, I

5  don't.

6    Q.    And actually, I didn't even tell

7  Mr. Simon that you believed that you were being

8  treated differently because of your age, did you?

9    A.    Didn't even get that far with it.

10   Q.    So there was no PD 19 or other

11  violation, policy violation, that you identified to

12  Mr. Simon as the basis for your complaint?

13   A.    Not by policy.  I was just explaining

14  the situation and essentially nothing happened.

15   Q.    Did you agree with the concerns that

16  Mr. Johnson had but just disagreed with how he

17  addressed them?

18   A.    I'm sorry?

19   Q.    Mr. Johnson expressed to you concerns

20  over your policy violations, correct?

21   A.    Mr. Johnson?

22   Q.    Noah Johnson?

23   A.    Noah Johnson at the hotel?

24   Q.    Correct.

25   A.    Just the sign on.

**Huseby, Inc.**                          **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 113 of 160

1      Q.      And during that conversation with

2   Mr. Johnson and Mr. Binder nothing about your age was

3   said, right?

4      A.      No.

5      Q.      On September 10th, 2009 you filed an

6   open door complaint, isn't that correct?

7      A.      If I go back through my records, yes.

8      Q.      Mark as Exhibit 35.

9      (Exhibit 35 was marked for identification.)

10  BY MS. SHAH:

11     Q.      Do you recognize this document?

12     A.      Yes.

13     Q.      And this is an email that you sent to

14  Eduardo Castro-Wright, Mike Duke, Bill Simon, Mike

15  Moore and David Carmon and Tom Heid; is that correct?

16     A.      Yes, that's correct.

17     Q.      And you don't state anywhere in this

18  document that it's your belief that any action has

19  been taken because of your age; is that right?

20     A.      Because of my age, at that point I

21  definitely felt like that, yes.

22     Q.      But where do you say I believe this has

23  happened because of my age?

24     A.      In the last section.

25     Q.      Where?

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 114 of 160

1       A.      Where it says a few associates

2   questioned me, well, my associates questioned me why

3   the market team was trying to fire me and I let -- of

4   course them know that yes, because I was, you know,

5   I'm one of those people that they were targeting as

6   being older.

7       Q.      But you don't say -- you say that some

8   associates questioned you about that, you don't say

9   that it's your belief, right?

10      A.      Well, that was the buzz word that that's

11  what the problem was because I was old, I was older

12  than everybody else and that they wanted the new face

13  of Wal-Mart.

14      Q.      But you don't say that this is because

15  that you believe this occurred because of your age?

16      A.      Correct.

17      Q.      And you don't mention in here that you

18  have been allegedly harassed, correct?

19      A.      I don't believe so.

20      Q.      And you don't mention anywhere in here

21  Mr. Litchfield's alleged kidnapping of you; is that

22  right?

23      A.      That's correct.

24      Q.      Did you get a response to this email?

25      A.      No, I don't believe I did.  And I say I

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 115 of 160

1      Q.      And does this refresh your recollection

2  from when you would have met with Mr. Magiver?

3      A.      I'm trying to recall, did I write this

4  when I was with him?  This is definitely my writing,

5  but --

6      Q.      It's dated October 14th, correct?

7      A.      Yeah, and I can't recall.

8      Q.      You didn't meet with him during your

9  leave of absence, right?

10     A.      I don't believe so, no.

11     Q.      So this probably would have been made

12  sometime within a couple of days after the

13  investigation with Mr. Magiver, correct?

14     A.      If those dates match, yes.

15     Q.      And in this letter to Mr. Magiver you

16  don't make any reference to any kind of harassment or

17  hostile work environment, do you?

18     A.      I didn't know who it was so no, I did

19  not.

20     Q.      Mr. Magiver didn't tell you that he was

21  a market human resources manager?

22     A.      No, I knew that, but I knew when he was

23  at Mr. Litchfield's office before he met with me I

24  figured what the roll out there was going to be.

25     Q.      Wouldn't it be common for Mr. Magiver to

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 116 of 160

1  want to speak with the individual who you are

2  accusing of disparate treatment?

3        A.      Yes.

4        Q.      Do you know who you sent Exhibit 39 to?

5        A.      I did so many of these I don't recall.

6        Q.      As you testified earlier you met on

7  November 9th with David Carmon, Noah Johnson and Art

8  Binder in the store; is that correct?

9        A.      Yes.

10       Q.      And at no time during your meeting with

11 them did Mr. Carmon, Mr. Johnson or Mr. Binder make

12 any comments to you about your or anybody else's age,

13 correct?

14       A.      No, I just got treated very differently.

15       Q.      And in fact, Mr. Carmon, Mr. Johnson and

16 Mr. Binder none of them ever made any comment that

17 you're aware of regarding your age or anyone else's

18 age, right?

19       A.      No.

20       Q.      Let's like to mark Exhibit 40.

21       (Exhibit 40 was marked for identification.)

22 BY MS. SHAH:

23       Q.      Do you recognize this document?

24       A.      Online coaching.

25       Q.      This is a copy of the decision making

Huseby, Inc.                                www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 117 of 160

1  document or I knew I would have been terminated

2  that's the one I did.

3       Q.     On that document did you write any

4  disagreements or disputes with the coaching?

5       A.     I'm sure I probably did.

6       Q.     But you don't have a copy of that

7  document?

8       A.     Probably at home in my file.

9       Q.     I will ask you to go through your files

10  and look for them because we have not seen a copy of

11  that document yet and it's critical.

12       A.     But it would be the same one that

13  Mr. Litchfield would have had because I was told to

14  sign that in his presence which I did because him and

15  Tracey Battle were there.

16       Q.     In the observations of associate's

17  behavior and performance there are at least four

18  policies that are the noted as having been violated,

19  isn't it that correct?

20       A.     What is that, I'm sorry?

21       Q.     In the observations of associate's

22  behavior and or performance section there are at

23  least four policy violations mentioned; is that

24  correct?

25       A.     Yes, that's what's on here, yes.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 118 of 160

1       Q.      And you've already admitted to me today
2  that you violated the access control and key and door
3  control policy and the statement of ethics, isn't
4  that true?
5       A.      From the very first start the password
6  and the keys yes, with Teresa Shanefelter, and I did
7  fundraising the same way for 17 years as I was
8  taught.
9       Q.      It was still a violation of company
10 policy, was it not?
11      A.      Then this would be correct.
12      Q.      Mark as Exhibit 41.
13      (Exhibit 41 was marked for identification.)
14 BY MS. SHAH:
15      Q.      Do you recognize this document?
16      A.      Yes.
17      Q.      What is this?
18      A.      Let me refresh my memory.  I guess this
19 would kind of be like a plan of action.
20      Q.      And if you compare it with the -- with
21 Exhibit 40 under the action plan it's the same
22 wording, is it not?
23      A.      Yes.
24      Q.      And in the action plan you don't dispute
25 any portion of your coaching, isn't that right?

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 119 of 160

1       A.      It wouldn't have made any sense to,

2   correct.

3       Q.      Do you know anyone who violated -- was

4   found to have violated at least the company policies

5   and was not issued a decision date?

6       A.      I don't know what other people have

7   done, I couldn't answer that.

8       Q.      So is that a no, you're not aware of

9   anyone?

10      A.      I'm not aware of anyone.

11      Q.      And Eric Litchfield had discussed with

12  you throughout 2009 issues concerning modulars,

13  merchandising, the IMS system, isn't that correct?

14      A.      He may have.

15      Q.      Did he or did he not?

16      A.      I'd probably say yes.

17      Q.      And as a result of the decision day you

18  weren't discharged, right?

19      A.      Not at that time, no.

20      Q.      And you weren't demoted?

21      A.      No.

22      Q.      And you didn't have a decrease in pay or

23  benefits?

24      A.      No.

25      Q.      And you didn't lose your position as a

Huseby, Inc.
www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 120 of 160

1  store manager?

2      A.     No.

3      Q.     Didn't lose any of your

4  responsibilities?

5      A.     No.

6      Q.     Didn't -- and you didn't apply for any

7  other positions following your decision day; is that

8  right?

9      A.     Apply for any other positions?

10     Q.     Positions, right.

11     A.     Within Wal-Mart?

12     Q.     Right.

13     A.     No.

14     Q.     You ever ask anyone if you could

15  transfer away from Mr. Litchfield's market?

16     A.     Yes.

17     Q.     Who did you ask?

18     A.     District manager Chris Mailer.

19     Q.     When?

20     A.     When I knew that what was going on and

21  he knew my capabilities where they weren't

22  appreciated where I was and the way I was being

23  treated so he said why don't you move here.  And then

24  I wanted to rescind my resignation and I was told by

25  Mr. Litchfield that that was not going to happen and

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 121 of 160

1  get you because of your age?

2       A.     No.

3       Q.     I'm going to show you what I'll mark as

4  Exhibit 42.

5       (Exhibit 42 was marked for identification.)

6  BY MS. SHAH:

7       Q.     Actually, going back to Exhibit 41, your

8  action plan, you state that you have enjoyed your 16

9  year, 9 month career; is that correct?

10      A.     Yes.

11      Q.     Why would you state that you've enjoyed

12  it if you're feeling harassed and bullied?

13      A.     Because I'm trying to keep my job to get

14  to February 1st.

15      Q.     Why February 1st?

16      A.     Because I figured I was going to be

17  terminated before February 1st and at that point I

18  would have lost my bonus.

19      Q.     And you weren't actually terminated

20  before February 1st, right?

21      A.     No, because I put my resignation in so

22  I'm sure they said good, we got rid of him so let's

23  let him fly until February 1st.

24      Q.     That's just your speculation?

25      A.     Speculation but I would say truth.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 122 of 160

1      Q.     Again, that's just your subjective

2   belief that they were trying to get rid of you,

3   right?

4      A.     Yes.

5      Q.     Do you recognize what's been marked as

6   Exhibit 42?

7      A.     Yes, this is the copy that I got with my

8   performance with my PIP.

9      Q.     Is this the document that you were

10  referring to before that you signed?

11     A.     Yes, that's correct.

12     Q.     Okay.  So it is possible that you did

13  review an electronic coaching and then this PIP in a

14  hard copy that you signed; is that right?

15     A.     Yes, a lot of that was a blur, I'm going

16  to be honest with you.

17     Q.     Okay.  And you didn't note on your

18  associate comments the last page, you don't dispute

19  the grounds for the PIP; is that correct?

20     A.     Signing this document if I would have, I

21  would have been terminated so it would not be the

22  right thing to do.

23     Q.     You would have been terminated if you

24  stated in the comments that you believed it was

25  discriminatory?

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 123 of 160

1      Q.      Uh-huh, what's the impact on your

2  employment of a PIP?

3      A.      What a PIP is is a personal improvement

4  plan.  It is what it is.

5      Q.      And so Mr. Litchfield was giving you

6  areas of opportunity and what you needed to do to

7  improve your performance, isn't that right?

8      A.      That's correct.

9      Q.      And the areas that are listed in the PIP

10 are areas that you're already supposed to be

11 performing well at in order to meet Wal-Mart's

12 expectations, isn't that right?

13     A.      Always had performed very well in all of

14 them.

15     Q.      Move to strike as non responsive.  Could

16 you repeat the question?

17     (Whereupon, the court reporter read back the

18 previous question.)

19     A.      Exactly, and I was.

20     Q.      And as we've testified in conjunction

21 with this PIP you were not discharged, right?

22     A.      That is correct.

23     Q.      You were not demoted?

24     A.      No.

25     Q.      You received no decrease in pay?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 124 of 160

1      A.      That's correct.

2      Q.      Didn't lose your job title or

3   supervisory responsibility?

4      A.      That's correct.

5      Q.      I want to refer you to what's been

6   marked as Exhibit 3.  This is your notice of intent

7   to retire, correct, Exhibit 3?

8      A.      I'm sorry?

9      Q.      I want to direct your attention to

10  what's been marked as Exhibit 3.

11     A.      Okay.

12     Q.      This is your notice of voluntary

13  retirement, right?

14     A.      Before I was terminated, correct.

15     Q.      And when you say before you were

16  terminated meaning that you retired because you were

17  afraid of being terminated?

18     A.      I was going to be terminated, that's

19  correct.

20     Q.      Because it was your belief that you were

21  going to be terminated, correct?

22     A.      When I was told the writing is on the

23  wall and different things that were said to me, yes,

24  most definitely.

25     Q.      And on November 23rd you were actually

**Huseby, Inc.**                              www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 125 of 160

1  informed that you weren't going to be terminated, but

2  that instead you would be given a decision day and a

3  PIP, isn't that right?

4       A.    That's correct.

5       Q.    But still I understand your testimony to

6  be that you retired because in your mind you still

7  thought that you could be terminated, right?

8       A.    I was going to be terminated, yes.

9       Q.    And this letter again doesn't mention

10  discrimination of any kind, right?

11       A.    That's correct.

12       Q.    Doesn't mention harassment of any kind?

13       A.    No.

14       Q.    Did you -- and you tried to rescind this

15  resignation, isn't that right?

16       A.    Yes, ma'am.

17       Q.    When was that?

18       A.    I have to look up the date, I'm not

19  sure.

20       Q.    Was it a month after, a week after, a

21  day after?

22       A.    Shortly after.  I don't want to tell you

23  wrong, shortly after.

24       Q.    What document would be able to refresh

25  your recollection about when you rescinded it or

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 126 of 160

1  evidence that your age played any role in any of the

2  decisions that we've discussed today?

3      A.    It does.

4              MR. NANNEY:  Objection.

5              THE WITNESS:  I'm sorry.

6              MR. NANNEY:  Go ahead.

7      A.    It does because I don't know what else

8  it would be.  I've gone through everything in my

9  mind, every document, my performance the way I've

10  treated people, everything, and I'm thinking what

11  could it be.  There's only one thing, I'm the oldest

12  person in the market, what in the world else could it

13  be.

14      Q.    Mr. Dutton, what document do you have

15  that gives any indication that any manager considered

16  your age in any employment decision regarding you?

17  Is there any document?

18      A.    No, but once again I can't figure what

19  in the world else it would be.

20      Q.    And you don't have any evidence from

21  anyone that Mr. Litchfield ever took your age into

22  account in any of the employment decisions that were

23  made, yes or no?

24      A.    No.

25      Q.    And you don't have any evidence that

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 127 of 160

1  Mr. Carmon considered your age in making whatever

2  employment decisions he made regarding you, do you?

3      A.    I don't know.

4      Q.    In fact, Mr. Carmon was pretty close to

5  your age, wasn't he?

6      A.    I don't know his age.

7      Q.    You don't have any evidence that Noah

8  Johnson considered your age in making any of the

9  decisions that he may have made regarding your

10 employment?

11     A.    Everything I heard throughout that time

12 that it was going on, old guard gone, new face,

13 Wal-Mart having a new face, all's could think of I

14 even looked myself duh, what else can I can it be, my

15 performance is perfect, my evaluations up to

16 Mr. Litchfield because he didn't know me, everything

17 was perfect, how in the world else could it be

18 anything else.  I couldn't with anything myself.  If

19 I did I would tell you right now.

20     Q.    But you -- you have no evidence tying

21 Mr. Litchfield, Mr. Binder, Mr. Carmon, Mr. Johnson

22 or anyone else who you've identified today as making

23 any of the comments that you've discussed about old

24 guard or getting rid of the old managers, that's all

25 people you don't even know who they are or they're

**Huseby, Inc.**                        **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 128 of 160

1              THE VIDEOGRAPHER:  On the record at 5:17.

2  BY MS. SHAH:

3       Q.    Mr. Dutton, did Mr. Litchfield conduct a

4  followup review to your PIP?

5       A.    Yes.

6       Q.    And that was on January 6th of 2010; is

7  that right?

8       A.    That sounds right.

9       Q.    Mark as Exhibit 43.

10      (Exhibit 43 was marked for identification.)

11 BY MS. SHAH:

12      Q.    Do you recognize this document?

13      A.    Yes.

14      Q.    And is this that followup to your PIP?

15      A.    Yes.

16      Q.    And Mr. Litchfield rated you as below

17 expectations; is that right?

18      A.    That is correct.

19      Q.    Did Mr. Litchfield go over this with

20 you,

21      A.    No, all's he mentioned was I was getting

22 marks below expectation because the outs in my store

23 which was not even on my PIP.

24      Q.    I'd like to refer you to Exhibit 42, the

25 last page on Exhibit 42 which is your initial PIP.

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 129 of 160

1      A.      A lady I couldn't remember her name last

2   night or last time we had talked about her name that

3   was her, I believe, Marlene Hunter when you had asked

4   me a question I couldn't produce the name.

5      Q.      Do you remember what context that was?

6      A.      You asked me about something who I

7   contacted and that name now rings a bell.

8      Q.      Mark this as Exhibit 45.

9      (Exhibit 45 was marked for identification.)

10     A.      She was a new human resource manager or

11  becoming a human resource person for the corporate

12  office.

13     Q.      So she worked in the home office?

14     A.      Yes, I believe that's where she was out

15  of.

16     Q.      Do you recognize this document?

17     A.      Yes.

18     Q.      Is this a true and accurate copy of the

19  letter that you submitted to Miss Hunter?

20     A.      Yes.

21     Q.      You do not identify in here any alleged

22  harassment that you believe you were subjected to, is

23  that true?

24     A.      You're saying I did not?

25     Q.      Correct.

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208
www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 130 of 160

1      A.     That is correct.

2      Q.     You even indicate in the second

3  paragraph towards the end it seems as though you're

4  saying that -- implying that Mr. Litchfield may have

5  been jealous or had hard feelings towards you because

6  you had applied for a market manager position, does

7  that -- am I reading that correctly?

8      A.     I was approved to be a market manager by

9  the president of the company which was Lee Scott,

10 Mike Duke and Eduardo Castro-Wright.  I was

11 interviewed by all three of them at Bettonville,

12 Arkansas.  Then all the divisionals, there were five

13 of us got interviewed.  Two of us got chosen and it

14 was not long after that then the market came open

15 where I was.  I applied and all I got was a thank you

16 and pretty much that was it.

17     Q.     You state that you believe that this

18 situation became known to my current market manager

19 Eric Litchfield and this was the beginning of an

20 unfavorable and hostile relationship with my market

21 team, do you see that?

22     A.     I was just treated so differently.  I

23 was trying to figure out every aspect, why would

24 someone be treating me like this and there again I

25 told you earlier I was trying to figure out what is

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 131 of 160

1  provoking all this.

2      Q.      And so one theory you had as stated in

3  this letter is that Eric Litchfield found out that

4  you had applied to become a market manager and for

5  some reason harbored ill will towards you for that.

6      A.      Could be because no one would level with

7  me what was going on, yes.

8      Q.      That's as good a theory as you had as

9  any at this point?

10              MR. NANNEY:  Objection, go ahead.

11     A.      I'm not sure.

12     Q.      What are you not sure about?

13     A.      You're asking me if the -- ask me that

14 question again, if you will, please.

15     Q.      This theory stated in the second

16 paragraph that Eric Litchfield began being hostile

17 towards you as a result of learning that you had

18 applied to become a market manager, you have as much

19 to support that theory as you do --

20     A.      That was my assumption correct because I

21 didn't -- I couldn't figure what was going on.

22     Q.      You state on the second page in the

23 second full paragraph that starts with "many of the

24 issues addressed" you state I have been accused of

25 not giving proper direction or providing leadership

**Huseby, Inc.**                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 132 of 160

1  to my associates.  I fail to understand this point as

2  well as I have 75 percent of this team with more than

3  ten years in the company and you go on to talk about

4  promoting managers.

5      A.      Uh-huh.

6      Q.      But you previously admitted and you had

7  admitted to your own manager that you had violated

8  company policies in a couple -- at least two to three

9  areas, isn't that right?

10     A.      With the sign on and the keys, yes.

11     Q.      And the statement of ethics as it

12  regarded the charitable contributions issues, isn't

13  that right?

14     A.      Doing contributions the same way for 17

15  years.

16     Q.      But you had admitted that how it had

17  been done for 17 years had violated company policy;

18  is that right?

19     A.      The way it's written, yes.

20     Q.      And part of your position as a store

21  manager and being a leader is to lead by example and

22  always show compliance with all policies, right?

23     A.      Yes.

24     Q.      So being accused of not giving proper

25  direction or providing leadership would actually be

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 133 of 160

1   accurate in light of your admitted policy violations,

2   isn't that correct?

3        A.     If you'll repeat that again, please.

4        Q.     So in light of your role as a store

5   manager and being required to lead by example and

6   your admitted policy violations it would be supported

7   that you had not given proper direction or provided

8   leadership for your associates supported by your own

9   actions?

10       A.     Those actions were me running the store

11  and that wasn't something that I taught, if that is

12  the question.

13       Q.     But you lead by example, correct?

14       A.     I most definitely lead by example.

15       Q.     And so as the store manager you're

16  required to comply with company policies and show

17  associates how to comply with company policies,

18  right?

19       A.     Yes, that's correct.

20       Q.     And so if there were several policies

21  that you had admittedly violated it would be accurate

22  to say that you had not given proper direction and

23  you had failed to provide that leadership for your

24  associates, isn't that right?

25       A.     Yes.

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 134 of 160

1    Q.    Did you ever get a response from Miss

2  Hunter?

3    A.    There was and she admitted to me she was

4  fairly new and I'm trying to think if I have a copy

5  or not what she sent back to me.

6    Q.    If you again could --

7    A.    Because I want to say then it went to

8  somebody else after her.

9    Q.    You don't remember who it went to after

10 her?

11   A.    It was a gentleman and I don't know --

12   Q.    Tim Langley?

13   A.    That may be it.

14   Q.    Do you know what steps were taken to

15 investigate your letter to Miss Hunter?

16   A.    No, I do not.

17   Q.    And you didn't mention in your letter to

18 Miss Hunter that you felt as though you had been

19 forced to retire; is that correct?

20   A.    I didn't, no, I did not.

21   Q.    And you also sent an open door to

22 Eduardo Castro-Wright and Bill Simon; is that

23 correct?

24   A.    That is correct.

25   Q.    And you didn't complain about harassment

Huseby, Inc.
1230 West Morehead Street, #408, Charlotte, NC 28208          www.huseby.com
(704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 135 of 160

1 from any of your managers in those letters; is that

2 correct?

3        A.    I didn't really feel that would do

4 anything, correct.  That is correct?  That is

5 correct.

6        Q.    You didn't complain that you felt like

7 you had been forced to retire?

8        A.    No.  That almost sounds like a

9 complainer and I was never a complainer.

10        Q.    Did Mr. --

11        A.    I was just trying to make what should be

12 right, right.

13        Q.    Did Mr. Simon respond to you?

14        A.    He called me.

15        Q.    When did he call you?

16        A.    I'm trying to think, I would have to

17 look that up to see if I have that record and then

18 like I said, there wasn't much credibility after that

19 when he had mentioned to me he didn't know who

20 Mr. Litchfield was after Mr. Litchfield had mentioned

21 several times how great it was having breakfast with

22 Bill Simon on Saturdays in New Bern.

23        Q.    Did you not believe Mr. Litchfield or

24 did you not believe Mr. Simon?

25        A.    At that point I did not believe

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 136 of 160

1        Q.      Is this a copy of the initial charge of

2    discrimination you filed with the EEOC against

3    Wal-Mart?

4        A.      Yes, it is.

5        Q.      You state halfway down in the narrative

6    throughout this period I was subjected to ongoing

7    remarks from Mr. Litchfield about my age and length

8    of service with the company.  If memory serves, you

9    testified that Mr. Litchfield made a comment about

10   Christmas ribbon candy and you liking that because of

11   your age or something to that effect?

12       A.      No, I'd be the only one that we would

13   recall that because of my age.

14       Q.      Okay.  And I can't recall any other

15   comments that Mr. Litchfield allegedly made about

16   your age, am I missing any?

17       A.      Just that I had been there for a long

18   time but kind of the way it was said.

19       Q.      But as we discussed, you had been there

20   for 16 years at that point, right?

21       A.      That's correct.

22       Q.      So the only age comment is the candy

23   related comment; is that correct?

24       A.      Yes.

25       Q.      Show you what will be marked as Exhibit

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 137 of 160

1  47 -- 48.

2       (Exhibit 48 was marked for identification.)

3  BY MS. SHAH:

4       Q.    Do you recognize this document?

5       A.    Yes.

6       Q.    And this -- what is this document?

7       A.    Looks like apparently one of the people

8  that I talked to throughout this hundred year

9  investigation.

10      Q.    You state on the second page towards the

11  bottom I believe that being threatened with imminent

12  termination is a form of harassment and constitutes

13  subjecting one to a hostile work environment, do you

14  see that?

15      A.    And that was the second page?

16      Q.    Yes, sir, paragraph number 2.

17      A.    Where it starts "I believe that being."

18      Q.    Yes, sir.

19      A.    Yes, uh-huh.

20      Q.    And you've testified today that

21  Mr. Johnson had talked to you about the writing is on

22  the wall which you took as a form of harassment.

23  What else are you contending in this litigation was

24  harassment?

25      A.    Harassment that I have a bead on your

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208     (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 138 of 160

1 head.

2      Q.     And that comment has nothing to do with

3 your age, correct?

4      A.     I'm not sure.

5      Q.     I mean nothing -- that statement could

6 equally apply to someone who is under 40, could it

7 not?

8      A.     I guess it could.

9      Q.     So bead on your head, the writing is on

10 the wall, what other acts do you contend were

11 harassment?

12     A.     Harassment being taken out of the store.

13     Q.     And again when you were taken out of the

14 store nothing regarding your age was said, correct?

15     A.     That's correct.

16     Q.     And you had opportunities to leave but

17 you chose not because you were afraid you would be

18 fired; is that correct?

19     A.     That's exactly correct.

20     Q.     So any -- what else do you claim

21 constitutes harassment?

22     A.     I guess when I'm called in my office and

23 told if I talk to anybody I'm going to be

24 terminated.  I mean, and me asking can someone please

25 enlighten me what is going on and just ignored, said

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 139 of 160

1  you'll be terminated if you talk to anybody.  How can

2  I run the store if I can't talk to anybody.

3      Q.    But they were referring to talk about

4  the investigation that you were under, were they not?

5      A.    They were talking about this and that's

6  when I asked what -- can you tell me what this is so

7  I can make sure I don't take about this.

8      Q.    But common sense would dictate that they

9  weren't telling you that you can't talk to associates

10 about anything, correct?

11     A.    This is the terminology that was used,

12 that word can't talk about this or be terminated.

13     Q.    But again it would be far fetched for

14 them to claim that you weren't allowed to speak to

15 your associates.

16     A.    I thought very far fetched.

17     Q.    And that day that they told you you

18 couldn't talk about this they informed you that you

19 had been the subject of an investigation, correct?

20     A.    They said they were doing an

21 investigation.

22     Q.    And as we discussed, it's within company

23 policy that investigations have to be kept

24 confidential, correct?

25     A.    Correct.

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 140 of 160

1      Q.      And so it would be -- people in an
2  investigation would be cautioned that they wouldn't
3  be allowed to talk about it for fear of discipline up
4  to and including termination, correct?
5      A.      Correct.
6      Q.      So aside from those four instances is
7  there anything that you contend was harassment?
8      A.      Nothing more than what we've talked
9  about already today.
10     Q.      What other -- we've talked about a lot
11 of things.  I want to know from you --
12     A.      7 months was totally
13 threatening,demeaning, bullying.  Everything we've
14 talked about today was threatening, demeaning,
15 bullying and I've never been treated like that in my
16 adult life.
17     Q.      And when you say 7 months you're just
18 referring to the investigations that were done?
19     A.      The investigations and leading up to me
20 get forced out because the morning of my leaving on
21 the 11th I called Tracey Battle and said Tracey,
22 being human resources I said okay, let me try another
23 person and I didn't figure I'd get anywhere and I
24 said Tracey, please tell me what I have done wrong to
25 deserve all this and she was like I don't know but

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 141 of 160

1  just keep doing those PIPs the way you're doing them

2  and at that point I knew it was done.

3      Q.    But she would have known you were

4  retiring that day, right?

5      A.    She -- I'll say she probably knew I

6  wanted to rescind my resignation and I'm trying to

7  recall if I shared that with her, yes, I did.  I

8  shared that with her and I don't know that she made a

9  comment.

10     Q.    What other instances of bullying can you

11 identify today aside from the four that you've

12 identified for me now, the writing on the wall

13 comment, the bead on your head, being taken out of

14 the store and told that you couldn't talk to do

15 people, what other instances of bullying do you

16 contend constitute your harassment claim?

17     A.    The behavior when I went for my followup

18 PIP.

19     Q.    What behavior?

20     A.    The behavior of Mr. Litchfield.

21     Q.    What did he do?

22     A.    Just very arrogant.

23     Q.    What did he say?

24     A.    After Tracey said it was great he says

25 well, you're still below standard.

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO   Document 96-2   Filed 08/28/13   Page 142 of 160

1      Q.      So you disagreed with his evaluation of

2   your performance?

3      A.      Yes.

4      Q.      Did Mr. Litchfield say anything else

5   other than he found your performance to be below

6   expectations?

7      A.      Just that it was because of my outs

8   which I did have the second lowest outs in the entire

9   market.

10      Q.      Did he say anything else?

11      A.      I don't believe so.

12      Q.      What else do you contend constitutes the

13   bullying and harassment?

14      A.      There again I guess I can say everything

15   we've talked about today from the beginning of

16   January to the day I left February 11th, the entire

17   episode throughout that time, everything.  It created

18   health problems and everything else so --

19      Q.      You had health problems before 2009, did

20   you not?

21      A.      Not like I had in 2009, no, nothing like

22   that ever.

23      Q.      So as you sit here today those are the

24   only instances that you can remember of bullying or

25   harassment?

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 143 of 160

1      Q.      You state that -- you also state that
2  you felt you had no other options at the time that
3  you left Wal-Mart; is that right?
4      A.      I was not in any mental state to do
5  really anything.  I don't even know if I went
6  outside.  I mean, it was -- it was a bad time.
7      Q.      But you had never complained to anyone
8  in writing at Wal-Mart that you believed you were
9  being subjected to any kind of harassment, correct?
10      A.      When I talked to people on the phone
11  yes.  Did I write down that I'm being harassed I told
12  several people from Marlene to now that you say
13  Mr. Langley, I told them all what had occurred and
14  nothing occurred.  Mr. Bill Simon, Max I'll come out
15  to the store, you know, I'll come and see, never
16  happened.  Contact Mike Duke, never contacted me
17  back.  Eduardo Castro-Wright never contacted me back.
18      Q.      But you never told any of --
19      A.      I was on my own.
20      Q.      You never told any of them that you
21  believed you were being harassed because of your age,
22  correct?
23      A.      I don't know that I said age, but I
24  couldn't figure any other reason why I was being
25  treated like that, and yes, I was the oldest person

**Huseby, Inc.**                          www.huseby.com
**1230 West Morehead Street, #408, Charlotte, NC 28208**       **(704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 144 of 160

1  in the market.

2       Q.     You also claimed that discussion in the

3  store was that Dawana Riddick, Tracey Battle and Eric

4  Litchfield had instructed associates on what to say

5  so that they could produce enough circumstantial

6  allegations to the regional vice president -- you

7  stated that the discussion heard around the store is

8  that Dawana Riddick, Tracey Battle, and Eric

9  Litchfield had instructed associates on what to say

10 so that they could produce enough circumstantial

11 allegations to the regional vice-president.  Do you

12 see that on -- in paragraph 7 in the middle?

13      A.     There was one of my associates that

14 overheard what was being done.

15      Q.     Who was that?

16      A.     That was Teresa Shanefelter.

17      Q.     Did Teresa report it to anyone?

18      A.     Yes.

19      Q.     Who did she report it to?

20      A.     She called the ethics hotline.

21      Q.     Do you know when she called the ethics

22 hotline?

23      A.     I do not know the date.

24      Q.     What did she hear?

25      A.     She was overheard telling associates

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 145 of 160

1  age discrimination because I couldn't figure what in

2  the world -- who would actually believe one person

3  making comments about a person with a 17-year career

4  that is filled with nothing but awards and accolades

5  and doing what Wal-Mart wanted me to do.

6       Q.    What comments did Miss Moore make that

7  were untrue?

8       A.    I don't think they were ever shared with

9  me other than from someone, two different girls that

10 she would hang it with.  One ended up being Kim Grant

11 who was asset protection.  The other one was Winona

12 Lightner (phonetic) who was an unachieving assistant

13 manager.  They would drink beer and was overheard at

14 the place where they would drink beer together that I

15 harassed them and that was brought to me by a

16 gentleman that does -- he owns like a garden center,

17 Kitty Hawk Garden Center.

18      Q.    Did any member of Wal-Mart management

19 ever physically threaten you?

20      A.    Like to do bodily harm?

21      Q.    Yes, threaten you --

22      A.    To do bodily harm?

23      Q.    Correct.

24      A.    I don't believe so.

25      Q.    What acts -- aside from the harassment

Huseby, Inc.                                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 146 of 160

1      A.      Did what?  I'm sorry.

2      Q.      That the company improperly kept

3  Mr. Litchfield as a manager over you; is that

4  correct?

5      A.      Improperly kept as a manager over me.

6      Q.      The claim is called negligent retention

7  and supervision.  It's included in your complaint.

8      A.      The way I was treated, yes, yes.  And

9  then I know immediately after I was forced out of the

10  store it's funny that they quick took him to another

11  area and got him away from there.

12      Q.      Took you -- took him to another area?

13      A.      He went to another market.

14      Q.      At that time though that was all due to

15  a market realignment company wide, right?  This had

16  nothing to do with Mr. Litchfield specifically?

17      A.      If that's what you're saying, yes.

18      Q.      And you have no knowledge that the

19  company moved Mr. Litchfield because of any associate

20  complaints or any reason, you don't know why the

21  company reassigned Mr. Litchfield's market?

22      A.      No, I do not.

23      Q.      What -- are you aware of any other

24  associate complaints against Mr. Litchfield?

25      A.      Not at this time.

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 147 of 160

1      Q.      And again Mr. Litchfield was new to the

2  company when he began as a market manager over your

3  market in March of 2009, correct?

4      A.      Correct.

5      Q.      And you never complained in writing that

6  Mr. Litchfield had harassed you unlawfully, correct?

7      A.      I wasn't a complainer, no.

8      Q.      Are you aware of any other associates

9  who complained about Mr. Litchfield?

10     A.      No.

11     Q.      I think we're about done.  I just wanted

12  to ask you some questions regarding your damages, if

13  I may.  What damages are you alleging that you

14  suffered in this lawsuit?

15     A.      Well, definitely economic damages.  You

16  know, I planned to have a long career as I look at

17  myself still as a young person and I planned to work

18  a long time, and the other parts I don't know that I

19  could even put a number on them.

20     Q.      At some point in this lawsuit you'll

21  have to put a number on those non economic damages as

22  I'm understanding you to say.  What would enable you

23  to valuate those damages?

24             MR. NANNEY:  Objection, answer if you can.

25     A.      I don't even know.

Huseby, Inc.                    www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 148 of 160

1      A.      And my previous supervisors.

2      Q.      But it's not necessarily

3  Mr. Litchfield's perspective that you performed well,

4  correct?

5      A.      That's what I'm being told, yes, and

6  that's what I was told from the beginning.

7      Q.      Do you have any evidence to support that

8  anyone at Wal-Mart acted with an intent for you to

9  have severe emotional distress?

10     A.      Repeat that, please.

11     Q.      Do you have any evidence to support that

12 anyone at Wal-Mart acted with an intent to cause you

13 emotional distress?

14     A.      No.

15     Q.      Do you have any evidence to support that

16 anyone at Wal-Mart acted recklessly knowing that they

17 could be causing you emotional distress?

18     A.      Yes, from June to February 11th, yes.

19     Q.      What circumstantial evidence do you have

20 that supports that they knew and disregarded there

21 was a risk they could be causing you emotional

22 distress?

23     A.      My medical records, and even when I was

24 taken by ambulance to the hospital not even

25 contacted, very non caring.  And it was a pretty --

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 149 of 160

```
 1                IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                        EASTERN DIVISION

 3
     BRUCE BANNISTER, et al.,        :     Civil Action No.
 4
                     Plaintiff,      :     4:11-CV-00094-BO
 5
          vs.                        :
 6
     WAL-MART STORES, INC., et al., :
 7
                     Defendant.      :
 8

 9

10

11

12                            VOLUME II

13              VIDEOTAPE DEPOSITION OF MAX DUTTON

14                      (Taken by Defendant)

15                    Raleigh, North Carolina

16                    Friday, May 31, 2013

17

18

19

20

21

22

23
                     Reported in Stenotype by
24                   Marian E. Cummings, LSR
          Transcript produced by computer aided transcription
25
```

**Huseby, Inc.**                              **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 150 of 160

**BRUCE BANNISTER, ET AL. vs. WAL-MART STORES, INC., ET AL.**
**Max Dutton on 05/31/2013**

Page 362

1  like it's a series of questions about your education,

2  your experience, and then it goes through and kind of

3  towards the end asks you a series of questions, for

4  example, criminal convictions, how many jobs you've

5  held, that sort of thing.  Do you remember responding

6  to those documents or those questions at any point

7  during the application process?

8      A.    Yes.

9      Q.    And do these -- as best as you can tell,

10  and if you need a minute to scan through that's fine,

11  do these accurately reflect the answers that you gave

12  on -- gave to these questions?

13      A.    Pertaining to all or a particular page?

14      Q.    All the questions.  I mean, if

15  anything -- if you'd like a minute to look through

16  and if anything jumps out at you as incorrect, let us

17  know, but otherwise, if it was accurate, if you could

18  let me know.

19      A.    Just skimming through them to the best

20  of my knowledge they're answered correctly, I guess.

21  I mean, I'm just skimming through them to best of my

22  knowledge.

23      Q.    Okay.  Oh, I apologize.  Sorry,

24  continue.

25      A.    To the best of my knowledge at this time

1  without taking probably substantial time to look

2  through them I -- you know, they're Harris Teeter

3  documents.

4      Q.     And so you have no reason to question

5  the authenticity of the information contained in this

6  document?

7      A.     Not at this time.

8      Q.     Great, and I apologize, I didn't mark

9  this as an exhibit.  I'd like to mark this as Exhibit

10  49.

11      (Exhibit 49 was marked for identification.)

12  BY MS. SHAH:

13      Q.     Mr. Dutton, the last time you and I

14  spoke, you had referenced some correspondence that

15  you believed you had received from Dr. Mann regarding

16  a referral to a psychologist based on what you

17  believe he had observed as you being depressed.  Do

18  you recall that testimony?

19      A.     Yes, I do.

20      Q.     Were you able to find that

21  correspondence since we last met?

22      A.     I have not.  He actually wrote a

23  prescription for me to see a psychologist and I think

24  I had it in my briefcase and I know I was not able to

25  do that at that time because I checked, my wife

Huseby, Inc.                              www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 152 of 160

1  checked, actually, with our insurance company and it

2  would not have been covered to the extent that I

3  would have needed it to be.

4      Q.      Did you at any time make any effort to

5  see a medical professional or a psychologist without

6  charge or based on a patient's inability to pay?

7      A.      I did not.  I was just following my

8  doctor's referral or wanted to follow my doctor's

9  referral.

10     Q.      Did you ever call a psychologist to see

11  if he had any programs or plans set up for patients

12  who are unable to afford his fees?

13     A.      My wife being a nurse, she was handling

14  that for me.  I gave her the okay to speak for me

15  since it would probably fall under the HIPAA rules or

16  laws, and she was probably a little upset with me

17  that I decided I wasn't going to do that only because

18  of what the expense would have been.

19     Q.      Do you know if your wife contacted a

20  psychologist to ask about services for -- that, you

21  know, any assistance he could provide in light of

22  your inability to pay?

23     A.      I don't think she asked for any

24  assistance.  She just checked on exactly what it

25  would cost or how much they would -- how much my

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208          (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 153 of 160

1  insurance would cover.

2      Q.      And Mr. Dutton, you've not been

3  medically diagnosed with any kind of neurosis; is

4  that correct?

5      A.      Any type of what?  I'm sorry.

6      Q.      Neurosis.

7      A.      As far as you're saying a psychological

8  condition?

9      Q.      Correct.

10     A.      Just Dr. Mann knowing that I was very

11  depressed.

12     Q.      And that was Dr. Mann noticing that you

13  were depressed and referring you to a psychologist

14  for further evaluation and a medical diagnosis; is

15  that correct?

16     A.      That is correct.

17     Q.      Had you been diagnosed with any type

18  of -- and medically diagnosed, I should clarify.

19  Have you been medically diagnosed with any other type

20  of severe and disabling emotional or mental

21  condition?

22     A.      No.

23     Q.      And aside from what we spoke about

24  Dr. Mann, have you seen any other doctor or health

25  care provider for treatment of embarrassment,

**Huseby, Inc.**
**www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208**        **(704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 154 of 160

1  humiliation, or any other mental or emotional anguish

2  that you claim was caused by Wal-Mart?

3      A.    No, just Dr. Mann.  I was actually too

4  embarrassed to go anywhere else.

5      Q.    And so Dr. Mann is the only physician

6  that you've seen for any alleged injuries stemming

7  from the lawsuit and the actions complained of in

8  that complaint?

9      A.    As far as with the condition that I'm

10  suffering from today, yes.

11      Q.    What other conditions have you suffered

12  from that you believe were caused by Wal-Mart's age

13  discrimination?

14      A.    The age discrimination probably just

15  emotional distress, and as much as I hate to say

16  because I'm not like that, anger and --

17      Q.    Have you ever been diagnosed with any

18  previous mental or emotional conditions before this

19  lawsuit ever arose?

20      A.    No.

21      Q.    At any time?

22      A.    No, I have not.

23      Q.    Have you ever seen a psychiatrist,

24  psychologist or counselor before your resignation

25  from Wal-Mart?

**Huseby, Inc.**                              **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 155 of 160

1      Q.      Sorry.  And can you hear me okay?

2      A.      Yes, let me just listen very closely.

3      Q.      Have you -- the last time we spoke, you

4  were going to review your records to see the amount

5  of any out-of-pockets costs for medical services that

6  you've had since leaving Wal-Mart and so what I was

7  asking is have you been able to reach a determination

8  as to how much out-of-pocket costs you've expended

9  for medical services since you left Wal-Mart?

10      A.      No, I do not have that figure.

11      Q.      Have you been prescribed at any point in

12  your lifetime any type of antidepressant medication?

13      A.      I believe Dr. Mann prescribed something

14  for me one time telling me I needed to relax a little

15  bit more.

16      Q.      Do you remember what medication that

17  was?

18      A.      I want to say it was Ativan and I did

19  not like taking it; it made me entirely too tired.

20      Q.      And Dr. Mann prescribed you Ativan, do

21  you remember when that was?

22      A.      No, I don't because once again, I did

23  not like taking it.

24      Q.      I'd like to mark as Exhibit 50 the

25  records relating to Dr. Mann, so that would begin at

Huseby, Inc.                        www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 156 of 160

1   Mann 195 and the last one in the stack I believe

2   would be 305, and that should be about ten pages.

3          (Exhibit 50 was marked for identification.)

4   BY MS. SHAH:

5          Q.      Mr. Dutton, have you seen these

6   documents before that have been marked as Exhibit 50?

7          A.      Yes.

8          Q.      What are these documents?

9          A.      It looks like prescriptions written from

10  my doctor.

11         Q.      And that doctor is Dr. Mann; is that

12  correct?

13         A.      That is correct.

14         Q.      And is it accurate to say that these

15  prescriptions span a period of from 1996 to about

16  2004?

17         A.      Yes.

18         Q.      And these prescriptions concern

19  prescriptions for the drug Ativan, Restoril, Xanax,

20  Clonazepam and Ambien; is that correct?

21         A.      Yes.

22         Q.      And those are used to treat -- what was

23  your understanding of what those drugs were used to

24  treat for you?

25         A.      He was trying to help me get some better

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 157 of 160

1  rest at night.  I didn't -- I would have restful

2  nights and I wouldn't have restful nights back in

3  this time frame.

4      Q.     And some of these are anti-anxiety

5  medications as well; is that correct?

6      A.     All's I recall he was trying to make --

7  trying to ensure I was getting a good night's sleep.

8  I would only take it before bedtime.

9      Q.     And you had been diagnosed with sleep

10  apnea in 2007; is that right?

11      A.     Yes, uh-huh.

12      Q.     So that -- it's your testimony that

13  that's what these were to combat?

14      A.     Yes.

15      Q.     Aside from these medications, have you

16  been prescribed any type of anti-anxiety medication

17  at any time?

18      A.     No.

19      Q.     Do you have any plans to see any

20  psychologist, psychologist, counselor or any other

21  doctor regarding your alleged depression at any time

22  in the future?

23      A.     Yes, I know I need to.

24      Q.     Have you selected a physician or

25  psychologist or psychiatrist or counselor?

**Huseby, Inc.**                                    **www.huseby.com**
**1230 West Morehead Street, #408, Charlotte, NC 28208    (704) 333-9889**
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 158 of 160

1      A.      When I'm -- if and when I'm able to, I
2  will probably follow Dr. Mann's recommendation.
3      Q.      Why are you not able to see the
4  counselor or someone else at this point?
5      A.      I was following who my doctor told me to
6  see and then, of course, like I had mentioned, it
7  wasn't covered through my insurance, Cigna, and for
8  my family I had a concern about that just straight
9  out of pocket because it is very expensive.
10     Q.      Did you ask anyone else that you know
11 for any kind of referrals or recommendations
12 regarding any psychologist, psychiatrist, or
13 counselor?
14     A.      No, probably totally too embarrassed to.
15     Q.      And your wife is a nurse; is that
16 correct?
17     A.      That is correct.
18     Q.      Did you ask if she knew anybody just by
19 virtue of her profession, any psychologist,
20 psychiatrist, or counselor?
21     A.      Of embarrassment I've asked her not to
22 do that.
23     Q.      Notwithstanding your claims of emotional
24 distress, you were able to fulfill your duties as a
25 county commissioner; is that right?

**Huseby, Inc.**
www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208        (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 159 of 160

 1        A.      Yes, with difficulties, yes.

 2        Q.      And notwithstanding your claims of

 3   emotional claims, you were also to fulfill your

 4   duties as an assistant manager at Harris Teeter,

 5   isn't that right?

 6        A.      I've forced myself to do that daily.

 7        Q.      And you've had great attendance at

 8   Harris Teeter, isn't that your previous testimony?

 9        A.      That is correct.

10        Q.      Mr. Dutton, what amount of economic

11   damages are you seeking?

12        A.      I'm not a greedy person, but I tell you,

13   I think that that would be best decided by the court

14   system and a jury.

15        Q.      But you won't put a number on it?

16        A.      I can't even imagine what that number

17   would be.  I don't -- like I said, I'm not greedy but

18   I can't imagine -- the turmoil in my life, I don't

19   know what price you put on where I'm at today.

20        Q.      And I'm only asking, Mr. Dutton, I

21   apologize if it wasn't clear, about economic damages.

22   You had -- at the last session of your deposition we

23   had talked about economic damages that would be

24   related to back pay, for example, the difference

25   between maybe what you are earning at Harris Teeter

Huseby, Inc.                          www.huseby.com
1230 West Morehead Street, #408, Charlotte, NC 28208      (704) 333-9889
Case 4:11-cv-00094-BO    Document 96-2    Filed 08/28/13    Page 160 of 160