IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:11-CV-00094-BO

| | |
|---|---|
| BRUCE BANNISTER; MAX DUTTON; and MARION TOWLES;<br><br>Towles,<br><br>vs.<br><br>WAL-MART STORES EAST, L.P.,<br><br>Defendant. | **APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING MAX DUTTON'S CLAIMS** |

D

**Declaration of Eric Litchfield**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF NORTH CAROLINA
# EASTERN DIVISION

| | |
|---|---|
| BRUCE BANNISTER; MAX DUTTON; AND MARION TOWLES;<br><br>Plaintiffs,<br><br>vs.<br><br>WAL-MART STORES EAST, L.P.,<br><br>Defendant. | Civil Action No. 4:11-CV-00094-BO |

## DECLARATION OF ERIC LITCHFIELD

I, Eric Litchfield, declare and state as follows:

1. I am 46 years of age and in all respects competent to provide this sworn Declaration. I am a resident of New Bern, North Carolina and make this Declaration voluntarily. The facts contained in this Declaration are based on my personal knowledge and, if called and sworn as a witness, I could and would testify competently to the facts below. I am submitting this Declaration in support of Walmart's Motion for Summary Judgment as to Plaintiff Max Dutton.

### Employment Background

2. I have worked at Walmart since September 27, 2008. I was hired as a Developmental Market Manager but became a Market Manager soon after I was hired, on March 28, 2009. At that time, I became the Market Manager over Market 486, which included Store #2000 in Kitty Hawk, North Carolina and 12 other stores in that geographic area. The plaintiff in this action, Max Dutton, served as the Store Manager over Store #2000, and I directly supervised him during the entirety of my tenure over Market 486. As such, I am familiar with

Max Dutton, the plaintiff in this action. The office for the Market 486 team at the time was located in Greenville, North Carolina. Prior to joining Walmart, I served in the U.S. Marine Corps from 1988 until I retired in 2009. At the time of my retirement, I was a Major.

3. In February 2010, Walmart realigned its operations, and, as a result, I became the Market Manager over Market 302. This Market did not include Store #2000, but, regardless, Mr. Dutton was no longer employed by Walmart at that time. Thus, I supervised Mr. Dutton from March 2009 to February 2010.

4. In my position as the Market Manager over Market 486, I was responsible for operations and financial results of 12 Stores, which included 2 "Division 01" Stores and 10 Supercenters.[1] This comprised nearly 4,000 Associates (i.e., Walmart employees) and 175 managers.

## Walmart Policies, Procedures and Store Organization

5. The reporting structure of Walmart's store operations while I was the Market Manager over Market 486 was generally as follows: hourly store Associates reported to salaried store-based managers, including Assistant Store Managers ("ASMs"), Co-Managers (now called Shift Managers) and Store Managers.

6. Above the store-level, the Store Managers reported to Market Managers; the Market Managers reported to Regional General Managers and, in some cases (like mine), a Regional Director of Operations; and the Regional General Managers reported to Divisional Vice Presidents.

7. Since the Store Manager is the highest-level Associate in a Walmart Store, he or she is ultimately responsible for everything that occurs in the Store. One of the Store Manager's

---

[1] As I testified during my deposition, a "Division 01" Store is a Walmart Store that sells general merchandise. By contrast, a Walmart "Supercenter" has a grocery store as well and typically a larger sales volume.

crucial functions is to serve as a "servant leader" and lead the Store Associates by example. This includes being familiar with, following, and providing accurate direction as to every Walmart policy. In my opinion, a Store Manager who does not follow policies and/or does not ensure that his or her Associates are following policies is not meeting my or Walmart's expectations. Nor is a Store Manager who is not adhering to all of his or her job duties, including those identified in the job description. That being said, there are numerous other ways that a Store Manager can fail to meet Walmart's or my expectations.

8. Store Managers are also required to ensure that the Store and all of its Associates are complying with wage and hour laws; failing to do so is grounds for termination. This is echoed in Walmart's Working Off the Clock Policy (PD-15), a true and correct copy of which is attached hereto as Exhibit 1, which requires the Store Manager to ensure that Associates are properly compensated or risk disciplinary action up to and including termination. Walmart takes this Policy seriously and trains its Associates (including managers) on it during their employment.

9. Walmart's Coaching for Improvement Policy (PD-30) is designed to inform an Associate when he is not meeting the requirements and expectations of his position. A true and correct copy of the Coaching for Improvement Policy in effect the last year of Mr. Dutton's employment was attached to Mr. Dutton's deposition transcript as Exhibit 11. During the relevant time period of this lawsuit, this Policy, which acts strictly as a guide, contemplated four levels of disciplinary action that an Associate could receive, depending on the severity of the infraction committed: (1) Verbal Coaching; (2) Written Coaching; (3) Decision-Making Day; and (4) Termination. Under this Policy, managers have discretion to deviate from the progression of steps and/or skip steps in the Coaching process when the circumstances of an

Associate's misconduct or poor performance warrant the same. For example, immediate termination is appropriate under the Policy where an Associate engages in "gross misconduct," which includes inappropriate conduct, rude and abusive conduct towards an Associate, or where a salaried member of management either directed, knew or should have known that an hourly Associate worked without being properly compensated. This Policy does not include an exhaustive list of the grounds for which Associates can be "Coached" or even immediately discharged. No level of Coaching affects Associates' pay or job duties, nor is a Coaching a demotion.

10. In addition to issuing a Coaching, another option available to salaried members of management whose performance needs improving is a Personal Improvement Plan ("PIP"). As I testified during my deposition, PIPs are development tools. PIPs are given when: (1) an Associate's overall evaluation rating is Below Expectations or Development Needed, (2) an Associate is rated Below Expectations or Development Needed on four or more competencies, and/or (3) independent of an annual evaluation, there is a decline in the Associate's performance in a critical area of the business, failure to meet Company standards or comply with Company policies and/or failure to deliver or execute results.

11. Typically, after I issue an Associate a PIP, I will meet with the Associate in approximately 30 days to review his improvement and issue a "Follow-Up" PIP rating. In certain situations, however, this time period is flexible. For example, after I issued Mr. Dutton a PIP in November 2009, he took a leave of absence the next month, in December 2009. As such, I waited until January 2010 to meet with Mr. Dutton and hold his first follow-up review session. Since Mr. Dutton's voluntary resignation was effective at the beginning of February 2010, I did

not see the need to hold a second "follow-up" meeting in February to review his progress, if any, on the PIP.

12. Walmart encourages charitable giving and contributions, and it (and I) encourage the Stores to meet certain goals related to fundraising for various charitable organizations. However, neither a Store nor any Associate faces any penalties for failing to meet the same. Walmart has implemented policies that govern and dictate the parameters of charitable giving and volunteerism in the workplace and vis-à-vis Walmart's suppliers/vendors. One such policy is Walmart's Volunteerism and Charitable Contributions Policy. A true and correct copy of the version of this Policy in effect during the relevant time period is attached hereto as Exhibit 2. One of the key provisions of this Policy is that Stores and Associates cannot solicit suppliers for charitable organizations or communicate with suppliers about charitable events. I have never provided direction to anyone to violate Company policy in order to meet fundraising goals, to perform his or her job or do anything otherwise in connection with employment.

13. Walmart's Statement of Ethics provides the foundation for Associates to make ethical, sound decisions in conducting business. Failing to adhere to the Statement of Ethics, or any of Walmart's Three Basic Beliefs (i.e., Respect for the Individual, Service to Customers and Strive for Excellence) is grounds for disciplinary action, up to and including termination.

### Investigation Concerning Max Dutton

14. In Spring 2009, Market Human Resources Manager ("MHRM") Tracey Battle informed me that then-Asset Protection Coordinator, Kim Grant, had contacted her and asked if she could provide Ms. Battle's contact information to a former ASM at Store #2000, Tonja Moore, who wanted to lodge a complaint. Ms. Battle told me that she confirmed for Ms. Grant

5

that Ms. Moore should contact her (Ms. Battle). Ms. Battle also informed me that she later spoke with Ms. Moore, who made allegations regarding Mr. Dutton.

15. According to Ms. Battle, Ms. Moore and Ms. Grant reported that Associates at Store #2000 were afraid to speak out against Mr. Dutton for fear of retaliation and that Ms. Moore had resigned because of Mr. Dutton's behavior toward her. Ms. Moore told Ms. Battle that Mr. Dutton had made an inappropriate poster of Ms. Moore regarding her diet and that he had provided her with a copy of a diet plan.[2] Additionally, Ms. Battle stated that there were allegations that Mr. Dutton was improperly using his hourly Invoice Clerk, Teresa Shanefelter, more like a salaried member of management. According to Ms. Battle, Ms. Moore and Ms. Grant told her that Mr. Dutton had provided Ms. Shanefelter with keys to the Store and with his (Mr. Dutton's) confidential computer sign-on information to assist him with his work; these are not part of the role of the hourly Invoice Clerk.

16. Ms. Battle subsequently informed me that she had spoken with additional Associates who had echoed Ms. Moore's and Ms. Grant's statements, including those regarding Ms. Shanefelter and the general fear-filled atmosphere at Store #2000. Ms. Battle also told me that she had spoken with her supervisor, then-Regional Director of Human Resources Melody Fogarty (who Walmart records show is now age 44 and was age 41 when Mr. Dutton's resignation was effective), regarding the extent of an investigation that should be done into these claims. Ms. Battle stated that she intended to interview a large cross section of managers at Store #2000 to be sure to get a complete and accurate idea of what had occurred and what conduct Mr. Dutton may have engaged in. I agreed with that course of action, especially in light

---

[2] During my review of Ms. Battle's investigation, described below, I saw a copy of the poster Mr. Dutton admittedly made of Ms. Moore, which had a picture of her face with the prominent caption, "I DON'T LIKE PROTEIN. I LIKE TO BE SICK," as well as the diet plan he provided to her. These standing alone appeared to me to constitute gross misconduct under Walmart's Coaching for Improvement Policy and Respect for the Individual tenet.

of the already-corroborated allegations against Mr. Dutton. Ms. Battle also told me that she and Ms. Fogarty had decided that Mr. Dutton should not be in the Store during the interviews, since a central allegation "against" him was that the Associates feared him and feared retaliation if they ever spoke out against him. I agreed with this approach as well.

17. Ms. Battle, Market Asset Protection Manager Dawana Riddick (who Walmart records show is now age 40 and was age 36 when Mr. Dutton's retirement was effective) and I traveled to Store #2000 on June 12, 2009 so that Ms. Battle could conduct the investigation in person (with Mr. Riddick as a witness). Collectively, Ms. Battle, Mr. Riddick and I decided that, upon our arrival to Store #2000, I would ask Mr. Dutton to travel with me to visit competitors and another Walmart Store so that Mr. Dutton would not be in the Store during the interviews. My role, as assigned to me by Human Resources, was to ensure that Mr. Dutton was not in the Store during these Associate interviews. It is routine for the subject of an investigation to be removed from the Store where an investigation is occurring, so as to allow all individuals interviewed to feel comfortable and able to speak openly. To that end, after Ms. Battle told Mr. Dutton that she and Mr. Riddick were conducting an investigation in the Store that day, I asked Mr. Dutton to accompany me to visit competitors' stores, and he agreed to do so. I did not order Mr. Dutton to get into my car, I did not use threats of any kind, nor did I touch Mr. Dutton or use physical force against him whatsoever. I actually enjoyed my time with Mr. Dutton that day. We shared pleasant conversations, including his telling me a story about the times that Andy Griffith would shop in Store #2000, we visited competitors' stores; we had lunch in Elizabeth City and we went to the Walmart in Elizabeth City. I never told Mr. Dutton or implied to him that he was not free to leave, and he could have left at any time. Until this lawsuit was filed, I

7

had never heard from anyone, including Mr. Dutton, that they believed I had engaged in any inappropriate behavior by having Mr. Dutton travel with me during this day.

18. During the course of Ms. Battle's investigation, I was kept apprised of what was occurring and what allegations were being made as to Mr. Dutton. This included that Associates had reported that Mr. Dutton had knowingly allowed – and perhaps directed – a non-Walmart Associate to assist Walmart with Store fundraising initiatives on numerous occasions and without being compensated. To that end, I was aware that then-Regional Asset Protection Director Art Binder (who Walmart records show is now age 63 and was age 60 when Mr. Dutton's retirement was effective) spoke with Mr. Dutton in July 2009 about these allegations due to the potential wage and hour violations and ethical concerns, but I did not know details regarding their conversation at the time nor attempt to influence the direction of their meeting. I did, however, subsequently receive a copy of Mr. Binder's investigation.

19. I understand that Mr. Dutton claims that I informed him that Ms. Battle and Mr. Riddick had "botched" their investigation discussed above in paragraphs 14 through 18. I never made such a statement to Mr. Dutton. Instead, Mr. Dutton had repeatedly asked me how much longer the investigation would take to complete. In turn, I responded to Mr. Dutton that it was a complicated investigation and that I understood his frustration with the time it took.

20. When Mr. Binder got involved, and due to the increasingly severe allegations (which included potential wage and hour violations, ethics violations and potential confidentiality and other problems due to Ms. Shanefelter's improper "role" in the Store), I believe the investigation then became the responsibility of the Regional team (i.e., the level of supervision above me). At this time, the Regional team included Ms. Fogarty, Mr. Binder, then-Regional Director of Operations Noah Johnson (who Walmart records show is now age 38 and

8

was age 35 when Mr. Dutton's retirement was effective) and then-Regional General Manager David Carmon (who Walmart records show is now age 53 and was age 50 when Mr. Dutton's retirement was effective). Thus, at around this time, Ms. Battle's (and the rest of the Market 486 team's) involvement in the investigation significantly lessened, if not stopped altogether.

21. In August 2009, I learned that a "red store visit" was going to be conducted at Store #2000 to inquire about Associate engagement (i.e., Associate morale). This visit was to be conducted by MHRMs for other Markets, Adoncia Spann and Marie DeBarros. It was my understanding that this visit was spurred by numerous Associates' claims to Ms. Battle (in the investigation(s) discussed above in paragraphs 14 through 18) that they felt as though the Store had an intimidating environment. Aside from being told this visit was occurring, I played no role in it being held.

22. In early September 2009, one of my supervisors, Mr. Johnson, asked me to review the notes from Ms. Battle's investigation, from Mr. Binder's meeting with Mr. Binder and from Ms. Spann's and Ms. DeBarros' Store visit, prepare a summary of them and recommend a course of action to other members of the Regional team.

23. As such, in early September 2009, I reviewed the above-referenced investigation files pertaining to Mr. Dutton and/or Store #2000, as requested by Mr. Johnson. Specifically, I reviewed the conclusions of Ms. Spann/Ms. DeBarros and Mr. Binder, the investigators'/managers' notes of the interviews, the interviewees' written statements and any other documents that were relevant and discovered during the course of the investigations. I then prepared a summary of the investigations' findings, synthesizing all of the findings contained therein. A true and correct copy of the summary I prepared is attached hereto as Exhibit 3.

9
Case 4:11-cv-00094-BO    Document 96-29    Filed 08/28/13    Page 10 of 19

24. I concluded that these investigations corroborated that Mr. Dutton had done the following, or at least knew that the following were occurring without rectifying the inherent policy violations: created an environment of intimidation and fear of retribution; allowed Ms. Shanefelter to act as a salaried member of Management even though she was an hourly Associate, including by allowing her to have a copy of the Store keys and his computer sign-on information, attending salaried-member-of-management-only meetings and other tasks outside her job duties;[3] had either directed or allowed a non-Walmart Associate, Art Glidden, to collect funds for the Children's Miracle Network on Walmart property and while posing as a Walmart Associate (i.e., in Walmart dress code and wearing a Walmart name badge); solicited donations from vendors servicing Store #2000; hosted an improper raffle at the Store; asked an hourly Associate to falsify a Walmart document from the First Quarter Unbeatable Excellence Review on or about April 21, 2009, in order to make himself look better; created a hostile work environment in threatening Associates with firing and other punitive actions for not doing what he asked; and improperly questioned several Associates about statements made during the investigations.

25. As a result of these findings and my conclusions, I determined that Mr. Dutton violated **several** Walmart policies, including its Statement of Ethics, Key and Door Controls Policy, Access Control Policy, Solicitation and Distribution of Literature Policy, Working Off the Clock Policy, Volunteerism and Charitable Contributions Policy, Prizes and Awards Policy, Discrimination/Harassment Prevention Policy, Workplace Violence and Coaching for

---

[3] I am not aware of any other Store Managers whom I have supervised who provided an unauthorized Associate with access to his or her confidential computer sign-on information. I understand that Mr. Dutton claims that Turner Thompson and Robert Marchbanks, the Store Managers over the Greenville, North Carolina and Ahoskie, North Carolina Stores, respectively in 2009 and 2010, violated the Access Control Policy by providing an hourly Associate with their computer sign-on information. I was not aware of this occurring, or of any Store Manager doing so aside from Mr. Dutton. Additionally, Mr. Thompson (who is now the Store Manager for Store #2000) is, per Walmart's records, 44 years of age and was age 40 when Mr. Dutton's retirement was effective, and Mr. Marchbanks is, per Walmart's records, 48 years of age was age 45 when Mr. Dutton's retirement was effective.

Improvement Policy, not to mention his job duties. As a result of my conclusions, I ultimately recommended to Mr. Johnson in the summary (which I sent to him) that Mr. Dutton be discharged for his repeated policy violations.

26. In October 2009, I was contacted by a then-Regional Human Resources Senior Director, Jeff McIver. Mr. McIver informed me that Mr. Dutton had utilized the Open Door process, and Mr. McIver asked me to send him a copy of the files I had reviewed in preparing my summary for Mr. Johnson. On October 13 and 14, 2009, I sent Mr. McIver these documents, as well as the summary that I prepared.

27. Mr. McIver also asked me some questions to which I provided responses. For example, Mr. McIver asked me if I had ever directed my Store Managers to "do whatever it takes to raise funds for CMN [Children's Miracle Network]." I informed Mr. McIver that, while I may have used emphatic wording to get my point across that charitable fundraising was important, it **never** was my guidance to violate policy for fundraising (i.e., solicitation of vendors) or at any other time. In fact, as I pointed out to Mr. McIver, no other Store Manager took my direction to mean that he or she should violate policy in fundraising or anything else. I explained to Mr. McIver that, since I had been in Market 486, I had been clear in my guidance that all Associates must follow and comply with all Walmart policies and guidance.

28. Additionally, Mr. McIver asked if I had ever told Mr. Dutton that the reason the investigation conducted by Ms. Battle and Mr. Riddick was taking so long was because they (Ms. Battle and Mr. Riddick) had "botched" it. I denied ever making the statement. Instead, as I explained to Mr. McIver, Mr. Dutton, on almost a weekly basis, asked me how much longer the investigation would last. I repeatedly responded to Mr. Dutton that the investigation was complicated and that I understood his frustration with the time it took. At no time did I imply or

state that Ms. Battle or Mr. Riddick had improperly conducted the investigation or otherwise "botched it."

29. Mr. McIver never provided me with any substantive details regarding Mr. Dutton's Open Door, nor would I expect him to. Open Doors and any related investigations are expected to be kept confidential and not disclosed with anyone except those who need to make decisions regarding the same.

### Mr. Dutton's Decision-Making Day Coaching and PIP

30. I did not make the decision to issue Mr. Dutton a Decision-Making Day Coaching and PIP. Rather, I was simply instructed by Mr. Johnson that the Regional team had made that decision and that Ms. Battle and I were going to issue the same to Mr. Dutton. I worked with Regional team members (Mr. Johnson, Ms. Fogarty and Mr. Carmon) and my Human Resources Market-level counterpart (Ms. Battle) in drafting, revising and/or finalizing the Decision-Making Day Coaching and PIP that we ultimately issued to Mr. Dutton.

31. Ms. Battle and I met with Mr. Dutton on or about November 20, 2009 to issue him the Decision-Making Day Coaching. A true and correct copy of the Decision-Making Day Coaching that we issued to Mr. Dutton is attached hereto as Exhibit 4. During this meeting, Ms. Battle and I reviewed with Mr. Dutton that Walmart concluded that he had admitted to engaging in conduct which violated Walmart's Key and Doors Control and Access Control policies in providing keys and computer sign-on information to Ms. Shanefelter, violated the Statement of Ethics in the manner in which he raised money for CMN, that he sent mixed messages to Associates through various Company initiatives, and that he had shown a lack of "Respect for the Individual." I made clear to Mr. Dutton that he was not being discharged, but, instead was going to be getting a "second chance" to improve his conduct. I also informed Mr. Dutton that

we would be coming to his Store in a few days, on November 23, 2009, to formally issue him a PIP. At no time during this meeting – or ever – did Mr. Dutton deny to me that he had engaged in the conduct for which we were Coaching him.

32. When we met with Mr. Dutton on November 23, 2009 to issue him the PIP, he provided me and Ms. Battle with a document at the beginning of the meeting. I did not review this document at that time. Instead, I went ahead and reviewed the PIP with Mr. Dutton. A true and correct copy of the PIP that we administered to Mr. Dutton is attached as Exhibit 5. Mr. Dutton's PIP focused on his need to improve in the areas of People Leadership, Associate Engagement and Execution of Company Policies/Procedures. The main focus of the PIP was ensuring that Mr. Dutton would adhere to policies and procedures in light of his previous problems with the same, as uncovered during the investigations. That being said, the PIP also mentioned other deficiencies with respect to his Store management. I had discussed these other areas of opportunity with Mr. Dutton on previous occasions, and I had kept the Regional team apprised of these as well through my regular "recaps." Nonetheless, but for Mr. Dutton's policy violations as uncovered during the investigations, it is my understanding that Mr. Dutton would not have received a PIP – or even a Coaching – at that time. I had no plans to do so before this arose. Like at his Coaching meeting, during this PIP meeting, Mr. Dutton did not dispute the grounds of the PIP. I also made clear to Mr. Dutton at this meeting that Walmart was not terminating his employment as a result of his misconduct.

33. Toward the end of the meeting, I reviewed the note that Mr. Dutton had provided to us at the beginning. In it, Mr. Dutton stated that he was voluntarily retiring from Walmart and that he enjoyed his time with the Company. A true and correct copy of the letter Ms. Battle and I received from Mr. Dutton was attached to Mr. Dutton's deposition transcript as Exhibit 3. After

13

reviewing this letter, I reiterated to Mr. Dutton that he was not being discharged, and Ms. Battle and I both asked him if he was sure that he wanted to retire and whether he wanted more time to consider his resignation. Mr. Dutton held firm and stated that he wanted to resign, but he also praised Walmart and his tenure with the Company.

34. During this meeting, Mr. Dutton also provided Ms. Battle and me with a copy of his Action Plan in response to his Decision-Making Day Coaching.[4] A true and correct copy of this Action Plan that we received is attached hereto as Exhibit 6. Nowhere in this Action Plan does Mr. Dutton deny his misconduct.

35. From December 5 to December 15, 2009, Mr. Dutton requested, and Walmart approved, a medical leave of absence.

36. On or about December 16, 2009, when I was visiting Store #2000 and after Mr. Dutton had returned from his leave of absence, Mr. Dutton asked if Walmart might allow him to rescind his resignation. Mr. Dutton had recently returned from a leave of absence and told me that he no longer wanted to retire because he "loved" Walmart. I replied that the Company had already accepted his resignation, so I was not sure whether he could rescind it. I further told Mr. Dutton that I would have to partner with the Regional team to determine this answer.

37. Shortly after receiving this request, I informed Ms. Battle, Mr. Johnson and Ms. Fogarty of the same. Since the Regional team had made the decision to issue Mr. Dutton the Coaching and the PIP, I expected Mr. Johnson or the Regional team to make the decision regarding whether Mr. Dutton would be allowed to rescind his resignation and continue working at Walmart. At some point, I spoke with Mr. Johnson who told me that the Regional team had decided not to allow Mr. Dutton to rescind his resignation.

---

[4] An Associate who receives a Decision-Making Day Coaching must provide a written plan of action to his supervisor (who must approve same) as to how he will improve his performance and comply with policies.

38. On January 7, 2010, Ms. Battle and I met with Mr. Dutton to review his First PIP Follow-Up. Although Mr. Dutton had made some improvements in the areas noted in his PIP, he had not improved in every area. When rating a PIP, it is my understanding that, if the individual has not improved in every area noted on the PIP, that individual should receive a "Below Expectations" score on the PIP. Thus, I gave Mr. Dutton a "Below Expectations" rating on this First PIP Follow-Up, a true and correct copy of which was attached to Mr. Dutton's deposition transcript as Exhibit 43. During this meeting, I explained the grounds for the rating, which Mr. Dutton did not dispute. I plainly informed Mr. Dutton that, despite this rating, Walmart was not terminating him. I reminded him that Walmart had already accepted and would be honoring his voluntary retirement, and that Walmart was allowing him to continue working through his prior, agreed-upon notice period. During the meeting, I further informed Mr. Dutton that Walmart was not allowing him to rescind his resignation.

39. I became aware sometime after the PIP Follow-Up meeting that Mr. Dutton had used the Open Door process. That Open Door review was supervised by then-Regional Human Resources Director Marlene Hunter (39 at the time). In January 2010, Ms. Hunter requested that I provide her with information supporting my contention that Mr. Dutton had not met expectations on his PIP Follow-Up as it related to "outs."[5] On January 18, 2010, I explained to Ms. Hunter in an email that Store #2000 had trended above the Market average in Out of Stocks during the entire period leading to the PIP Follow-Up. The only other Division 1 Store in my Market, Store #1950, had lower outs than Store #2000 during the entire period. A true and correct copy of that email to Ms. Hunter is attached hereto as Exhibit 7.

---

[5] Items that are out-of-stock on a store's shelves are also known as "outs." Walmart wants to be sure that the items a store carries are available on the shelves in our stores – not just in the backroom. As such, one component of a store's performance is its level of "outs," particularly as compared to stores within the same Market.

40. In February 2010, Walmart Global Investigator Tim Langley (stationed in the Home Office in Arkansas) contacted me and asked to speak with me regarding Mr. Dutton's Open Door Complaint. I spoke with Mr. Langley on or about February 4, 2010, and I summarized our conversation in a written statement shortly thereafter. A true and correct copy of that statement is attached hereto as Exhibit 8.

41. Ms. Hunter subsequently informed me that Walmart had closed the investigation into Mr. Dutton's Open Door and that Walmart upheld the decision not to allow Mr. Dutton to rescind his resignation. A true and correct copy of the correspondence I received from Ms. Hunter wherein she so informed me is attached hereto as Exhibit 9.

42. At no point in time did I believe that Mr. Dutton was susceptible or otherwise prone to emotional distress. Instead, I always found Mr. Dutton to be very mentally tough. I was unaware that Mr. Dutton suffered from any emotional distress; in fact, the only medical issues regarding Mr. Dutton of which I was aware was deep vein thrombosis.

## Staffing at Store #2000

43. During my tenure as Market Manager over Market 486, I recall Mr. Dutton requesting additional ASMs at Store #2000. Walmart posted requisitions for ASM positions at Store #2000 frequently throughout 2009 to assist Mr. Dutton in attracting and retaining quality ASMs, but ASM positions for that Store were often difficult to fill. In fact, Store #2000 lost four ASMs in early 2009. Mr. Dutton once acknowledged to me that he had a hard time attracting talent due to the cost of living near the Store. I frequently worked with Ms. Battle to determine ways to assist Mr. Dutton, and we had success adding ASMs to Store #2000. However, any issues with Store staffing were due to high turnover and difficulty attracting qualified applicants – not because of any discriminatory or improper motives by Walmart. Nonetheless, from July to

16

Case 4:11-cv-00094-BO    Document 96-29    Filed 08/28/13    Page 17 of 19

October 2009, Store #2000 hired approximately three ASMs to resolve any staffing concerns by Mr. Dutton.

**Response to Mr. Dutton's Lawsuit Allegations**

44. I understand that Mr. Dutton is alleging, in the above-captioned lawsuit, a claim of age discrimination against Walmart based on alleged harassment from me, the Decision-Making Day Coaching and PIP he received, and based on his resignation. That is totally untrue for several reasons.

45. First, I am over 40 years of age and was at all times that I supervised Mr. Dutton. I did not know Mr. Dutton's age at the time, nor was his age a factor in any aspect of his employment under my supervision. Upon having reviewed his personnel information in conjunction with this lawsuit, I see that Mr. Dutton was born in March 1954 and was 55 years old at the time he retired from Walmart.

46. Second, I have never treated anyone differently because of their age, race or the like. I do not recall ever making any comments to anyone about their age, including Mr. Dutton, and I certainly have never done so in a manner that was intended to be offensive. Nor do I currently recall making any comments to Mr. Dutton about placing a "bead on his head."

47. Lastly, I was not a decision-maker with respect to any actions taken regarding Mr. Dutton's employment. However, I firmly believe that the investigations, by and large, corroborated that Mr. Dutton engaged in the misconduct identified in his Decision-Making Day Coaching and that he was appropriately held accountable for the same.

48. I further understand that Mr. Dutton claims that Walmart based its employment decisions with respect to him on a 2005 memorandum authored by Susan Chambers. I am only aware of this memorandum through this lawsuit. I have never read this memorandum and did

17
Case 4:11-cv-00094-BO     Document 96-29     Filed 08/28/13     Page 18 of 19

not take this memorandum into consideration as to Mr. Dutton in any fashion. Indeed, I could not have done so since I had no idea of the existence of the memorandum until Walmart's counsel mentioned it to me in conjunction with defending this lawsuit..

49. I also understand that Mr. Dutton claims in this lawsuit that Walmart negligently retained and/or supervised me. Aside from the claims present in this lawsuit, I am not aware of any complaints of discrimination or other unlawful conduct that have ever been lodged about me.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed this 27th day of August, 2013, in ~~Jacksonville~~, NC

_____
Eric Litchfield

Firmwide:122673195.1 015602.7843