IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

Civil Action No. 4:11-CV-00094-BO

| | |
|---|---|
| BRUCE BANNISTER; MAX DUTTON; and MARION TOWLES;<br><br>Towles,<br><br>vs.<br><br>WAL-MART STORES EAST, L.P.,<br><br>Defendant. | **APPENDIX TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT REGARDING MAX DUTTON'S CLAIMS** |

**G**

**Declaration of Adoncia Span**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION

| | |
|---|---|
| BRUCE BANNISTER; MAX DUTTON; AND MARION TOWLES;<br><br>Plaintiffs,<br><br>vs.<br><br>WAL-MART STORES EAST, L.P.,<br><br>Defendant. | Civil Action No. 4:11-CV-00094-BO |

## DECLARATION OF ADONCIA SPANN

I, Adoncia Spann, declare and state as follows:

1. I am 46 years of age and in all respects competent to provide this sworn Declaration. I am a resident of Hope Mills, North Carolina. I make this Declaration voluntarily. The facts contained in this Declaration are based on my personal knowledge and, if called and sworn as a witness, I could and would testify competently to the facts below. I am submitting this Declaration in support of Walmart's Motion for Summary Judgment as to Plaintiff Dutton.

### Employment Background

2. I have worked at Walmart since April 2009, and I have worked as a Market Human Resources Manager ("MHRM") the entirety of my employment with Walmart. I am currently the MHRM for Markets 301 and 302. I have never been the MHRM over Store #2000 in Kitty Hawk, North Carolina, where Max Dutton served as the Store Manager.

3. In my position as an MHRM, I am responsible for, among other things, conducting or assisting with investigations into Associates' concerns and conducting or assisting with "red store visits." One type of "red store visit" is specifically designated to examine any

"Associate engagement" concerns. Walmart specifically defines "Associate engagement" as when Associates consistently say positive things about Walmart, they have a desire to stay with the Company, and they strive to give the extra effort that contributes to customer satisfaction. One of the Company's key initiatives is to improve Associate engagement, and one way that Walmart achieves this goal is by conducting red store visits to improve this area in stores where problems with Associate engagement have been noted. Walmart believes that improving Associate engagement begins by showing Associates that Walmart and management care about them. As such, Walmart believes that it must first give the Associates a positive visual impact by having clean stores, clean restrooms, clean break rooms, equipment that works and Associates in dress code. One way this is examined is by conducting a facility assessment review. Occasionally, I will conduct or witness such an investigation or store visit in other Markets.

4. I have had an opportunity to review the notes and conclusions from the "red store visit" that I attended with another MHRM at the time, Marie DeBarros (who Walmart records show is now age 46 and was age 43 when Mr. Dutton's resignation was effective).[1] As such, I can provide the information below after having an opportunity to refresh my memory. I certify and aver that the attached Exhibit 1 through 4 are true and accurate copies of the investigation notes, statements, summaries and other documents compiled during the course of the store visit that I attended with Ms. DeBarros and in the ordinary course of business. (Although some of the witness statements are difficult to read, these are the best copies we have on file.)

### Visit to Store #2000 and Implications as to Mr. Dutton

5. In August 2009, Ms. DeBarros was my designated trainer as an MHRM. As such, whenever she was in North Carolina conducting an investigation or performing any other human

---

[1] I was relatively new to Walmart at this time. As such, Ms. DeBarros officially led the visit, while I assisted her and observed the proceedings, including at least half (probably more) of the interviews. Ms. DeBarros no longer works for Walmart.

resources-related function, she would let me know so I could attend. I believe that Ms. DeBarros reached out to me in August 2009 to let me know that I was to attend a store visit with her that month for Store #2000 in Kitty Hawk due to reported poor Associate morale.

6. As such, on or about August 19, 2009, Ms. DeBarros and I visited Store #2000 in Kitty Hawk, North Carolina.[2] The purpose of this visit was to check Associate engagement and determine ways to improve the same. It was my understanding that the Associates at Store #2000 were not happy with the Store Manager, Max Dutton (the plaintiff in this action), but I did not know any details as to why. During a store visit regarding issues with Associate engagement, the manager(s) leading the visit determines the needs of the facility management team and the Associates at the facility and evaluates ways to improve communication lines between them in hopes of creating a better working environment. Additionally, during such a visit, the manager(s) conducting the visit also review various areas of the Store for compliance with Walmart policies and procedures, such as whether job postings are utilized correctly for all areas of the store, whether all Associate evaluations have been reviewed and keyed on time, and so forth.

7. Ms. DeBarros adhered to these standards in conducting the store visit at Store #2000. For example, as witnessed by Exhibit 1, we evaluated no fewer than 35 areas of human resources- and morale-related compliance with Walmart-established protocols. (Exhibit 1 is a true and correct copy of an email that I received from Ms. DeBarros and which summarized our review at Store 2000 in conjunction with this visit.) These categories are part of a pre-determined set of assessment areas that Walmart specifically sets for store visits involving "Associate Engagement" concerns. For example, a true and correct copy of an e-mail I received

---

[2] Other members of the Market team, including then-Market Electronics Manager Calvin Minnifield and then-Market Fashion Merchandising Manager Debra Boykin, were present during the visit.

from Ms. DeBarros regarding the criteria for the store visit – and the email's attachments – are attached hereto as Exhibit 2.

8. One aspect of a "red store" visit pertaining to Associate engagement issues, among others, is to speak with Associates and determine the needs of the Store and any outstanding issues. To that end, during our visit, approximately 25 Associates were interviewed about any concerns they had with the Store. (*See* Exhibit 3, which is a true and correct copy of an email that I received from Ms. DeBarros regarding the store visit, including attachments that contained true and accurate witness notes and statements.) Many of the Associates expressed their beliefs that they could not take advantage of the Open Door process out of a fear of retaliation from Mr. Dutton, as well as a lack of confidentiality concerning the same. Additionally, our visit confirmed numerous other problems at Store #2000.

9. The interviews during the store visit uncovered that Store #2000 had serious problems with fears of retaliation, threats and intimidation arising from investigations and Associates' refusal to comply with certain improper directives of Mr. Dutton. (*See* Ex. 3.) Additionally, we discovered that an hourly Invoice Clerk, Teresa Shanefelter, improperly had a set of Store keys and Mr. Dutton's computer sign-on information, and that Mr. Dutton's user ID and password had been used to modify Ms. Shanefelter's time entries on several occasions, including one in which Ms. Shanefelter was alleged to have used Mr. Dutton's user ID and password to correct her own (i.e., Ms. Shanefelter's) time records. Moreover, Associates expressed concerns that Mr. Dutton and Ms. Shanefelter regularly had lunch alone together. As such, that created at least the appearance of an inappropriate relationship between the two of them. Numerous Associates also stated that Mr. Dutton and the management team regularly made negative comments about their superiors (the Market team) in front of Associates,

including that they are "lazy" and asking if the MHRM over the Market at the time, Tracey Battle, was "on drugs." Finally, one witness told us that Mr. Dutton had, on at least one occasion, spoken to her about work off-the-clock and without compensation. I also recall that we learned that Mr. Dutton had a non-Walmart Associate come to the Store and inappropriately raise money there for Walmart to donate to a charity.

10. Ms. DeBarros and I collaborated on preparing the conclusions of our visit, which included extensive findings regarding Mr. Dutton. A true and correct copy of the conclusions of our visit as to Mr. Dutton is attached as Exhibit 4. The findings contained in these conclusions mirrored what witnesses told us during our visit. Additionally, Exhibits 1 and 3 previously referenced in this Declaration contain the true and correct findings of our visit (which did not all pertain directly to Mr. Dutton).

11. Ms. DeBarros and I believed that the witnesses with whom we spoke during our visit demonstrated that Mr. Dutton had engaged in the following inappropriate acts:

    a. Managed through intimidation;

    b. Failed to protect Company assets by securing his computer sign-on information and keys to the building;

    c. Directed the solicitation from vendors to raise money in the store;

    d. Had Associates campaign for his publicly-elected position as a County Commissioner by handing out information regarding his campaign when they thought, instead, they were only volunteering on Walmart's behalf for a "Relay for Life" walk;

    e. Modified Ms. Shanefelter's time entry records (but not that of other Associates) on numerous occasions;

f. Regularly had lunch alone with Ms. Shanefelter offsite;

g. Made negative comments about the Market team in front of hourly Associates;

h. Talked to hourly Associates off the clock without compensating them for the time;

i. Requested Associates to falsify documents to make him and the Store look more favorable than they really were;

j. Engaged in rude treatment – slammed doors and made negative comments – to and in front of hourly Associates; and

k. Had interrogated Associates about their statements during a confidential investigation.

12. As a result, Ms. DeBarros and I concluded that Mr. Dutton had violated the following policies, for which we recommended termination:

a. Key and Door Controls Policy

b. Access Control Policy

c. Statement of Ethics: intentional dishonesty; no retaliation; wage and hour; gifts and entertainment; personal relationships; political involvement; showing favor

d. Rude/Abusive Behavior toward Associates, which is considered "gross misconduct" and grounds for immediate termination under Coaching for Improvement Policy.

e. Harassment/Inappropriate Conduct, which is considered "gross misconduct" and grounds for immediate termination under Coaching for Improvement Policy.

f. PD-43: Working Off the Clock

g. PD-48: Workplace Violence/Intimidation

13. Although Ms. DeBarros and I recommended that Walmart discharge Mr. Dutton for his actions, it is my understanding that Mr. Dutton was not discharged. Following this red store visit, however, I had no further involvement in issues regarding Mr. Dutton.

14. Ms. DeBarros never told me that she believed any part of the store visit was improperly motivated, improper in and of itself, or had anything to do with Mr. Dutton's age. Nor did I hear Ms. DeBarros communicate that to Mr. Dutton or anyone else. In fact, I never heard anyone reference Mr. Dutton's age or otherwise imply that Mr. Dutton was being treated differently by anyone because of his age.

## Response to Mr. Dutton's Lawsuit Allegations

15. I understand that Mr. Dutton is alleging, in the above-captioned lawsuit, a claim of age discrimination against Walmart based, in part, on the red store visit that Ms. DeBarros and I conducted.

16. First, Ms. DeBarros and I are both over 40 years of age and were at the time that we conducted the store visit at Store #2000. (I was 42 years of age and Ms. DeBarros was 43 years of age as of February 2010 (when I understand Mr. Dutton's retirement took effect). Nor did I know Mr. Dutton's age at the time, and his age was not a factor in any aspect of the investigation process. Nor were the ages of any of the witnesses remotely relevant when I listened to them and evaluated their credibility. There was absolutely no reason for me to inquire

about such facts.

17. Second, it has been my experience that red store visits are helpful whenever Associate engagement is an issue. Based on the Associates with whom we spoke, Store #2000 had one of the more extensive Associate engagement problems I have seen at a Store.

18. Lastly, I was not a decision-maker with respect to any actions taken as to Mr. Dutton's employment. However, I firmly believe that the investigation by and large corroborated that Mr. Dutton had violated numerous Walmart policies.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Signed this 23rd day of August, 2013, in NC.

*Adoncia M. Spann*
Adoncia Spann

Firmwide:122670772.1 015602.7843